IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE UNITED STATES OF AMERICA, ex rel., MICHAEL T. BROOKS,

    Plaintiff-Relator,

    v.

TRILLIUM COMMUNITY HEALTH PLAN, INC., AGATE RESOURCES, INC. and LANE INDIVIDUAL PRACTICE ASSOCIATION, INC,

    Defendants.
_____

Case. No. 6:14-cv-1424-MC

OPINION AND ORDER

    Relator Michael Brooks brings this False Claims Act case against his former employers and their alleged alter egos. Brooks alleges defendants double billed the United States for medical services, discriminated against sick (and therefore expensive) individuals, and violated anti-kickback statutes. Judge Aiken dismissed the First Amended Complaint with detailed instructions on how Brooks could cure the deficiencies. ECF No. 63. Because the Second Amended Complaint provides no timely representative examples, and fails to include any timely examples with sufficient particularity required for fraud claims, defendants' motion to dismiss, ECF No. 73 is GRANTED.

1—Opinion and Order

**BACKGROUND**

Brooks worked as a database administrator for defendant Agate Resources, Inc. from 2005 until September 27, 2013. Brooks alleges he was fired in retaliation for blowing the whistle on defendants' fraudulent activities related to Medicaid and Medicare billings. Brooks brings False Claims Act claims against all three defendants: Agate, Lane Individual Practice Association (LIPA), and Trillium Community Health Plan.

In 2007 (at the latest), Brooks started to have some concerns about defendants' practices. Brooks quietly took his concerns to the Oregon Attorney General. Around that time, Brooks also copied thousands of files at the request of government authorities. Brooks includes some of those files, or data from those files Brooks turned into spreadsheets, as exhibits filed under seal in support of his Second Amended Complaint (SAC). Brooks points to the exhibits as representative examples supporting his claims.[1] As explained below, Brooks's representative examples are all time-barred. After the authorities essentially sat on Brooks's complaints, Brooks raised his concerns again in 2012. Again, the authorities did nothing and Brooks was terminated in 2013, allegedly in retaliation for going to the authorities.

Brooks essentially brings three types of claims under the False Claims Act. First, Brooks alleges defendants double-billed, or overbilled, the government. Second, Brooks alleges defendants violated anti-kickback statutes by providing shares of stock to doctors in exchange for referrals. Third, Brooks alleges defendants compiled lists of expensive employees to sell to employers. As explained below, all of these claims are time-barred.

---

[1] As pointed out by defendants, it is unclear what the exhibits are or show. Brooks does not really explain the exhibits and does not say the exhibits are files from defendants or information Brooks or an expert compiled. Brooks does not even identify the alleged expert who allegedly reviewed the files.

## STANDARD OF REVIEW

To survive a motion to dismiss under rule 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

While considering a motion to dismiss, the court must accept all allegations of material fact as true and construe them in the light most favorable to the non-movant. *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

The False Claims Act bars Brooks from bringing any claim:

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b).

In addition to satisfying the statutes of limitations and repose, all claims under the False Claims Act are subject to heightened pleading standards for fraud claims. *United States v. United*

3—Opinion and Order

*Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). This means the plaintiff-relator "must state with particularity the circumstances constituting fraud." *Id.* (quoting Fe. R. Civ. P. 9(b)). To satisfy this heightened pleading standard, the plaintiff must provide specific factual allegations describing "the who, what, when, where, and how of the misconduct charged." *Id.* (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

In dismissing the First Amended Complaint, Judge Aiken provided detailed instructions for Brooks to correct the deficiencies in his complaint. Specifically, Judge Aiken stated:

> At this stage, however, the fact that all plaintiff's representative examples occurred outside the statutes of limitations and/or repose represents a pleading deficiency rather than a bar to relief as a matter of law. As discussed above, Rule 9(b) pleadings must include the "who, what, when, where, and how" of the alleged misconduct. The First Amended Complaint broadly refers to activity throughout relator's employment with defendants, from 2005 to 2013. It also refers to "more than 200,000 possible instances of duplicated billing data" obtained in discovery. Compl. ¶ 30. The problem is not that relator failed to allege violations within the statutes of limitation and/or repose–it is that he failed to do so *with sufficient particularity*. Representative examples are one way of meeting the particularity requirement. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010). But here, the representative examples cannot cure the particularity deficiencies of the Complaint because the vast majority of them are time-barred by the statute of repose. Relator may remedy this problem by providing timely representative examples or by otherwise amending the Complaint to include particularized allegations within the statutes of limitation and repose.

April 29, 2016 Opinion, 6-7 (footnotes omitted), ECF No. 63.

In discussing "timely representative examples," Judge Aiken noted:

> Because section 3731(b) bars actions commenced either six years after the violation was committed or three years after the date when the "*qui tam* plaintiff knows or reasonably should have known the facts material to his right of action," whichever occurs later, *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1217-18 (9th Cir. 1996), any representative examples that occurred on or after September 3, 2008 are timely. Whether representative examples that occurred between September 3, 2004 and September 2, 2008, are timely depends on when relator knew or reasonably should [have] known the material facts for his claims. That issue is not before the Court in its consideration of this Motion.

April 29, 2016 Opinion, 7 at n.2., ECF No. 63.

4—Opinion and Order

Brooks filed the original complaint on September 3, 2014. ECF No. 3. The 10 year statute of repose bars claims arising on or before September 3, 2004. § 3730(b). The timeliness of claims between September 3, 2004 and September 3, 2008 depends on when Brooks reasonably should have known of the facts supporting the claim. *Id.* In examining the SAC and Brooks's own declarations, it is clear he did not, and cannot, provide "timely representative examples" or "particularized allegations within the statutes of limitations and repose." Because this deficiency is fatal to Brooks's claims, I need not discuss defendants' other arguments.

## I. OVERBILLING CLAIMS

Brooks alleges defendants overbilled the United States with Medicaid and Medicare double billings. Exhibit B to the SAC contains Brooks's representative examples detailing the alleged overbilling. The spreadsheets show two bills on the same day for the same patient for the same procedure.[2] At this stage, I assume the documents show what Brooks argues they show.

In addition to overbilling, Brooks argues exhibit B shows examples of overpayments. As alleged by Brooks:

> ¶ 78. The claims records of Exhibit B to the SAC having a Fraud Type of referencing "Overpayment" or "Overpay" show specific illustrative examples of very likely overpayments due to the unlisted procedures or high variability of quantity and costs indicating an attempt to hide charges.
>
> ¶ 79. Specific examples of overpayment include Claim Numbers 200501116500173, 20050116500174, and 200503166500225 having relatively expensive and unspecified parts were paid via claims LIPA presented to the Government.

SAC.[3]

---

[2] As defendants point out, the billing code referenced in the exhibit shows that the alleged "duplicate" billing is for the removal of foreign objects such as pins, plates, and bolts. It is entirely conceivable that more than one object was removed on the same day.
[3] Because the claims are time barred, I need not determine whether merely alleging "very likely overpayments" sufficiently pleads a claim under the False Claims Act.

5—Opinion and Order

The last representative example of overbilling is from December 31, 2006. Ex. B to SAC. As discussed above, any representative examples from September 3, 2008 or earlier are barred by the six-year statute of limitations unless Brooks was unaware of the facts supporting his claim. Brooks attempts to avoid the six-year limitation by including this allegation in the SAC:

> ¶ 85. Relator did not, and could not, have reasonably become knowledgeable that the claims presented by both LIPA and Trillium at the respective times were potentially fraudulent until sometime in early 2012 because he had no understanding of the Medicaid billing guidelines until he began suspecting fraud via red-lining and personally inquired in detail about the Medicaid guidelines regarding billing and procedure codes.

Second Am. Compl., ¶ 85.

That allegation, however, is contradicted by other sworn statements and admissions in the record. First, Brooks's suspicion regarding fraud led him to copy these billings as early as 2007 or before. Brooks's concerns were strong enough that he took them to the Oregon Attorney General. Additionally, Brooks alleges:

> ¶ 4. Brooks' responsibilities included the maintenance and management of electronic databases belonging to Agate and Trillium that were used by those Defendants and Defendant LIPA to generate data for Medicaid and Medicare claims and for other purposes.
>
> ¶ 5. Brooks was also frequently tasked with running database queries and generating reports that are in large part the subject of this Second Amended Complaint ("SAC").
>
> \* \* \* \*
>
> ¶ 10. Through this relatively high-level position, Brooks was allowed access to intimate knowledge concerning the details of how Defendants LIPA and Trillium generated data used for Medicare and Medicaid claims, how that data was maintained, and for what other purposes it was used as set forth herein.
>
> \* \* \* \*
>
> ¶ 13. Brooks had unfettered access to most every database utilized by Agate, LIPA, and Trillium. Brooks frequently was asked by top officers in Defendants organization to search and manipulate data for reporting or other purposes on behalf of Trillium or Agate.

6—Opinion and Order

> ¶ 19. In addition, Brooks' investigation of the data uncovered a pattern and volume of duplicative billing and other improper claims resulting in overpayment by the government that, intention, not mistake is the likely cause of the patterns.

SAC.

Even worse for Brooks are his sworn admissions in a declaration in opposition to defendants' motion for a protective order. *See* ECF No. 55. Brooks stated:

> ¶ 4. I have detailed personal knowledge of Defendants' falsely submitted Medicaid and Medicare claims records contained in Defendants' databases from 2005 through 2013.
>
> ¶ 5. From 2005 through 2013, I was asked by my superiors to create reports, including those designed to induce healthcare providers and employers to discriminate against high-cost patients.
>
> ¶7. Because I was concerned that the extent of the Defendants' fraud was severe and systemic, *I further investigated the data and uncovered a pattern and volume of fraudulent billing, as well as other improper claims resulting in overpayment by the government* that I had a good faith belief could not likely result from mistake.
>
> ¶ 8. *During the course of my personal investigation from 2005 to 2006*, I retained no data or documents.

Brooks Decl., ECF No. 55 (emphasis added).

Brooks's declaration demonstrates he was aware of the alleged overbilling practices as early as 2005 and 2006. His representative examples of overbilling, the latest dated December 31, 2006, are barred by the six-year limitation period because Brooks did not file this complaint until September 4, 2014.

Although his representative examples of overbilling are time-barred, Brooks may state a claim by including "particularized allegations within the statutes of limitation and repose." *See* April 29, 2016 Opinion, 7. Brooks, however, fails to provide any details as to any timely overbilling allegations. After pointing to his exhibit B, Brooks notes his expert sampled 11,000 claims (from December 31, 2006 and earlier) and estimated 23% - 27% "of the claims show

indication of duplicative and overpayment classes of fraud such that LIPA routinely and knowingly overbilled Medicaid." SAC, ¶ 70. Brooks then alleges:

> Based on the random sample analysis and on information and belief, the claims represented by the time period from late 2007 until present which would be discoverable . . . will show that LIPA and Trillium presented fraudulent claims in similar proportions [to the alleged representative examples].

SAC, ¶ 71.

Brooks provides no allegations with the requisite specifics (who, what, where, when, or how) required under rule 9. Brooks does not allege that a particular claim was presented on a particular date, for a particular service, for a particular individual, with a duplicate billing that same day. Instead, Brooks merely states he knows where to look for that information when he receives it in discovery. Rather than specific factual allegations for timely claims, Brooks's allegations are exceedingly broad:

> ¶ 84. From 2007 until he was fired in 2013, Relator on person [sic] knowledge, as part of his responsibilities being intimately aware of the claims data, observed fraudulent claims data . . . which are analogs of the both the [sic] illustrative examples and representative of the random sample discussed herein.
>
> * * * *
>
> ¶ 86 A false claim was made and paid each time LIPA, previous to August 2012, and Trillium thereafter received payment from the Government which was duplicative or an overpayment.
>
> ¶ 87. Defendants LIPA and Trillium each presented many claims to Medicaid of same type discussed herein and of more complex forms involving multiple billings at all times from September 3, 2004 until present.

SAC.

Brooks failed to comply with Judge Aiken's detailed instructions. Additionally, it is now clear that Brooks cannot provide any timely specifics because he admits, "I was not authorized

to, and did not retain Claims Data from Defendants after 2007." [4] March 3, 2007 Brooks Decl., ¶ 5, ECF No. 78. At oral argument, Brooks argued it would be unduly burdensome to require him to to explicitly plead a specific instance of overbilling and the False Claims Act does not require "a photographic memory." This argument is meritless. Even lacking a photographic memory, Brooks had all the documentation he needed to state a timely claim in this matter. Instead of filing a complaint by December 31, 2012, Brooks waited an additional two years to file his complaint.

## II. Anti-Kickback Statute and Stark Act Claims

The anti-kickback and Stark act claims both essentially rely on defendants providing stock to doctors in return for patient referrals to a subsidiary. Brooks provides exhibit C in support of these two claims. Exhibit C lists several doctors along with how many shares in Agate the doctor owns, and then shows how much those doctors billed LIPA. The most recent service date in this exhibit is July 29, 2004. As Brooks filed the original complaint in September of 2014, these representative examples are all barred by the 10-year statute of repose. § 3731(b).

Outside of these untimely representative examples, Brooks does not allege defendants provided any specific doctor with shares in return for referrals. Once again, Brooks only provides broad allegations with the hope of obtaining specifics through discovery:

> ¶ 120. Defendant Agate violated the [Anti-Kickback Statute] by knowingly and willfully giving remuneration in the form of shares of stock to medical service providers and others to induce patient referrals and recommendations to purchase items or services . . . from Agate and its subsidiaries.

*  *  *  *

> ¶ 123. Relator, on personal knowledge and belief, has seen many examples of referred claims that are exact analogs to the illustrative examples in Exhibit C to

---

[4] Brooks alleges he kept no files during his personal investigation in 2005-06 and only copied claims in 2007 at the request of authorities.

9—Opinion and Order

> the SAC which LIPA and Trillium presented for payment between late 2004 and
> late 2013 which he intends to seek during discovery.
>
> * * * *
>
> ¶ 144. The total number of Defendant Agate's stock issuances to induce referrals
> and recommendations is not fully known, but illustration of approximately twenty
> such acts are already known.
>
> ¶ 145. Plaintiff-Relator alleges on personal knowledge and belief that there are
> numerous examples of improper referrals and recommendations and stock
> issuances that occurred after September 3, 2008 that will be obtained in discovery.

SAC.

Brooks's allegations fail to set forth with any particularity (who, what, when, where, and how) the manner in which the defendants violated the Anti-Kickback Statute. Simply wanting to obtain supporting evidence in discovery, even if that evidence is "beyond the knowledge of the pleader and can only be developed through discovery," is not enough to survive a motion to dismiss in a False Claims Act case. *United Healthcare,* 848 F.3d at n.10 (quoting *Wright & Miller*, § 1298).

**III. Employee Discrimination, Hot-Spotter, and Risk Reports**

Brooks alleges defendants gathered and sold private healthcare data to employers so the employers could terminate their higher-cost employees. Even assuming Brooks's implied certification theories could potentially be viable, these claims, like those described above, are time barred.

**III(a). Employee Discrimination Reports**

Brooks alleges he compiled reports of private healthcare information of employees whose employers used an Agate subsidiary. The reports contained private health information and essentially compiled a list of the cost of employees under the plans. As alleged by Brooks:

> ¶ 99. The purpose of the Employee Discrimination Reports was to provide
> employers information in order to discriminate against their own employees based

on the perceived high cost of their healthcare given their medical history that include extremely sensitive PHI such as HIV and drug dependency diagnoses.

¶ 100. Senior, high level managers of Agate and Trillium admitted to Relator on several occasions that the Employee Discrimination Reports were sold to such employers.

¶ 101. Agate and Trillium management also admitted to Relator that the ultimate purpose of these reports were to assist employers in unlawfully discriminating against employees by choosing which employees should be laid off in order to reduce the employer's cost of coverage and remove the employee's access to employer provided healthcare and shift the costs to Medicaid.

¶ 102. One example of a large employer who paid for Employee Discrimination Reports was the division of Monaco Coach in Coburg, OR who used EHA to provide insurance to its employees.

¶ 103. On personal knowledge and belief, beyond this sole example in early 2007, Brooks produced Employee Discrimination Reports for Agate to continue to sell to other employers during the following year.

¶ 104. On information and belief, Plaintiff is informed and believes and thereon alleges that termination on the basis of the Employee Discrimination Reports did occur at certain employers since after [sic] September 3, 2008, causing a shift of the terminated employees to Medicaid which, in turn, generated claims that Agate then presented to the Government for payment while knowing that its provision of the Employee Discrimination Reports caused the discrimination and shift of costs to the Government.

SAC.

The representative example of Monaco Coach in "early 2007" is time-barred by the six-year statute of limitations. As Brooks contacted the authorities after creating this report, he clearly knew of the material facts supporting the claim at that time.

The other allegations clearly lack sufficient particularity needed for a timely claim. ¶ 104, read in conjunction with the other allegations listed above, essentially alleges that: (1) defendants compiled a list, at an undetermined time between 2008 and 2013, of employee personal health information; (2) at an unidentified time, defendants sold that list to an unidentified company; (3) with the purpose of having the unidentified employer fire the unidentified high-cost employee;

(4) the employer actually fired the employee; (5) the unidentified employee then shifted from the employer health plan to Medicaid; (6) defendants at some unidentified time submitted a Medicaid claim for the unidentified employee; and (7) the government would not have paid the unidentified claim had it known defendants used discrimination to generate the claim. These broad allegations do not supply the who, what, where, when, and how necessary for an implied certification claim.

### III(b). Risk Reports and Hot-Spotter Reports

Brooks alleges that beginning in 2012, defendants had him create "risk reports" and "hot-spotter reports" "by performing complex statistical analysis on the vast data" in defendants' systems. SAC, ¶ 109. The reports contain private health information and ranks the patients with high health costs or "financial risk" patients. Defendants used the "risk report" to "discriminate against patients on the basis of their medical condition" and to refuse excessive treatments. SAC, ¶ 111. Defendants distributed the "hot-spotter reports" electronically to doctors and hospitals. "[T]he purpose and intent of these reports was to make doctors and hospitals aware of patients who posed a higher cost risk so that these healthcare providers could engage in unlawful discrimination and avoid the costs." SAC, ¶ 114. "On information and belief, the discriminatory 'risk report' and 'hot-spotter report' continue to be produced and distributed to present." SAC, ¶ 119. Brooks goes on to allege:

> [¶ 133(c)] by submitting false, misleading and incomplete data certifications that failed to reflect the fraudulent and discriminatory risk analysis, data sharing, and enrollment practices, as well as unlawful disclosure of PHI as described herein.
>
> 134. By submitting false and misleading Express Certifications and Implied Certifications with each claim while doing the discriminatory acts described herein in derogation of such certifications, without which payments would not have been made, LIPA, Trillium, and Agate knowingly made and caused to be made a false record or statement in order to get false and fraudulent claims paid by the Government.

12—Opinion and Order

> * * * *
>
> 136. By submitting claims at all times while LIPA, Trillium and Agate knowingly carried out the discriminatory practices described herein without reporting their failures of certification, all such claims, from, early 2007, at the latest, till present were thereby false or fraudulent.

SAC.

Like the claims above, Brooks fails to provide sufficient particularity required to successfully plead a fraud claim. Like the other claims, Brooks seeks to supplement his broad allegations with discovery. As noted above, the desire to beef up specifics with information obtained in discovery will not save a claim lacking the requisite particularity. *United Healthcare*, 848 F.3d at n.10 (quoting *Wright & Miller*, § 1298).

## CONCLUSION

As Brooks's claims are time barred, defendants' motion to dismiss, ECF No. 73, is GRANTED. Brooks admits he lacks information necessary to plead his claims with specificity. Brooks Decl., ECF No. 55. Because leave to amend would be futile, the SAC is dismissed with prejudice.

 IT IS SO ORDERED.

DATED this 28th day of June, 2017.

                                          _____/s/ Michael J. McShane_____
                                                   Michael McShane
                                        United States District Judge