February 16, 2021

Michael T. Brooks
mibrooks@mac.com
32713 Vintage Way
Coburg, Oregon 97408
Telephone: 541-556-6130
Pro Se

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

**MICHAEL T. BROOKS**               Civil No. 6:14-cv-01424-MC
    **Plaintiff**
    **v**

**AGATE RESOURCES INC., Doing Business
as Trillium Community Health Plan, Inc., et al
    Defendant**

## *CERTIFICATE OF SERVICE*

re:      **ANSWER, ORDER OF 1/29/2021 (FILED WITH US SUPREME COURT)
DECLARATION, BROOKS, RE ORDER OF 2/16/2021
SPOLIATION LETTER, 2/16/2021**


        **With regards to**

        **Order, 1/29/2021**


Reilley D. Keating
Stephan H. Galloway
Michelle Lee
Attorneys for Agate Resources
Stoel Rives, LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205-2584

PLAINTIFF placed the following items in an addressed container to be sent via first class mail on February 16, 2021.

**ANSWER, ORDER OF 1/29/2021 (FILED WITH US SUPREME COURT)**
**DECLARATION, BROOKS, RE ORDER OF 2/16/2021**
**SPOLIATION LETTER, 2/16/2021**

The above listed items were placed in a pre addressed stamped envelope and sent to the below addressee on January 17, 2021. The Court's Order did not arrive until 2/10/2021. Plaintiff telephone the Court clerk on 2/11/2021 and evidently it was sent to Alan Leiman, who did not receive it. It was returned and sent to Brooks on 2/05/2021 and took until 2/10/2021 to get to Coburg. A second copy was sent by the Court on 2/11/2021and arrived on 2/13/2021.

Brooks is disabled and was not able to find help until the weekend, both writing these answers and the declaration and finding the memory sticks. Those are being sent under separate cover to Stoel Rives. They are accompanied by a Spoliation letter. The Court's Order makes no provision for sending evidence to the Supreme Court, in spite of the fact that the Court was told Plaintiff is filing with them. Brooks assumes the Supreme Court will do whatever Courts do and request the evidence. Brooks apologizes for the extra steps but sees no way of avoiding disappointing on Court or the other.


Reilley D. Keating
Stephan H. Galloway
Michelle Lee
Attorneys for Agate Resources
Stoel Rives, LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205-2584

Court Clerk
United States District Court, District of Oregon
Eugene Oregon

CERT SVC

Respectfully,

Michael T. Brooks
Plaintiff in Pro Se
February 16, 2021

CERT SVC

February 16, 2021

Michael T. Brooks
mibrooks@mac.com
32713 Vintage Way
Coburg, Oregon 97408
Telephone: 541-556-6130
Pro Se

## IN THE
## SUPREME COURT OF THE UNITED STATES

### Michael Brooks
### Relator The United States of America

vs

US District Court of Oregon
and
Centene Corporation and it's shell companies
Agate Resources
dba Lane LIPA (aka Lane Individual Practice Association and Lane Independent Physicians Association) dba
and Trillium Community Health Plan and the shell companies

### Motion for Emergency Injunctive Relief
#### In Support of Petitioners Writ of Certiorari
#### To the Supreme Court of the United States

re:

### Answer, District Court Order of 1/29/2021
### (Received on 2/10 an 2/13)

Plaintiff/Relator Michael T. Brooks petitions the Court to grant Injunctive Relief from District Court interference in his filing an appeal of the Courts dismissal of 6:15-cv-00983-TC/JR/MK/AA.

This case is messy. Brooks is an injured whistleblower that was fired for whistleblowing about the solicitation of bribes by state officials. Brooks provided information and evidence that

led to the investigation and resignation of former governor Kitzhaber. Brooks has additional information about the current governor, Kate Brown, and Oregon's Attorney General, Ellen Rosenblum, both of whom Brooks reported and gave records of fraud and HIPAA violations to and who retaliated against Brooks.

Oregon operates a more or less independent health insurance exchange. That exchange provides insurance for public employees, public school teachers, college students, inmates in the state prison system, and patients at the state psychiatric hospital and county mental health hospitals and clinics.

The problem comes in when the state and Agate-Centene sell those records. Agate and Centene's counsel admits that Agate sold counseling and medical records for foreign students. The cases Stoel Rives refers to was ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Stoel Rives is objecting to Brooks revealing that Agate sold that record to a foreign information warehouse, e.g. they engaged in espionage. How anyone could figure out the students identity from the other ▓▓▓▓▓▓▓▓▓ Agate had records for that they peddled defies credulity. Likewise, referring to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is ridiculous because there were several and thousands of those students, too.

The problem is not the fact that Agate and Centene are selling those records. The problem is that the Oregon Health Authority sold those records to Agate. Brooks had a zipped file from OHA, one of the files from the state psychiatric hospital sent monthly to Del Texley at Agate. Del "unzipped" those files and extracted the information into a database table. Brooks managed to get one of those zipped containers. It not only contains a map of the table columns, it contains the name of the contact person in OHA that Del would call if he ran into problems. In other words, this Court, the United States, has proof of OHP giving PHI to a business associate that was not even permitted to see those files, much less own them, as the District Court explicitly claims in its order.

OHA provided Agate with HIV reports. The file Brooks was sending to this Court had 235 individuals who had positive HIV tests. The file contains the patient's name, address, social security number, and date of the test. Those were also provided monthly. So were lab reports of STD tests, counseling records, including private records of marriage, sexual disfunction/disorder, drug and alcohol abuse counseling.

Employee and their family's medical records for workers in 33 states were also sold. Usually the buyer was the employer and credit rating agency. A worker with a sick child or spouse, one undergoing (say) chemotherapy would usually loose their job if the cost ceiling exceeded $40,000 for the entire family. Even if they did not loose their job, the credit agency would jack their interest rate on credit cards, auto or home loans up by three to five points.

No one wants to touch this case because it involves some very powerful politicians in Oregon and on the board of the Centene Corporation. The Court, and please note this, conferred ownership of these records on Centene-Agate. In fact, the "Protective Order" was an absolute gag order that protected corrupt executive at Agate and Oregon: **"The parties are EXPRESSLY PROHIBITED from using or disclosing PHI subject to this Order for any purpose other than prosecuting or defending this action."**

Brooks was prohibited from revealing this to Congress, to the US Supreme Court or other courts, to administrative agencies, or to wronged patients. It was designed to protect the political and business cronies of the Oregon District Court. Aikn interpreted PHI in the broadest sense and included money from the sale and buying of shares, insider trading, tax fraud, in her Protective Order.

Books is asking for emergency injunctive relief from the District Court, the Ninth Circuit Court, the state if Oregon and Stoel Rives. Stoel Rives is not merely Agate and Centene's counsel, they also represent Oregon, MODA Health, and other OHP contractors.

In the dense web pf corruption that is Oregon government, Agate-Centene is the Benefits Manager for public employees and school teachers in Lane County and, at the same time, the Benefits Manager for MODA. When Brooks cites examples of being denied imagining, drugs and other necessary medical care, it is Stoel Rives behind the scenes. Before Brooks understood that he would file appeals with MODA for denied medical services. They (Agate-Centene-MODA) denied an MRI of the upper spine for 10 months. That led to the rupture of the Mylin sheath covering of the spinal cord, a spinal infection, and Brooks developing multiple sclerosis. Agate executives own medical businesses like Slocum Orthopedic. They bought them using money scammed from Medicare by double billing, charging multiple times for CPT codes like 20680 and by using shell companies as the insurer, provider, vendor, and referring provider for millions of dollars in claims. The shell company is Agate and the patients are all fake.

This becomes really interesting when the fake patient is receiving mail order opiates from an Agate-Centene pharmacy shell. As many as 100 of these illusory patients shared a post office box and each of the patients was dispensed a months supply of 40 or 80 mg oxycotin or hydrocodone with a street value of around a dollar per mg. Some months as many as 500,000 pills would be dispensed with a street value of $20 million or more. The government wants to know where illegal street drugs come from? Look at Oregon! Brooks and a California police officer, Dick Sabbath discovered this scam when they were looking for fraud and abuse by patients. When we ran into the "patients", they led us straight back to Agate.

The Oregon District Courts are even more corrupt than Agate, hence the broad Protective order and the rushed Order to destroy records. Keep reading. Brooks intends to make you mad.

Plaintiff/Relator Michael Brooks receive this Order on February 10, 2021. It was post marked on February 5, 2021. Another copy arrived on February 13, 2021. [Exhibit 1]. Brooks telephoned the U.S. Supreme Court on February 10 to inform them of the Order, because they would be interested in the information the district court just ordered destroyed or returned to Stoel Rives.

Brooks telephoned the District Court on February 11 about receiving the Order late and pointed out to the clerk that he is handicapped and impoverished and unable to even shower without help. Help finding the thumb drives and data would have to wait until Saturday, February 13. The District Court Clerk said Brooks would need to write a letter about that to the District Court Judge. Brooks explained that due to the spinal injury, he is paralyzed on the left side, cannot make a fist, and cannot sit up to write without a bradycardia attack. [Exhibit 2] Sitting up causes spinal compression which brings on the bradycardia episodes and that, in turn results in fainting. [Exhibit 3] Since that same injury completely destroyed Brooks' swallow reflex, [Exhibit 4] Brooks aspirates saliva when passed out. Brooks will drown in his own saliva if he lays down for more than a few minutes. All of those injuries either are untreated injuries or they stem from injuries sustained on the job at Agate Resources.

Brooks filed for accommodations under the American's With Disabilities Act, the Rehabilitation Act, and the due process clauses of the Constitution. The District Court and the Ninth Circuit, refuses to provide accommodations and defense counsel treats each new health

crisis as an excuse to file another 800 pages of motions, declarations and dense legal lingo by teams of from three to six attorney's. When Brooks about to have heart surgery on January 31, 2020, the Court and Stoel Rives took that as an invitation for a motion festival and filed 32 new motions! Look at November through January 2018-19. Brooks was appealing an ARB decision where the ARB believed three Stoel Rives attorney's over a Pro Se plaintiff. Stoel Rives said there was no provision for cross filing whistleblower claims. Brooks had/has a recording of a BOLI attorney telling him they have cross filed whistleblower claims with OSHA (Sarbanes Oxley, Affordable Care Act, and HIPAA). The ALJ's and ARN flat out refused to listen to the recordings and wouldn't accept Brooks self made transcripts.

So, Brooks found himself before the Ninth Circuit in case 19-71240. Brooks was supposed to write a Brief. Brooks had written a draft of this, 60 pages long and was editing it down when he started having bad bradycardia episodes where his heart would nearly stop (36 BPM). Brooks passed out from one episode on November 18, had a heart attack and collapsed on top of his computer destroying it and bleeding all over . Brooks ended up in the hospital for November 18-19, 2019. The problem was the brief was due. Brooks sent the 60 page Brief with an explanation of what had happened. The Court refused it and gave Brooks 30 days to submit a new one that was at most 30 pages long.

Brooks could barely afford his medication, ~ $650 a month, and had to charge a new computer. He dictated the shortened Brief and submitted to the court before the 30 days was up on November 20, 2019. The Court, instead of looking at it, demanded Brooks pay Court fees in spite of the fact that he is so poor had to sell his cameras, amateur radio, and his bamboo rod making equipment (I am he Mike Brooks that mades those classic Payne and Leonard rods) just to pay for rent and medical bills. They invited defense to file a motion for "failure to prosecute". Then, they dismissed the case on April 21, 2020.

Brooks was having a series of serious cardiac episodes because Agate-Centene-MODA suddenly cut him off from his medication. Brooks goes into the side effects of suddenly stopping Xarelto. Couple that with Brooks also being forced to take Cephalexin - 500 mg, hydrochlorothiazide - 25 mg, Losartan - 100 mg, Metoprolol Succinate - 100 mg (heart rhythm regulation), Xarelto - 20 mg, Lovastatin - 20 mg, Potassium Chloride - 20 mg and Vitamin D2 - 50, 000 IU to counteract the effects of the other drugs, with clonazepam - 1 mg for spasms. Suddenly stopping this was dangerous, but that was the whole point. It led to several months of

trying to get stabilized after that nasty trick. It succeeded in that Brooks could not do anything in Court and spent most of December and January in the hospital. Brooks had 7.5 hours of heart surgery on January 31, 2020, getting out just in time for Covid 19 and a series of bradycardia attacks that are increasing in severity and timing.

Brooks has been working with a senior clerk at the US Supreme Court about getting the evidence in the labelled memory stick to you. Note that not all of the folders contain the records referenced. Brooks was in the process of populating this when the District Court Order came down. There is no provision in that Order to keep or give exhibits to the Supreme Court [Exhibit 1] and the District Court seems to be trying to dictate what Brooks can write in his Writ of Certiorari.

Stoel Rives knows this because they have been the recipient of every filing and communication with that Court. Brooks is severely disabled and cannot comply with this Court's Order without help. He had two hours of help on February 13, but will be without out help on February 14 and 15. Brooks is going to try to delete any HIPAA records on his computer and package up the thumb drives found on February 13 to be sent to Stoel Rives.

The Post Office is closed on February 15 and Brooks will not be able to mail those to Stoel Rives until February 16. Brooks is going to take a taxi to the US Court House on Tuesday morning and file this reply, the Court ordered declaration, and a Spoliation Letter.

Brooks is only able to certify that he has returned the memory sticks that were returned to him on October 20, 2017. Brooks swore that he had stored all, as in everything, he had with Leiman and Johnson in 2016 and 2017. Those were for safe keeping and copying. There were approximately three banker boxes of documents, a dozen DVD's and CD's, and more than 20 memory sticks in that locked storeroom. This bears explaining to this Court and to Stoel Rives because everyone seem to think that Brooks has documents that he does not have. Brooks' documents and evidence were stolen on September 10, 2017, and never returned.

Leiman and Johnson's partner, Marianne Dugan, evidently took those documents and memory sticks on September 10, 2017, and sent everything to Stoel Rives. Brooks has not received the his evidence and documents back. Brooks filed multiple motions with the District Court but the District Court did not do anything to get those returned to him. Brooks contacted

Leiman and Johnson on September 20 because he was no documents with which to prosecute his case. [**Exhibit 5**]

> *I need to collect my papers and documents which all of you had for scanning. I will need these as soon as possible if I am to have any hope in pursuing my cases. Please provide me with a time and place to collect these this week. If you wish, since I am still hobbled up from the "production" and will ring someone to help load the papers. Will we need boxes? I am especially interested in the original documents I gave you all in those plastic sleeves.*
>
> *I had a 30 day window from 8/13/2017 and it is now 08/20/2017. That is a full week of my time to prepare, gone. Marianne, I would like the return of the $1000 I gave you for depositions. I am going to have to hire a Court stenographer and record voluntary depositions.*
>
> *Please respond by tomorrow. I am rapidly running out of time. [9/20/2017 8:27 PM, email from Brooks to Leiman and Johnson]*

> *Mike - The documents that Leiman & Johnson have are boxed up and ready to be returned to you. We are here this afternoon. What time. We can bring them down to the alley so that you don't have to be park. Regards. Alan [9/21/2017 12:04 PM, email from Leiman to Brooks]*

> *I can do it right now. I have to be back by 2:30 for my grandchildren. Or, I can do it after 5:30 [ 9/21/2017 12:08 PM, email from Brooks to Leiman]*

Brooks was given 1/2 to 1/3 of a bankers box of documents and a single memory stick. The memory stick was from Marianne Dugan to Jesse London who was concerned about her given attorney-client emails to Stoel Rives. It needs noting that the memory stick is "a lie" (the original is enclosed to Stoel Rives). Dugan created a fake memory stick. She definitely gave Stoel Rives all of the Qui Tam evidence and Brooks Pro Se work product and every attorney client email that was in the locked store room.

> *I just started looking and found attorney client emails:*
> *Arnold Law 10/13/2013, 10/03/02013, 11/22/2013 - re: preservation of evidence,*
> *Alan Leiman 12/20/2016 to Reilley Keating*
> *Kevin Dagforde to Alan Leiman 12/09/2016*
> *Michael Vergamini 11/16/2014, re: BOLI suit refiling*
> *Jesse London 4/28/2016 - email to the federal court*
> *\*\*ALL\*\* of the attorney emails from Honeywell and Intermec, where I am an expert witness and all marked attorney--client*
> *and, what look at the attached file! brooks220.pdf*
> *[9/21/2017 2:23 PM; email from Brooks to Leiman]*

*Mike - Attorney client privileged communications are communications between you and your attorney not between your attorney and third parties such as other attorneys. Since we are not representing you any longer it is not appropriate to continue conversing since I do not want to be perceived as giving you legal advice when you are not my client. Best for the future. [9/21/2017 2:40 PM; email Leiman to Brooks]*

This was news; as far as Brooks was concerned none of these attorney's were his. District Court Judge Ann Aiken appointed Jesse London as Brooks' Pro Bono Attorney. Mr. London had Brooks looking up evidence for him until he was satisfied that there was a case. Then he shopped this around to Kafoury Law and, then, to Leiman and Johnson. The Court permitted London to retain them, resign his position as Po Bono attorney and join them. They, in turn, hired Marianne Dugan. Brooks had no input and no say in any of this. Brooks met with this self referred to "dream team" a total of three times.

These attorney's hid from Brooks what they were doing. Brooks was extremely upset when he found that they had completely gutted his original complaint of September 2, 2014 [**Exhibit 6**]. Brooks was asking for help and treatment for on the job injuries, untreated medical issues and Agate's blocking of access to medical care, defamation, and civil rights violations. Brooks cannot under stand how he can file a complaint about these issues and the Court can appoint attorney's that drop those, can rewrite and botch a slam-dunk case so badly that defense counsel can misrepresent CPT codes and key records without a challenge and dismiss the qui tam case and, then prohibit the original relator/plaintiff, Brooks, from filing an appeal. Everything Brooks has read and been told about the law makes this impossible.

Brooks could care less about False Claims Act money. That belongs to the patients in a fund that will hire lawyers to go after corrupt insurers like Agate, Centene, Trillium, Ambetter Health Net, MODA, Cigna and Keizer.

The violations by Oregon and Agate are the most obviously provable instances of billing fraud, tax fraud, civil rights violations, violations of international treaties, that the CMS investigators had ever seen. One of them asked Brooks to file the False Claims Act suit in August 2014, which Brooks did on September 2, 2014.

The tax fraud concerned the fact that actual records show Agate executives sold 103,202 shares worth $201,243,900 with $131 million in reserve fund on top of that and only reported and paid federal taxes on $109 million. Agate's CEO, Terry Coplin, supposedly received $5.9 million, when Brooks had database records proving he received over $15 million. And the

District Court filed a "protective Order" keeping those records from the IRS, the SEC, and the multimillion ax fraud and insider trading by fourteen other Agate executives and state officials. Brooks simply cannot understand how a District Court can block the very information of those wrong doings from being given to the Congress and the federal government.

The District Court struck mention of medical counseling records for ████████████ ████████████████████████ because defense objected that the name of the state college and nationality of that student would somehow allow someone to identify ██ from the other 5,197 students from that country alone whose records were sold by Agate.

This has the Oregon District Court overruling decisions by the US Supreme Court and the Second and Eleventh Circuit's decisions in Mora v New York and Gandara v. Bennett. The federal Courts have long held that it is a requirement that foreign national's consulates must be notified when one of their citizens has been harmed. Defense counsel admits that Agate resources perpetuated "outrages upon dignity, in particular humiliating and degrading treatment" on foreign nationals in violation of Red Cross, Geneva, and current US treaties with the individual governments of those foreign students including the UN Convention On Rights For the Disabled. Yet, this Court is ordering the delivery of those records to defense counsel under the guise that Agate owns those confidential records. [Exhibit 1 and **Exhibit 7, Stoel Rives filing**].

The District Court disregarded this Court's decision in the Cochise Consultancy Inc. v. United States, ex rel. Hunt. The Oregon District Court assigned Magistrate Judges that had worked for or had friends in the Oregon Department of Justice. Brooks experienced them blocking his complaints about HIPAA violations and the selling of patient and patient family member records.

Brooks was threatened for opposing them and felt he could not morally not back down. The Magistrate Judges were imposed and this Courts ruling in Roell et al. v. Withrow, No. 02-69 (2003) was ignored.

Then Brooks filed for a mistrial and Judge Aiken dismissed the case , struck the Revised Complaint written by the Court's own appointed expert and attempted to make sure Brooks could not appeal that. It's all in the record.

This court was/is responsible for "legal team" of London-Leiman-Johnson-Dugan. They stripped Brooks' complaints, including Brooks whistleblower and personal injury claims

personal injury claims, the claims of defamation, claims against wrongdoing by the state, and making it possible for the District Court to ignore a the national and international case involving patients from 34 states and 12 foreign countries. Then those attorney's settled in to just look at fraud and make big bucks.

They simply did not care that this case involved treaties and international law that Brooks thought would go to the highest levels of the US government. How did a District Court and greedy lawyers hide that and throttle the ability of the US and foreign government, the UN and International Court of Justice to act on this?

> *I am now finding emails from Charese Rohny and Linda Williams from Kafoury Law, \*ALL\* of my correspondence with the federal investigators, every plan, note and document I made while planning these suits pro se. Marianne sent them…virtually all of your research, along with notes you made in case files… [9/21/2017 2:37 PM; email from Brooks to Alan Leiman]*

> *Mike - Maybe those are not what she produced - Maybe those are just copies of everything she copied. I don't know. You will have to ask her. We returned the memory stick to you because you are the former client and this is your data. Before reaching conclusions please reach out again to Ms. Dugan. I cannot represent that the last memory stick we gave you earlier this afternoon contains what was produced to Stoel Rives. If that is what was produced I am not in any position to provide an opinion as to the appropriateness of the production. [9/21/2017 2:44 PM; email from Leiman to Brooks]*

> *I just received a memory stick from Leiman and Johnson. It contains three folders: "Scans From Leiman Office 20170911-12", "Stole Rives Production", and "thumb drive from client 20170911 evening". Did you give any of these to Stoel Rives? The files folders show them being created at 3:51 p.m. on 09/13/2017, so I didn't think you did. I am concerned because I was looking through them and found emails from Charese Rohny, Jesse London, Alana Leiman, Arnold Law, Kevin Dagforde to Alan Leiman, and Michael Vergamini, and every email exchanged with the US Attorney's in Portland.*
> *Do you have any of my documents? I cannot find the original notes I made at the BOLI hearing and other documents. I need those as soon as possible.*
> *[9/21/2017 3:02 PM; email from Brooks to Dugan (she was not answering emails until prodded to by Alan Leiman]*

> *That memory stick has everything that was produced to Stoel Rives. [ 9/21/2017 3:36 PM; response from Dugan to Brooks]*

This was simply not true. As Brooks found out in October, Dugan has sent them everything that was in that storeroom. She not only sent them all of Brooks case preparation notes, his production reply couple with the documents he was claiming as privileged, she sent them all of Brooks' Pro Se and attorney-client work product. Brooks goes into this in detail in the Writ because it makes for great reading and the public corruption involved should warm he hearts of any human being, conservative or liberal, that is interested in people and justice and mercy.

> *I have the thumb drive you left for Jesse with Alan. That is what I have been looking at. It has emails from Charese Rohny, Jesse London, Alan Leiman Arnold Law, Kevin Dagforde to Alan Leiman, and Michael Vergamini. It has case files with notes written by Alan Leiman, an attorney client privileged document (#2020), notes on Garrett Andres and Miles Yamamoto, and everything I ever did in preparing for these cases. [9/21/2017 4:37; email from Brooks to Dugan]*

> *Mike - Drew and I will make another thorough search of our office but I believe we have returned all original documents that were in our possession to you. We will notify you if that is not the case. [9/26/2017 9:35 PM; email from Alan Leiman to Brooks]*

> *Mike - Drew and I will make another thorough search of our office but I believe we have returned all original documents that were in our possession to you. We will notify you if that is not the case. Regards. Alan [9/26/2017 9:44 PM email from Leiman to Brooks*

Two points are born out here. First, Alan Leiman told Brooks he resigned from this case on September 21 and these emails show Brooks desperately trying to find any of the evidence that was stored at Leiman and Johnson office. Except for that memory stick and the small, quantity about 10% of the total of paper documents, Brooks has never seen any of the paper documents again. The paper documents that were returned are the original Qui Tam Act filing, removed from the spring binder it was bound and scattered, a baggy of broken and mixed pieces of DVD's and CD's, and that one single memory stick. The only other evidence Brooks received was the three memory sticks from Stoel Rives on October 20, 2017, and the paper spreadsheet of HIV reports sold by Agate in 2010, the 44,000 prescription drug records for Oregon psychiatric patients sold by OHA to Agate, and a paper spreadsheet of foreign student counseling and medical records that Agate sold to an international information warehouse. Those records were purchased from OHA by Agate.

As this Court is aware, Brooks is disabled and filed with this court a detailed record of his disabilities. All of those stem from on the job injuries at Agate. Agate not only refused to treat those injuries, Agate blocked Worker's Compensation filings, Agate and Oregon abused their positions as Benefits Managers and refused Brooks' insurer permission to provide treatment or even imaging. Furthermore, Agate executives were caught red handed altering records at Slocum Orthopedic, owned by Agate's President.

To use just one example, on May 30, 2013, this court received records from Oregon Imagining for guided steroid injections to Brooks right foot. That foot had been so swollen for several months. Brooks was confined to a wheelchair and an image showing that the broken calcaneus fracture was still open and not healed.

Slocum's fabricated chart notes on June 4 (4 days later) by Dr. Jones, conveniently retired and overseas on a mission, claim that Brooks was walking straight with one crutch. That is countered by the staff at Slocum and two witnesses that actually took Brooks to that appointment who recall quite clearly that Brooks was not only in a wheelchair, but Dr. Jones insisted that Brooks have immediate surgery or risk permanent damage to the foot. Brooks told the doctor that Agate was refusing to give him time off for treatment, much less surgery, and both witness wrote statements that Dr. Jones told Brooks to cite the Family and Medical Leave Act and demand time off for surgery. They recall Dr. Jones explaining **to them** and Brooks what FMLA was, how it worked, and the fact that the Department of Labor would sue Agate if they fired Brooks for taking time off for a medically necessary procedure. In addition to this, Brooks has the insurance records and original notes Slocum sent to his primary care doctor. How on earth does a District Court dismiss this as irrelevant and beyond the scope of the Court to hear when this is an unlawful termination case based on untreated on the job injuries? This is conclusive proof of fraud!

Brooks was **injured on the job**, as a direct result of Agate's creating an unsafe and hostile work environment. The lower back injuries and crushed left foot happened because Agate was permitted to alter Brooks' job from non-exempt (hourly) to exempt . That permitted Agate Resources to order an already injured Brooks to come to work two hours early and do custodial work before doing his regular job as a database administrator, TSQL,C/C++ , Pascal and Visual Basic programmer from 8:00 AM until 6 PM...or 7 or 8 or 9.

The crushed left foot happened on August 19, 2013, at round 7 AM as a result of a heavy metal cart tipping over and crushing the left foot. Brooks right foot was broken and in a cast. Brooks had just graduated from being confined to a wheelchair to using crutches.

Brooks had an MRI for that on August 20. The results were phoned to Brooks at work by Dr. Cassell on September 9 at 1:30 PM. Brooks told Korjenek and Woods about this and demanded Worker's Compensation. When Brooks got the usual promises of Agate saying for everything and threats that his job would be terminated, Brooks pointed out that Agate had never paid one dime for the detached retina, the broken feet, the injured back and Brooks told them what he had been told by Dr, Jones . Korjenek kicked Brooks out of the office, escorted him to the back door and told him not to return without the MRI. Brooks got the MRI and returned with that and completed paperwork (form 801) for Worker's Compensation on September 12, 2013. Brooks was called into HR the following Monday, September 16, at 8 AM and essentially fired. His badge and FOB were taken and he was sent home. Brooks was told there was a secret complaint filed against him. Brooks asked what that was for and they refused to tell him.

Brooks had several large tears to the retina of the right eye and that retina was detached, an on the job accident that happened on April 2, 2012. Agate block surgery for that that resulted in permanently impaired vision. With custom corrective lenses, the best vision Brooks can achieve today is 20-50 and that had doubled vision. Every letter on a printed page is "echoed" to the left about one half space.

Brooks was "passing blood" and doctors thought he had a kidney stone in September 2012. On September 27, 2012, doctor's found a mass in Brooks' right lung that they were trying to treat while Agate was running interference trying to prevent treatment and demanding access to medical records. Agate claimed that they did not know about that, except they forgot Brooks wrote weekly status reports where he discussed that. [Exhibit 8]

Indeed, in an unsigned statement in Brooks' Personnel File, Patrice Korjenek wrote about knowing of "spots" found on Brooks lung. The statement is dated September 18, 2013, but the letter referenced to Agate from Dr. Beckstrand was on November 19, 2012. And that letter asked that Brooks be allowed to telecommute and not be forced to work 80 hour weeks doing two jobs. Dr. Beckstrand wrote them about a severe drug interaction that, coupled with their harassment of Brooks, was endangering his health. The Court will note that Korjenek's statement that the growth was benign is utter fiction. Doctors were still treating this, giving Brooks an experimental

drug to shrink the growth. No one knew if the growth was cancer or foreign matter lodged in the lung. Agate altered statements. The earlier statement was dated November 20, 2012, and had Agate knowing about the drug interaction and the mass found in the lung. Altering records has been a "normal" practice of this and it is criminal. This is both a whistleblower retaliation and a medical case over on the job injuries that were not treated. Altered records establish criminal intent and are criminal in and of themselves.

The District Court refused to accept those declarations and another from a high school teacher that vividly recalls fly tying classes attended by Dr. John Sattenspiel where Agate's sale of medical records was discussed. Dr. Sattenspiel was Agate's Chief Medical Officer. He defended Agate' sale of employee and their family's medical records to employers, patient profiling in the Hot Spotter reports, as legal and necessary to save money. He used the term "triage". There are eight witnesses to that.

Brooks mentions this, again, because he clearly stated that he was working with the US Supreme Court in an appeal to this entire matter and Brooks wants this on the record for both the Supreme Court, the World Court and the US Congress.

Brooks notes that he has filed for accommodations with this Court based on injuries incurred on the job that brought this case about in the first place.

Brooks notes and objects that the Court is conveying ownership of PHI on a corrupt company that has no legal authorization to own these records or even see them, under both state and federal law. Indeed, in 15-12-003 the Oregon Insurance Division fined former Agate Resources owner Terry Coplin $10,000 for conducting insurance business with Agate Resources.

*Agate has never been issued a certificate of authority evidencing the authority to transact insurance in Oregon. Agate transacted insurance as defined under ORS 731.102(1) and ORS 731.146(1)...Agate did not hold a certificate of authority under ORS 731.072(1). Agate violated ORS 731.022 and ORS 731.354 because Agate transacted insurance without a certificate of authority issued under ORS 731.072(1).* [**Exhibit 9**]

Agate Resources, however, is a fraudulent conveyance. It has no employees, facilities, business, nor assets. [**Exhibit 12**] Agate resources, though, has been permitted to operate as a con by the state if Oregon for years. Its fraudulent shells seem to only exist to run scams. Brooks was puzzled by Lane Home Medical a DMW and drug mail order outlet operated by Agate. Brooks ended up calling patients because he could. Ot figure out what they would do with an entire garage for of adult diapers or why their eye doctor was prescribing shots of C9003,

Palivizumab at $1500 a dose for their children. They had no idea of what I was talking about. I did not encounter even one patient that had gotten the service or item billed and paid for. I'm pretty sure every single one of those bills was fraud. How could OHP miss it if they weren't doing so deliberately.

Agate has been permitted to operate a series of fraudulent shells that illegally conducted insurance business in Oregon and across the country. In doing that, the only time it was stopped or fined was when its owner, Terry Coplin, attempted to defraud Centene out of money. Suddenly, the state "discovered" that Agate Resources did not have a license to conduct insurance business in Oregon (but neither did Centene and Trillium forfeited its license under ORS 441.025 and did not have authorization from CMS to operate as a business associate).

Trillium forfeited its certificate when it was transferred to Centene (or even from LIPA to Agate Resources) and none of the shells selling prescription drugs or DME was legally operating

> *Each license shall be issued only for the premises and persons or governmental units named in the application and shall not be transferable or assignable...A health care facility licensed by the authority or department may not offer or provide services beyond the scope of the license classification assigned by the authority or department. [ORS 441.025]*

Agate operated Employers Health Alliance, EHA, the Alliance in 33 states where Agate collected and sold employee and dependent prescription drug, medical, laboratory, and counseling records to employers, credit agencies and information warehouses. Agate operated at least four different mail order pharmacies without state approval where clerks and the director of those businesses, a music major with no medical credential, filled prescriptions, substituting drugs from a book. Brooks knows first hand of patients dying from that, patient dying because Agate denied them access to critical medical to save money for executive bonuses. One of those deaths was to a four year old girl that because she poor and mixed race. Minority race foster children and pregnant women were routinely denied care, especially Black, Hispanic, and Native American patients who were denied care at rates on less than 6% versus referral approvals of 65% to 90% for educated white patients.

Oregon, and especially OHP/OHA and its Doctor contractors, run a series of billing scams where the ignore the Medicaid/Medicare/ACA Assignment charges on the CMS Physicians Fee Schedule. The allowed maximum charge for a procedures, identified by a CPT,

HCPCS, or Revenue Code dictates the maximum charge that may be billed by a vendor and the maximum charge that a patient can be charged. A good example of this, which Brooks has personally experienced is for CPT code 93271. This is wearing a three lead ECG recorder for 30 days. The maximum charge for this on the Physicians Fee Schedule is $176.09, Oregon, chooses to interpret its contract with HHS to allow it to charge anything to likes and that procedure in Oregon is $1925.00, with the patient owing all of that but the CMS payment of $176.09 less 25%, or $1,792.93! That's quite a difference from the maximum $44.00 charge a patient pays in every other state in the country. However, as with Civil Rights, wiretapping, OSHA and EEOC complaints, Oregon claims the federal government has no jurisdiction in Oregon. It's in every medical contractors agreement with the state. They forfeit the ability to file federal Civil Rights claims:

> *Oregon claims sole jurisdiction over fraud cases and immunity from federal law. Under 42 U.S.C. § 2000d(4) - (7).....arises from or relates to the OHP Contract <u>shall be brought and conducted solely and exclusively within the Circuit Court of Marion County for the State of Oregon</u>; provided, however, <u>if a claim must be brought in a federal forum, then it shall be conducted solely and exclusively within the United States District Court of the District of Oregon</u>. In no event shall this paragraph 19 be construed as a waiver of the State of Oregon of the jurisdiction of any court or of any form of defense to or immunity from any claim whether sovereign immunity, governmental immunity, immunity based on the Eleventh Amendment to the Constitution of the Unites States" [2017 OHP Contracts, in the section "Governing Law, Consent to Jurisdiction"]*

Brooks asks the US Supreme Court for an emergency injunction to prohibit the Oregon District Court or the Ninth Circuit Court from interfering with his appeal and providing evidence to the US Supreme Court, the United State Congress, the SEC and IRS, and the governments of foreign students harmed by the sale of their records by Oregon, Agate Resources and Centene.

Brooks is asking the Supreme Court to overturn the "Protective Order". It doesn't protect the patients, whistleblowers, sick children and mother. It doesn't protect the taxpayers. It protects a sleazy business and some of the most evil men and women you will ever hear about. Strike the Protective Order and open those records up to the press. It's not rocket science. Remove the name, address, phone number, social security number and medical patient identifier. This is what they the IRS does, what intelligences agencies and the FBI do when discussing suspects. You simply do not hear about newspapers identifying those suspects and they are trying in then.

Brooks asks the US Supreme Court for an injunction prohibiting Agate, Centene or any of their shells or counsel from "owning", handling or selling medical, prescription drug, counseling, or psychiatric records. Their Trillium subsidiary, at best, is a subcontractor of state-federal cooperative insurance programs and they may handle records of patients that they are processing claims for them. However, none of these people were Agate customers!

Agate does **not** have licenses or permission to possess those records under 45 CFR 160.103. Any records in their possession should be surrendered to Brooks or CMS for safe keeping. Brooks asks for a spoliation order prohibiting the destruction or transfer of those records by Stoel Rives or Centene to any other party, including any state or state agency, public corporation or contractor. Brooks asks for the return of those records.

Brooks asks this Court to strike Judge Aiken's Protective Order. It protects Agate and a corrupt Oregon. It harms patients and the public. Those records should be made available to the press. It's not hard to remove the patient name, address, social security number number and medical id from records. The IRS does it all the time. In this case, the public good will be served by the broadest distribution of those records possible. Sleazy outfits like Agate, Centene, Trillium, Ambetter, Health Net, eviCore, CareCore, MODA, Kaiser, need to straighten up and treat patients like people, not profit center. Executives like Cole, Coplin, Korjenek, Neidorff, belong in prison, not board rooms.

Bad judges need to be removed from the bench and good judges owe it to themselves to get rid of corrupt judges. Brooks' evidence is overwhelming. Every ordinary person he has spoke with about it, shown the evidence to, thinks Dugan was set up by Stoel Rives AND the Court, and Dugan threw her client under a bus to avoid a few thousand dollars in fines she could have fought and won if she had one shred of decency.

Stoel Rives needs to be disqualified. Stoel Rives counsel needs to be disbarred. They lost their souls in this case and they don't have a prayer of getting them back as long as they sell their lives for a tawdry win for some of the worst people you will ever encounter. Brooks is going to prove that case in his Writ. Brooks has emails, letters and recordings that sink these people once and for all.

Then, under Rule 60 and due to fraud against the country, as well as fraud against Brooks and hundreds of thousands of patients, Brooks asks that this Court re-open 6:14-cv-01424-AA/MC in a venue other than Oregon. The Courts in this state are so corrupt it is not possible to get

anything like a fair hearing. Even worse is the U.S. Attorney's office in Portland. Put yourself in my shoes where you provide evidence to a Portland US Attorney and an investigator and six moths later find out the guy had sent your evidence to Washington D.C. and Jeffrey Wertkin who is caught peddling your evidence. The Portland US Attorney had gone to lawyers Brooks had found to take the case on a contingency basis and told them that Brooks was lying. Brooks was approached by an attorney at Kafoury who told him of this and she was upset that Brooks had evidence that she knew was true.

If this court so. Wishes, you could eliminate the $400 million in double billing fraud. Brooks doesn't care about that anyways. The judges mishandling this case dismissed it because they couldn't understand fraud, CPT codes, and lacked the ability to recognize patterns. Everyone will understand what these evil men and women did to those college students, to those psychiatric patients, to the workers who couldn't buy a home or a car or lost their job. Everyone can understand the foster children and pregnant impoverished women that these healthcare executive swine stole everything from. Please let me have them.

Brooks asks for the appointment of competent legal counsel not in any way connected with Oregon to help draft the Writ of Certiorari. The subject matter is both timely and apolitical enough to district the voters from the current food fight and get them to focus on something that is actually important to their lives. At the same time, this Court will get to decide two huge issues – how do you handle due process and disabled litigants. Brooks is clearly disabled. Brooks was clearly deliberately harmed by his employer, Oregon, Stoel Rives and the Court in an insane attempt to get him to quit. This is exactly what Agate did,. It is no different from what organized crime thugs have done to witnesses exposing their crimes. It is why 18 USC 1513 was written, Section 1107 of Sarbanes Oxley:

> *(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.*

Not providing counsel when Brooks cannot even take care of himself, is the very definition of disabled. Brooks is dying and simply doesn't care. I have nothing left to live for. My health is gone. My family is shattered. I have nothing but an endless road ahead of me where

things get worse. The one thing I do have is faith in God and faith that there are decent people. My father was one. I am trying to live up to the giant that was my father.

The Oregon District Court was beyond remiss in denying accommodations and making a mockery of their courts. They were remiss in not upholding the law and Brooks and those foreign students, foster children, all paid for their duplicity.

It seems obvious that Congress intended for the ADA to apply to the federal Courts. In 2008, when this Court made it impossible for the disabled get fair treatment, the Congress enacted the ADA Amendments Act to make it clear that their intent was that the ADA and Rehabilitation Act apply to their creation, to the article 3 courts.

Congress has done this from time to time, with the Civil Rights Act and with the Federal Rules of Civil Procedure, too. Brooks is enclosing another Exhibit, 10. Notice the large dent in the rear door of his RAV and the wheelchair, not handicapped, wheelchair, parking permit. That dent happened in Portland on March 7, 2016, when I was shopping for a hat for my wife's birthday on Broadway, right in the heart of town, two blocks South of the mid town Marriott. I stopped at a stoplight and before I knew it, my RAV was surrounded, a guy pried open the back door with a crowbar and half a dozen screaming black clad crazies crawled over the seats, kicked open the door and. Dragged me out into the street. They beat me up, threatened to kill me with that crowbar, and left me.

A police car was parked on the other side of the plaza. They saw he whole thing and didn't do anything. Ask me about that when I'm in your Courtroom.

Respectfully,

Michael T. Brooks
Plaintiff in Pro Se
February 16, 2021

32713 Vintage Way
Coburg, OR 97408

mibrooks@me.com
mobile: 541-556-6130

EXHIBIT 1

**U.S. District Court**

**District of Oregon**

## Notice of Electronic Filing

The following transaction was entered on 1/29/2021 at 10:43 AM PST and filed on 1/29/2021
**Case Name:**       United States of America ex rel v. Agate Resources et al
**Case Number:**     6:14-cv-01424-MC
**Filer:**
**WARNING: CASE CLOSED on 06/28/2017**
**Document Number:** 96(No document attached)

**Docket Text:**
ORDER: In Plaintiff's Response to Defendant's Motion to Enforce Protective
Order, Plaintiff moves for a new trial, to sanction the defense attorneys, and to
order a federal investigation in to these matters. Plaintiff's motions are denied.
The Court finds no evidence of fraud in Relator's filing and the issue of whether
"the District Court exceeded its authority in dismissing 6:14-cv-1424-MC" is
merely an attempt to relitigate long settled issues. Whether Centene-Agate
retaliated against Relator by denying hospital care and surgeries in 2018 and
2019 is not relevant to any issue in dispute in this action, which was dismissed in
June 2017. Having reviewed Plaintiff's response to Defendant's motion, the Court
GRANTS Defendant's Motion to Enforce Protective Order [91]. Relator is
ORDERED to return or destroy all of Defendants' confidential documents in his
possession, custody, or control, (2) return all of Defendants' documents in
Relator's possession, custody, or control that contain protected health
information under the Health Insurance Portability and Accountability Act, and (3)
certify to this Court that he has complied with the above orders. Plaintiff is
granted 14 days to certify to the Court, in a document submitted under penalty of
perjury, that he has complied with this order. Signed on 1/29/2021 by Judge
Michael J. McShane. (cp)

**6:14-cv-01424-MC** No electronic public notice will be sent because the case/entry is sealed.

Michael T. Brooks
32713 Vintage Way
Coburg, Oregon 97408

**UNITED STATES DISTRICT COURT**
OFFICE OF THE CLERK
DISTRICT OF OREGON
WAYNE L. MORSE U.S. COURTHOUSE
405 EAST EIGHTH AVENUE, SUITE 2100
EUGENE, OR 97401

OFFICIAL BUSINESS

EUGENE OR 974

11 FEB 2021 PM 4 L

$0.51 9
US POSTAGE
FIRST-CLASS
PITNEY BOWES
9052394893
97401
FEB 11 2021

Michael T. Brooks
32713 Vintage Way
Coburg, OR  97408

97408-927013

UNITED STATES DISTRICT COURT
OFFICE OF THE CLERK
DISTRICT OF OREGON
WAYNE L. MORSE U.S. COURTHOUSE
405 EAST EIGHTH AVENUE, SUITE 2100
EUGENE, OR 97401

OFFICIAL BUSINESS

EUGENE OR 974

5 FEB 2021  PM 3 L



$0.51 9
US POSTAGE
FIRST-CLASS
PITNEY BOWES
9052394893
97401

Michael T. Brooks
32713 Vintage Way
Coburg, OR  97408



97408-927013

EXHIBIT 2













**Print This Page**  |  **Close This Window**

Name: Michael T. Brooks | DOB: 7/27/1947 | MRN: 01618546 | PCP: KATHERINE L BECKSTRAND, MD

# Pathology - Details

ᵢ About This Test

## Study Result

**Narrative**

Collection Date: 05/04/2018
Ordering Provider: KATHERINE BECKSTRAND MD
Copy to Provider(s):
Performed by Pathology Consultants, PC: 123 International Way, Springfield OR 97477, 541-341-8006
CASE: SP-18-12373
PATIENT: MICHAEL BROOKS
Client Order Number:

FINAL DIAGNOSIS:

Scalp lesion, shave biopsy:
-At least squamous carcinoma in situ (see comment).

COMMENT:

Sections show squamous carcinoma that is apparently in situ and has a verrucous growth pattern simulating a wart. The shave biopsy is not sufficiently deep to exclude invasive squamous cancer.

This case was also reviewed by Dr. Hammock.

MICROSCOPIC EXAMINATION:

Performed.

CLINICAL HISTORY:

Skin lesion on scalp; ICD-10: L 98.9

GROSS DESCRIPTION:

Received in formalin in a container labeled with the patient's name and designated scalp is a 0.7 x 0.5 cm irregular, coarsely granular, tan-white skin shave. Eccentrically located is a 0.4 x 0.2 cm focally crusted, tan lesion that grossly abuts the nearest margin. The specimen margin is inked green. The specimen is bisected and totally embedded in cassette 1A.
KS 5/8/2018 09:44 AM

David S. Meyers, M.D.
Electronically signed 5/9/2018 8:40:31AM

Pathology Consultants, PC 123 International Way
Springfield, OR 97477

## Component Results

**There is no component information for this result.**

## General Information

| | |
|---|---|
| Collected: | 05/04/2018 9:09 AM |
| Resulted: | 05/09/2018 8:46 AM |
| Ordered By: | KATHERINE L BECKSTRAND, MD |
| Result Status: | Final result |

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation, © 1999 - 2015.

# EXHIBIT 3









# EXHIBIT 4

## PeaceHealth
### Sacred Heart Medical Center

 Patient Instr

**Speech Therapy**

☐ Acute Therapies at RiverBend - Phone: (541) 222-6362
☐ Acute Therapies at University District - Phone: (541) 686-6362
☐ Oregon Rehabilitation Center at University District - Phone: (541) 686-7363
☒ Outpatient Rehabilitation Services at University District - Phone: (541) 686-7085

Patient Name: __Mike Brooks__
The results of your Modified Barium Swallow / In-Clinic Swallow Evaluation on __5/29__ showed
__deep penetration__

It is recommended that you follow these diet recommendations:

**SOLIDS:**
( ) Nothing orally (NPO)              ( ) Dysphagia Advanced
( ) Dysphagia Puree                   ( ) Mechanical Soft
( ) Dysphagia Transitional            (☒) Regular (general) __small bites__

**LIQUIDS:**
( ) Nothing orally (NPO)              ( ) Ice chips only
(☒) Thin (water, coffee, tea, Ensure, all juices) __small sips__
( ) Nectar-thick (buttermilk, nectars, tomato, milkshakes, blenderized soups, cream)
( ) Honey-thick (can't drink it through a straw, but you don't need a spoon)
( ) Pudding-thick (pudding, custard style yogurt, fruit custard)

**COMPENSATORY STRATEGIES:**

Positioning:
(☒) Upright at 90 degrees
( ) Chin-tuck positioning
( ) Turn head right/left
( ) Tilt head right/left
( ) Other:_____

Supervision:
( ) Intermittent
( ) Constant
( ) Feeding needed
( ) Feeds self with set-up
( ) None

Medication:
( ) With water
(☒) In pureed food
( ) Crushed in pureed
( ) With thick liquid
(☒) 1 pill at a time

**For A Safe Swallow Please . . .**
(☒) Take small bites/sips
(☒) Wait for each swallow before taking another bite/sip
( ) Alternate food/liquid
( ) Use a straw
(☒) Do not use a straw
( ) Check for pocketing food
(☒) Rinse mouth/dentures after eating
( ) Clear throat then swallow if gurgly voice
(☒) Other: __2. chin-tuck__

x 3
(☒) Swallow twice: dry swallow
( ) Remain upright approximately 30-45 minutes after eating
( ) If coughing occurs, stop eating
( ) Do not feed patient if tired or sleepy
(☒) Swallow first, then talk
( ) Place food right / left / center of mouth

(☒) Follow-up with the Speech-Language Pathologist is recommended. If you are in agreement, your appointment will be scheduled after we receive orders from your Physician.

__Amber Cronin M.S., CCC-SLP__

Therapist Signature          EMR#          Date          Time

Patient Identification

EXHIBIT 5

**Mike Brooks**
Evidence, my papers and other documents; Second Request
September 20, 2017 at 8:27 PM
Marianne Dugan                    , Alan Leiman



I need to collect my papers and documents which all of you had for scanning. I will need these as soon as possible if I am to have any hope in pursuing my cases. Please provide me with a time and place to collect these this week. If you wish, since I am still hobbled up from the "production" and will ring someone to help load the papers. Will we need boxes? I am especially interested in the original documents I gave you all in those plastic sleeves.

I had a 30 day window from 8/13/2017 and it is now 08/20/2017.That is a full week of my time to prepare, gone. Marianne, I would like the return of the $1000 I gave you for depositions. I am going to have to hire a Court stenographer and record voluntary depositions.

Please respond by tomorrow. I am rapidly running out of time.


Mike Brooks

**Mike Brooks**
Re: Evidence, my papers and other documents; Second Request
September 21, 2017 at 12:07 PM
Alan Leiman
Marianne Dugan                           , Jesse L. London, Attorney at Law                    , Drew Johnson

I can do it right now. I have to be back by 2:30 for my grandchildren. Or, I can do it after 5:30

Mike

Sent from my iPhone

> On Sep 21, 2017, at 12:04 PM, Alan Leiman <alan@leimanlaw.com> wrote:
>
> Mike - The documents that Leiman & Johnson have are boxed up and ready to be returned to you. We are here this afternoon.
> What time. We can bring them down to the alley so that you don't have to be park.  Regards   Alan
>
> > On Sep 21, 2017, at 6:27 PM, Mike Brooks <mbrooks00000@gmail.com> wrote:
> >
> > I need to collect my papers and documents when all of you met for scanning. I still need them as soon as possible if I am to have
> > any hope in pursuing my case. Please provide me with a time and place to collect these this week. If you wish, since I am still
> > hobbled up from the "production" and will not someone to help load the papers, Will be good honest I am especially interested in
> > the original documents I gave you all in those plastic covers.
> >
> > I had a 30 day window from 9/1/2017 and it is now 09/09/2017. That is a full week of my time to prepare, poor, Marianne, I would
> > like the return of the $1000 I gave you for depositions. I am going to have to hire a Court stenographer and record voluntary
> > depositions.
> >
> > Please respond by tomorrow. I am rapidly running out of time.
> >
> > Mike Brooks



**Alan Leiman**
Re: Evidence, my papers and other documents; Second Request
September 21, 2017 at 12:08 PM
Mike Brooks

Now will work.  Call when you are in the alley.

> On Sep 21, 2017, at 12:07 PM, Mike Brooks <mibrooks@me.com> wrote:
>
> I can do it right now. I have to be back by 2:30 for my grandchildren. Or  I can do it after 5:30
>
> Mike
>
> Sent from my iPhone
>
>> On Sep 21, 2017, at 12:04 PM, Alan Leiman <alan@leimanlaw.com> wrote:
>>
>> Mike - The documents that Leiman & Johnson have are boxed up and ready to be released to you. We are here this afternoon. What time.  You can bring them down to the alley so that you don't have to be paid.   Regards.  Alan
>>
>>> On Sep 20, 2017  at 5:39 PM, Mike Brooks, mjbrooks@me.com> wrote:
>>>
>>> I had to collect my papers and documents which all of you has be covering. I will come down as soon as possible if I can have any role in producing my issue. Please contact me with a time and place to collect these this week. If you wish, since I (shall not) included up from the" production  and will use someone to help bear the copies. Will no need boxes? I am especially interested in the original documents I gave you all in basic status. Vickers
>>>
>>> I had a 30 day window from 9/5 but I won't a mail 9/20/2017. That is a full week of my issue practice gone. Moreover, I work due the return of my 6 mail I give you for statement. I'm going to have to use a Court stenographer and record voluntary stipulations.
>>>
>>> Please respond by tomorrow. I am mostly turning out at two
>>>
>>> Mike Brooks

**Alan Leiman**
Re: mdugan's memory stick
September 21, 2017 at 2:40 PM
Mike Brooks
Drew Johnson



Mike - Attorney client privileged communications are communications between you and your attorney not between your attorney and third parties such as other attorneys.  Since we are not representing you any longer it is not appropriate to continue conversing since I do not want to be perceived as giving you legal advice when you are not my client.  Best for the future.  Regards.  Alan

> On Sep 21, 2017, at 2:31 PM, Mike Brooks <mibrooks@me.com> wrote:
>
> I just started looking and found attorney client emails:
> Arnold Law 10/13/2013
>
> Arnold Law 10/03/02013
>
> Arnold Law 11/22/2013 - re: preservation of evidence.
>
> Alan Leiman 12/20/2016 to Reifley Keating
>
> Kevin Dagforde to Alan Leiman 12/09/2016
>
> Michael Vergamini 11/16/2014, re: BOLI suit refiling
>
> Jesse London 4/28/2016 - email to the federal court
>
> **ALL** of the attorney emails from Honeywell and Intermec, where I am an expert witness and all marked attorney--client
>
>
> and, what the attached file:
> <brooks220.pdf>

**Alan Leiman**
Re: My papers and documents
September 26, 2017 at 9:35 PM
Mike Brooks
Drew Johnson                            , Jesse L. London, Attorney at Law

Mike - Drew and I will make another thorough search of our office but I believe we have returned all original documents that were in our possession to you.  We will notify you if that is not the case.  Regards.  Alan

Alan Leiman
alan@leimanlaw.com

CONFIDENTIALITY NOTICE: This e-mail and any files transmitted with it are private and confidential and are solely for the use of the addressee.  It may contain material which is legally privileged.  If you are not the addressee or the person responsible for delivering to the addressee, be advised that you have received this e-mail in error and that any use of it is strictly prohibited.

> On Sep 26, 2017, at 10:51 AM, Mike Brooks <mibrooks@me.com> wrote:
>
> I have been looking through the papers I picked up from Leiman and Johnson and several original documents are missing. Most critical are original notes made before the BOLI meeting on March 3 through 5, 2014 and the nites made during and immediately after the meeting on March 6, 2014. Where are they?
>
> I had preserved these in a plastic paper protector and they are nowhere to be found. Did Marianne give these to Stoel Rives without my permission or a strict chain of custody? What happened to other original documents. Some of those have no backups that I can find?
>
> Mike Brooks
>
> Sent from my iPad

EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>Ex rel. | ) | Civil Action No. 6:14-cv-01424-AA<br>REVISED COMPLAINT |
| | ) | FILED IN CAMERA AND |
| Plaintiff | ) | UNDER SEAL |
| | ) | |
| vs. | ) | |
| | ) | RELATOR REQUESTS THE |
| Agate Resources | ) | APPOINTMENT OF BOTH |
| Oregon Healthcare Plan | ) | A PRIVATE ATTORNEY |
| State Of Oregon | ) | |
| | ) | |
| Defendants | ) | |

---

PLAINTIFF'S COMPLAINT PURSUANT TO
31 USC, CHAPTERS 3729-3732 OF THE FEDERAL FALSE CLAIMS ACT
And
42 USC, CHAPTERS 1320, 21A, 21E, 21F,
And
PARTS 160, 162, AND 164 OF SUBCHAPTER C OF
TITLE 45 OF THE CODE OF FEDERAL REGULATIONS
And
Stark Anti-Kickback and HIPAA/HITECH ACTS

In the United States of America, by and through qui tam relator MICHAEL T. BROOKS (Relator), brings this action under 31 USC, Chapter 3729, et seq, as amended (False Claims Act) to recover damages, penalties, and other remedies established by the False Claims Act. The Relator also brings actions under 42 USC Chapter 1320D-9, 21A, 21E, and 21F, based upon long term willful neglect for profit, of the HIPAA privacy regulations.

I. PRELIMINARY STATEMENT

1. This is an action to recover damages and civil penalties on behalf of the the United States of America, for violations of the False Claims Act, the Stark Anti-kickback and HIPAA/HITECH acts resulting from false or fraudulent records, statements, or claims, or any combination thereof, by the defendants, their agents, employees, or o-conspirators, or any combinations thereof, with respect to false DME and other claims made to the federal Medicare and Medicaid Programs.

2.  The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in the federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3.  The False Claims Act provides any person who knowingly submits, or causes the submission of, false or fraudulent claim to the US government for payment or approval is liable for civil penalties of up to $11,000 for each claim, plus three times the amount of the damages sustained by the Government.

4.  The Federal False Claims Act allows any person having information about a false or fraudulent claim against the government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (with service on the defendant during that time) to allow the Government to conduct its own investigation and to determine whether to join the suit.

5. This is an action for treble damages for each claim false claim and each false statement under the cited federal laws.

II. PARTIES

7. Relator, Michael T. Brooks, was the Data Warehouse Administrator at Agate Resources, dba Trillium CHP, From November 7, 2005 until September 27, 2013, when he was unlawfully terminated when Agate hacked his email account and discovered he was a whistleblower. (See companion federal lawsuit.)

8. Defendants
Agate Resources, dba Trillium Community Healthcare Plan, Trillium CCO,  Agate Healthcare, Trillium Holdings, Trillium Medicaid, Trillium Medicare, Trillium Sprout, Apropo Benefits Management, LIPA (alternately: the Lane Individual Practice Association and the Lane Independent Practice Association), Home Medical Care of Oregon, Health Policy Research Northwest, NuCo, Evergreen Health, Employers Health Alliance (EHA), etc.

OHP contractors in public-private partnerships with the State of Oregon.

The State of Oregon: Ellen Rosenblum, Attorney General  and John Doe staff members of the Oregon Department of Justice; Anthony Corcoran, Susan Rossitier, and "Shelly" Doe of the Oregon Employment Department; former Governor John Kitzhaber; Cyvlia Hayes, acting as an agent for the state of Oregon; Chris Lynch, Operations Manager, Oregon Bureau of Labor and Industry, Jeremy Wolff, BOIL investigator, Kate Brown, as Secretary of State and, currently, as Governor of the State of Oregon, and Jeanne P. Atkins, acting Secretary of State, and Lynne Saxton and John Doe's at the Oregon Health Authority.

## III. JURISDICTION, VENUE

9.  The State of Oregon is part of these corrupt actions. The Relator cannot determine the full extent of public officials, courts, or other authorities are corrupt or not. Thus far, the Department of Justice and the Employment Office are provably part of attempts to cover this up and both have committed multiple unlawful acts. The Oregon Health Authority has officials who have received kickbacks and certain parties are known to be involved. Likewise, but this is based on comments and conversations with database administrators and report writers, Oregon's OHP contractors are likewise involved. Agate, provably is. The only trustworthy venue for all of this is with the federal courts.

This, also is a federal matter. The retaliation, by the State of Oregon and Agate Healthcare involve collusion, evidence tampering, the destruction of documents, and both judicial and prosecutorial misconduct in retaliation against the whistleblower and his family. State employees and Agate employees are both involved in breaking federal laws and defrauding the federal government.

10.  The Petitioner has information that suggests the involvement of other persons. Most notably, kickbacks, in the form of shares and fraud against the government of the United States.

## IV. ALLEGATIONS

11.  The Petitioner has information that suggests the involvement of other persons for suspicious reasons, but payments by Agate suggest bribery or payoffs. Most notably, probable kickbacks, in the form of shares, were given to Peter Davidson, Executive Vice President and Chief Financial Officer at Pacific Source, had received 440 as of September 2008, all of which were exercised, with a value of least $15,000 (and, according to the independent audit report, rather than the reported number from Agate, the value of those shares is $1000 each. Then, the value of those shares was $440,000).

Similarly, Rhonda Busek, a lobbyist for Agate Resources and executive officer at LIPA, and currently an senior level official of OHA, had received 563 shares as of the third quarter of 2010, with a declared value of $14,636, but, again, according to the outside audit, had an actual value of $563,000.

Similarly, political figures and certain physician's, for rewards not connected with LIPA or as profit sharing, had received enormous quantities of shares. Several of these are currently board members of Agate, the Trillium CCO, or lobby with the State on behalf of Agate. Others, however, have no relationship with Agate that can be identified.

Also, and somewhat more mysteriously, there are records that have no name attached to the records.

12.  The defendants do business in the State of Oregon, with the State of Oregon. The Relator observed "shares", payments, in the form of shares, made by OHP contractors, made to public agency heads, hospital executives, physician's, employees of the Oregon Health Authority, and others. The Relator has records, the dates, and shares given to some public agency heads and employees of the Oregon Health Authority, hospital executives, physicians. The Relator, also, has a list of names, of state officials who received payments, shares, and other favors and was researching those when he was terminated. (Exhibits 1 and 2, on CD; various shareholder reports; and Exhibit 3, names of other recipients of money, from Agate's server )

13. The Relator has an audit report questioning Agate's accounting practices that show a 300% profit increase from 2011 to 2012, by the movement of money from corporate shells. It should be noted that this suggests tax fraud, also. That audit report shows a variation in the value of the share's. Agate claims they are valued at between $200 and $333, whereas the auditor reports being told they were valued at a flat rate of $1000 per share. (Exhibit 4)

The Relator discovered that the claims database did not account for Agate's billings to Medicare and,Medicaid or DME. Those bills were on tables maintained outside of Agate's intranet and resided with Brandy Whitmire, personal accountant to David Cole (VP of Finance)  and Terry Coplin (CEO of  Agate). Mr. Coplin, also, had private tables setup on his MacBook computer by the Relator.

The records seen by the Relator show a discrepancy between the amount paid for DME and the amount billed to the government. An electric wheelchair would have a contracted value of, say, $500, on a claim. Agate would, routinely, bill this to the government at the maximum allowable amount, disconnected from the claim. Agate's Apropo Benefits Management unit had previously been caught, but not punished, for this.

The Relator also saw wide discrepancies between amounts paid for services. Some vendors, and physicians, would be paid four or more times the established amount using multiple provider identifiers and paid under vendor codes. Furthermore, Mr. Coplin boasted about this to the Relator as having bought their loyalty and cooperation.

14.  The Relator, beginning in 2007, participated in data extracts  and studies for so called self funded insurance plans, funded by employers. There were three different kinds of reports. The first listed the employee, their healthcare number, the number of dependents and the sum of medical claims costs. The second was a data extract of claims, listing diagnosis (as diagnostic codes and in human readable format), cost, date of service (both from and to dates). (Exhibit 5, for Monaco Coach Corporation, exhibit 5 on disk "MONACO CLAIMS" and printed out on the master file)

Note, the Relator has seen the records for other employers, had records on his workstation, that suggest more widespread sales of this sort of information. Some of those employers were PacificCare, Secure Horizons (a PacificCare product), Pinnacle Health Plan, Seneca Sawmill, OMG (Self Insured Plans), Providence, and Pacific Continental Bank.

The Relator asked senior management what those reports were for and was told they were for sale to the employer for purposes of determining layoffs. The Relator reported this to the Oregon Attorney General's Office, by telephone, with a follow up of copies of the reports. The Attorney General's Office did not report any of this to federal authorities, as required by law under HIPAA HITECH, rendered an opinion o the Relator that Oregon was exempt from HIPAA, and has participated in a cover up of this. The Relator was outraged by this - employees were terminated because they had a sick spouse or child! Some suffered bodily harm or death as a result of this, because Agate and other OHP contractors.

15.  More recently, beginning in 2012, under the direction of Patrice Korjenek, COO at Agate Resources, Agate began providing patient names, and financial risk scores to hospitals, clinics and physicians. One of the chief beneficiaries of this was Sacred Heart Hospital and PeaceHealth, which the Relator saw resulting in patient dumping, based upon that information. Agate sent, still sends so far as I know, a "hot spotter" report of high cost patients on a monthly basis. (The mechanism for this is complex and the Relator would like/need to explain it to the Court or a Court appointed investigator.) (An example Exhibit of these reports is on the CD, "example HPRN/Analytics report to hospital")

The Relator wishes the court to take possession of those records, under seal, and to issue federal warrants to seize the other information detailed in this Action.

16.  Beginning in 2009, the Relator did data extracts and scripting, with custom filters and walking threshold algorithms, for the so called "Ten State Study". This study looked a Medicare and Medicaid data supplied by private businesses managing Medicaid and Medicare programs for ten states (Minnesota, Ohio, California, Washington, etc.). The contract was between Apropo Benefit Management and these businesses to discover DME fraud and abuse. That study was expanded several times with the total of discovered fraud totally $16 billion. The results of that study was not made available to the government. The Relator was alarmed when he was informed by a departing executive (at Agate) that the value of that study was to learn how to "get better at hiding DNE fraud". The Relator reported this to the Senior Medical Officer at Agate.

17. Those studies were, along with additional records of suspected wrong doing, were on my workstations at Agate. When Agate terminated me, I had an attorney file a spoliation letter with them on October 3, 2013. Nanette Woods, a member of senior management at Agate, ordered that my workstations be destroyed in spite of that. In anticipation of this, I made three different copies of those reports and stored them on Agate's intranet and places where it would be difficult for them to find. Likewise, backup tapes of everything on Agate's intranet are normally kept for at least one year.

Subsequent to this, Oregon Bureau of Labor and Industries apparently made known to Agate the location of those records where they were destroyed. That agency prohibited the transfer his case for unlawful termination, based on whistleblowing and state agencies, to the EEOC. In fact, in spite of documents showing state involvement, with BOLI promising to file an addendum to his case (which BOLI had originally refused to do), BOLI waiting until after the expiration of Oregon's statute of limitations. The Relator only discovered this, by accident, when he made an anonymous telephone call to BOLI and discovered that his assigned investigator had left and no new investigator has been assigned to his case.

The Relators cell phone records (the Relator does not have a landline) show multiple phone calls to BOLI, trying to find out what they were doing. Those telephone calls were not returned. BOLI, the Relator alleges, operating as an administrative agency, operating under the Governor's office, purposefully derailed his legitimate complaints as part of a state coverup.

18. As shown by SQL scripts [Exhibit 13] used to load data into medical analysis software, Agate obtained and used genetic test results, reports of residential stays alcohol and drug treatment centers, state information about mental health conditions and the drugs prescribed for treatment. Senior Medical staff had, repeatedly, spoken out about this being unlawful to Ms. Korjenek, but were ignored or retaliated against, themselves.

19. A series of unlawful acts by Agate and state of Oregon officials that amount to a criminal conspiracy, covered under the RICO statutes. The Relator believes that this is a

6 of 12

normal practice by the state. These include bribery, pay to play campaign contributions violations, conflict of interest, and agency member misconduct. The Oregon Health Plan is a piggy bank for certain officials in Oregon, a source of campaign money, jobs for relatives and friends, lobbyists, and bribes and kickbacks for agency heads. The retaliation against the whistleblower, following his termination, by an OHP contractor and the state of Oregon is illustrative of what whistleblowers can expect in Oregon"

The Relator applied for unemployment when he was terminated. The Realtors health insurance was cancelled and his health savings account were seized by Agate, upon his termination. The Relator was essentially penniless, unable to afford a surgery to his foot, for an injury that occurred, at least in part, on the job.

When the Relator applied for unemployment compensation, he was denied compensation based on Agate's use of fabricated and fraudulent documents. Those documents were falsely attributed to a former supervisor, when they were written by Ms. Nanette Woods and Patrice Korjenek and those documents allege incidents that did not happen, could not possible have happened. Furthermore, as indicated in multiple email exchanges, Agate falsified the Relators  They are criminal defamation that is a federal concern, since the unemployment programs in the United States are joint state-federal programs and the Relators claim for unemployment has been used by Agate as retaliation for whistleblowing and by the state of Oregon as retaliation and an opportunity to do discover on behalf of Agate.

Unemployment compensation was denied. That was appealed by the Relator to the Oregon Administrative Court, where evidence and testimony showed that Agate's documents were fabricated, that the Relator had been injured in work assigned activities and, so the Relator believed, Agate was attempting to avoid the legal ramifications of that -
  (i) harassment by Ms. Korjenek where, with one foot in a cast, the other in a brace, and on crutches, the Relator was told to clean his office with a media cart having one inch diameter wheels, resulting in a fall, swelling, an MRI and x-rays that included iodine injections into the right foot joint, etc.
  (ii) violations of the federal Family and Medical Leave Act. A determination that immediate surgery was necessary, as a result of an injury that occurred directly as a result of that harassment resulted in doctors notices and a request by the by the Relator for leave time under the federal FMLA for immediate surgery (the Relator's doctors had been recommending surgery since July, 2013, which the Relator had been requesting under FMLA and Agate had promised leave time "in November, following the completion of database work for the ACA, COO, etc.)
  (iii) the removal of legally filed grievances from the Relator's personnel file and introduction of fabricated documents.

The Administrative Court judge found in the Relator's favor and her written finding was that the Relator was terminated without cause. Judge Monroe wrote, in her "Conclusion of Law" , "The claimant was discharged but not for misconduct".

Agate appealed this to the Oregon Employment Appeals Board. The EAB board, a board of political appointees by Governor John Kitzhaber, meeting with only two members, instead of the required three, with one board member having a primary conflict of interest (his wife is a Nurse Practitioner whose practice is with Agate and is friends with Agate Senior Management) overturned a court decision by the Administrative Court.

In addition, as the Relator later discovered, on the day following Agate's appeal to the EAB, they made a $10,000 "campaign contribution" to the Kitzhaber for Governor campaign.

Similarly, when the Relator filed about this, about BOLI misconduct and the involvement of the Governor's girlfriend, Cylvia Hayes (when the Relator attempted to complaint the BOLI had refused to transfer his EEOC case to the EEOC, to accept complaints concerning retaliation for whistleblowing and other wrong doing by Agate and the state, he was transferred to a woman representing herself as Cylvia Hayes, who claimed to be a BOLI supervisor), Agate made another "campaign contribution" of $10,000 on 10/21/2014, after they and Oregon being served with papers for unlawful conduct in the Relators wrongful termination in this matter.

That these were not "campaign contributions", but bribes, is born out by the fact that records indicate Agate Healthcare of *never* having made campaign contributions prior to this. The dates, the amounts, designed to circumvent federal notice, all provide sufficient evidence that these were bribes. The fact that the EAB introduced new hearsay "evidence" and they used documents shown to be fabrications, and excluded for that reason by the Administrative Court judge. This is a classic case of Pay to Play politics. (exhibit 10, 11, 12)

In the United State v Milton E. McGregor, et al (2:10cr186-MHT), the court wrote: "…when there is a quid pro quo agreement, orally or in writing, that is, a mutual understanding, between the donor and the elected official that a campaign contribution is conditioned on the performance of a specific official action, it constitutes a bribe under federal law." There is clearly sufficient evidence, here, to bring charges against both the EAB and former Governor, here, and to charge Agate with attempted bribery.

Following the EAB's overturning the the court decision, evidence suggested to the Relator that the EAB broke state and federal rules by having Agate or their attorney actually write their decision. When the Relator appealed the EAB decision to the Oregon Court of Appeals, the EAB needed Agate's attorney to "assemble the record". The EAB did not have it!

The Relator discovered in May 2014 that Agate had hacked into his private computer and had read email communications between himself and federal investigators and private attorney's. The Relator had been sent home, on "administrative leave", for unspecified reasons at 9;00 a.m. on September 16, 2013 and Microsoft Corporation records prove that intrusion took place by Agate beginning at 10:37 a.m. and continuing

beyond 11:21 a.m. Those records show an email, from the Relator, to Agate at 11:53 a.m. on the same day. There is another series unlawful intrusions on 9/20/2013 from a Seattle WayPort WiFi hotspot (IP Address 64.134.136.142). The Relator notes that this is internet hacking across state lines. This was reported to the FBI. These are both in state and interstate intrusions, in violation of both state and federal laws (18 USC § 1030). That the target was a whistleblower, that Agate had no right or permission to hack into the Relators email, and that they used that information for obstruction of justice and retaliation, likely involving state officials, makes this a federal crime and a serious violation of the Relators civil rights.

The Relator, also, has documents of unlawful cell phone intercepts, likely by agents of Agate or by the state of Oregon. The state of Oregon operates the Titan Fusion center, under the Oregon Department of Justice. The Relator used equipment and software to trace these intercepts and has screen shots of them. When the Relator drove to the location of the "spoofed" cell phone tower, he observed a van leaving the area with state license plates, but was unable to get a photograph of that. This is not proof of state involvement, but it clearly suggests it and suggests state involvement in this matter and, furthermore, suggests state misuse of DHS equipment and programs in spying on and retaliation against a known whistleblower. The Supreme Court ruled on June 25, 2014, that cell phone communications and the information contained on them, are protected. "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet or a purse," Chief Justice John Roberts wrote for the court. That the decision was written, not just over warrantless police access to cell phone information, but over the protection of medical information, stored on a cell phone, and that was the original reason Agate and Oregon targeted the Relator's cell phone and computer, makes this especially pertinent.

The state's use of this technology is especially worrisome because the Relator has information concerning the political use of information obtained via Titan, opposition research for favored political candidates, spying on petitioners opposed to state actions. Reports in the Oregonian and Willamette Week have been based on leaks of information from this source.

With "nothing to loose", since Agate knew due to hacking his computer, the Relator revealed to the court that he was a whistleblower and that Agate had been hacking into his computer since at least the middle of August, 2013. They had discovered that the Relator was reporting fraud, kickbacks, bribes, and other unlawful activities to private attorney's and to the Oregon Attorney General's Office. The Relator had reported HIPAA violations to CMS, HHS, the US Attorney General, and other federal agencies. Those documents can be provided to the Court, if it so wishes.

20.  The consequence of that was the involvement of the Justice Department (intercepting and withholding motions filed to the Oregon Court of Appeals) (Exhibits 7 and 8), the Unemployment Office demanding a federal I-9 form, demanding detailed

financial and bank records, records of everywhere the Relator had lived or worked since high school.

A state employee with a distinctive voice pattern and accent, the Relator believes to be Australian, called the Relator representing herself as a special investigator for US Health and Human Services. She demanded a detailed account of the Relators finding and all of the documents the Relator had AND had in safekeeping with attorneys. The Relator declined and called HHS, called the FBI, and was informed that no such investigator existed, and they would be highly unlikely to schedule a Starbucks coffee shop for such a meeting. (Exhibit 9, transcript and notes, a recording of this is on the CD in the folder "Voice Recording From Shelly")

(The Relator only has a cell phone, records of all of those calls from the State are available. However, since the Relator's cell phone is an iPhone, with iCloud storage, the hackers have likely had access to every record, email, and document written or collected by the Relator, likely by the use of an IMSI catcher and intercepts.) The Relator has changed passwords, constantly monitors his email and phone for intrusions, but the unknown parties always reappear after a few days at most, until quite recently. [14].

The Relator is unfamiliar with the requirements for use of DHS provided equipment, however he cannot fathom any circumstance under which a state or state contractor would be granted federal approval for this. This, at the very least, requires the state and Agate to turn over records as to the reason provided to federal authorities for these blatant intrusions.

The Oregon courts have gotten deeply involved in this, too, and have been attempting to cover up unlawful acts by the State  have committed judicial misconduct to accompany the prosecutorial misconduct by the Oregon Judicial Department and the Employment Department and the Oregon Court of Appeals and engaged in conduct that begs for an investigation (See accompanying federal lawsuit for details on this.)


21.  The Relator also has some knowledge of Cover Oregon. Grants were given to OHP contractors to create gateways into the State site. The Relator heard, second hand, that Agate received a grant for several million dollars for this. The person creating that gateway was Agate's sole web page programmer, a full time Agate employee. At best, his work on this would have taken a few weeks. Even $20,000 would have been an exorbitant amount to pay for this.

(Note, the Relator created web sites and portal, filling in for the web page programmer, when he was busy, and has a very good idea of how long it takes to create a web portal.) All of the OHP contractors offer a healthcare plan on Oregon's exchange and all received grants. If the Court wants to know where the "other" two-thirds of the federal grant money disappeared, this is where the bulk of it went. Usual practice would entail kickbacks to multiple persons. That could be found by looking at the current shareholder

accounts, payments and "campaign contributions" to various political figures involved in these schemes.

The Relator has additional information and is desirous to hand it off to the government. The Relator stands ready to assist the government in any way, to recover that money.

22. The Relator has contacted multiple state and federal agencies about this matter. The Relator contacted Kate Brown, when she was Secretary of State, concerning his whistleblowing and asked for protection from retaliation and assistance. The Relator contact Jeanne Atkin's, when she was on Senator Jeff Merkley's staff, concerning all of this (spoke to her for over an hour, answering every question she asked, in anticipation of Senator Merkley's help in resolving this mess — she took the information directly to the state, and was rewarded by being made Secretary of State) and has repeatedly attempted to get the Oregon Secretary of State Office concerning retaliatory acts against himself and his family, the use of "campaign contributions" as bribes, suspected unlawful corporate activities by Agate and present and former Agate senior management officials. She did nothing. The Relator has repeatedly contacted the Seattle Regional Office of the EEOC, asking them to pry his case loose from BOLI, and to ask them to investigate BOLI when Mr. Lynch and other BOLI officials dismissed his case when the Relator filed a complaint in federal court over their misconduct, failure to keep promised filing, failure to communicate with the Relator as required by law.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, through Relator, requests the Court to enter the following relief

A.  Defendants be ordered to cease and desist from violating the federal statutes and regulations pertaining to HIPAA, unlawful intrusions using IMSI catchers and other cell phone intercept equipment, unlawful hacking into my emails and other communications.
B.  Defends be ordered to cease and desist any unlawful persecution of whistleblowers in this matter and in the investigation of Cover Oregon (and the Relator has information of fraudulent activities concerning THAT, also.)
C.  That this Court makes the State of Oregon liable for at least one third of the damages, since Oregon willfully failed to disclose to the federal authorities revelations of criminal conduct as detailed by HIPAA HITECH, enabled  and participated in the coverup of these unlawful actions and colluded with Agate in retribution against the Relator for whistleblowing,
D.  That this Court enter judgement against the Defendants an amount $650 million for willful and continuing violations of HIPAA.
E.  That this Court enter judgements against the Defendants in the amount of $1.5 billion for DME fraud

F.  That the "Ten State" records be used to pursue contractors in other states for DME fraud under the False Claims Act

G.  That this Court enter judgements for $30 million against the the State of Oregon, agency heads, employees, hospital heads, physicians, and others who have received kick-backs, "shares" and payoffs

H.  That this Court order a federal task force to interview the database and network administrators, report writers, analysts for all current and past OHP contractors for similar violations, which the Relator was told about  *personally* from other database administrators for Oregon Health Plan contractors at state meetings.

I.   That this Court enter appropriate judgements for other violations of federal law resulting from this complaint.

J.   That this Court order all of the victims of unlawful termination by Agate and Oregon in their sale of medical information be informed of that and compensated for unlawful termination and for any harm done as a result of their and their dependents losing medical insurance.

K.  The Relator begs this Court to criminally prosecute Terry Coplin, Nanette Woods, Patrice Korjenek, The CCO and LIPA Board colluding with Agate in defrauding Medicaid and Medicare, Oregon Attorney General Ellen Rosenblum, Employment Board members, Tony Corcoran and Susan Rossitier, Employment Department Employees "Shelly" and the unnamed woman representing herself as a federal agent, and others involved in this for their unlawful acts in this matter. My State is engaged in racketeering, misappropriation of federal funds, fraud, bribery and kickback schemes, and it requires the intervention of the federal courts to return to the rule of law and recapture it's dignity and the trust of its citizens.


The Relator swears that everything in this complaint is true, to the his knowledge.


Michael T. Brooks
32713 Vintage Way
Coburg, OR  97408

mibrooks@me.com

mobile:  541-556-6130

# EXHIBIT 7

Reilley D. Keating, OSB No. 073762
reilley.keating@stoel.com
Stephen H. Galloway, OSB No. 093602
stephen.galloway@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

   Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ex rel. MICHAEL T. BROOKS,<br><br>   Relator,<br><br>v.<br><br>TRILLIUM COMMUNITY HEALTH PLAN, INC.; AGATE RESOURCES, INC.; and LANE INDIVIDUAL PRACTICE ASSOCIATION, INC.,<br><br>   Defendants. | Case No.: 6:14-cv-01424-MC<br><br>**DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI ATTACHED TO RELATOR'S REPLY AND REBUTTAL** |

## **LOCAL RULE 7-1(a) CERTIFICATION**

Pursuant to LR 7-1(a), counsel for defendants Trillium Community Health Plan, Inc.

("Trillium"), Agate Resources, Inc. ("Agate"), and Lane Individual Practice Association, Inc.

Page 1 - DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI
     ATTACHED TO RELATOR'S REPLY AND REBUTTAL

("LIPA") (collectively "Defendants") certify that they conferred with relator Michael T. Brooks ("Relator") and that Relator opposes the Motion.

## MOTION

Defendants hereby move to seal the petition for writ of certiorari filed by relator Michael T. Brooks ("Relator") as an attachment to his "Reply and Rebuttal, Defense Demand to Enforce Protective Order" and to place a redacted version of his petition in the public record, on the ground that Relator's unredacted petition discloses the confidential health information of third parties.

## MEMORANDUM OF LAW

### I. BACKGROUND

Relator worked as a database administrator for Agate from 2005 to 2013. He was terminated in 2013 and, on September 3, 2014, filed this *qui tam* action under seal asserting violations of various federal laws, including the False Claims Act, 31 U.S.C. § 3721 *et seq.* ("FCA"). (*See* Dkt. 3.) During this proceeding, Relator's counsel acknowledged that Relator had retained possession of a large quantity of Defendants' documents and information, including many documents containing PHI. (Dkt. 51 ¶ 6.) On January 20, 2016, this Court entered a Protective Order requiring the return of all confidential documents at the conclusion of the litigation, including all documents Relator retained from his employment with Defendants. (Dkt. 57.)

Other than a Petition for Writ of Certiorari to the U.S. Supreme Court filed by Relator in another action (the "Petition"), all of his lawsuits and administrative actions against Defendants have now concluded, and Defendants on December 22, 2020 filed a Motion to Enforce Protective Order seeking the return or destruction of all confidential documents, including all of

Page 2   -   DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI
ATTACHED TO RELATOR'S REPLY AND REBUTTAL

Defendants' documents that Relator retained upon his termination. (Dkt. 91.) Relator's "Reply and Rebuttal" to that Motion attached a copy of the Petition, which describes some records of college students and medical treatment they received, potentially disclosing PHI.[1] Although Relator filed a motion to seal two other documents containing PHI, he did not seek to seal the Petition.

## II. THE COURT SHOULD SEAL THE CONFIDENTIAL HEALTH INFORMATION IN RELATOR'S PETITION FOR WRIT OF CERTIORARI.

A party seeking to seal a judicial record must typically overcome the "strong presumption" in favor of public access by meeting the "compelling reasons" standard," which allows a record to be sealed only when the Court finds "a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016) (quoting *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006)). The Court must then "conscientiously balance[ ] the competing interests of the public and the party who seeks to keep certain judicial records secret." *Id.* at 1097 (quoting *Kamakana*, 447 F.3d at 1178).

An exception exists, however, "for sealed materials attached to a discovery motion unrelated to the merits of a case." *Id.* (citing *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.,* 307 F.3d 1206, 1213–14 (9th Cir. 2002)). Under this exception, a party need only show "good cause," as directed by Federal Rule of Civil Procedure 26(c)(1), which relates to protective orders. *Id.* (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). "When deciding what test to apply to a motion to unseal a particular court filing— the presumptive 'compelling reasons' standard or the 'good cause' exception—[courts] have

---

[1] Because this petition potentially disclosed PHI, Defendants are not submitting a copy, but it can be provided *in camera* upon request.

Page 3  -  DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI ATTACHED TO RELATOR'S REPLY AND REBUTTAL

sometimes deployed the terms 'dispositive' and 'non-dispositive,'" depending "on whether the motion at issue is more than tangentially related to the underlying cause of action." *Id.* at 1098-99.

The Court should apply the "good cause" standard here because the Petition is an exhibit unrelated to the merits of this action that is attached to a discovery motion response. But regardless of which standard the Court applies, the Petition should be sealed.

**A.    Preventing Disclosure of HIPAA Protected Health Information Constitutes Good Cause to Seal the Petition.**

To safeguard the privacy of patients, the statutory and regulatory protections of the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"), supply a compelling reason to seal the information in Relator's petition for a writ of certiorari. *See* Pub. L. No. 104-191, 110 Stat. 1936 (1996); 45 C.F.R. pts. 160, 162, 164. Except as specifically authorized by regulation, any public disclosure of "protected health information" by a covered entity is prohibited by HIPAA and its implementing regulations. 45 C.F.R. § 164.502(a). Courts in this circuit have filed documents under seal on the grounds that protection of protected health information constitutes good cause. *Ennis v. Aetna Life Ins. Co.*, No. 3:18-CV-01617-WHO, 2018 WL 4636197, at *4 (N.D. Cal. Sept. 24, 2018).

Here, the information that Relator discloses about the college students appears to be protected health information, for the following reasons. *First*, the information—as described by Relator—appears to constitute "health information." Under HIPAA, "health information" is information that (1) is created or received by a health care provider, health plan, or certain other entities, and (2) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual. 45 C.F.R. § 160.103. Here, according to

Page 4  -   DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI
ATTACHED TO RELATOR'S REPLY AND REBUTTAL

Relator, the information about the medical care sought by the college students appears to have been created by the student's health care providers and transmitted to the student's health insurer. The information also relates to the students' health and the provision of medical care to them, including reproductive services. It appears, therefore, to be "health information" for purposes of HIPAA.

*Second*, the health information as described by Relator appears to be "individually identifiable health information." That term includes health information "with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103. Individually identifiable health information may include demographic information. 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103.

Here, there is a reasonable basis to believe that one of the individuals could be identified from the combination of the individual's (1) nationality, (2) family of origin, (3) gender, and (4) status as a college student in Oregon. (*See* Pet. at 3, 9.) As a result, the individual's identifying characteristics and the reproductive services sought by this individual appear to constitute "individually identifiable health information."

Furthermore, the petition describes two other individuals by student status and nationality. (*Id.*) However, the de-identification of health information entails removing certain geographic identifiers that apply to fewer than 20,000 people. 45 C.F.R. § 164.514(b)(2)(i)(B). Here, the health information about two individuals of a specified nationality located at Oregon colleges—out of a group that is likely much smaller than the regulatory criteria—may also constitute individually identifiable health information for purposes of HIPAA.

*Third*, all "individually identifiable health information" transmitted or maintained in any

form or medium is "protected health information" unless a regulatory exception applies. 45

C.F.R. § 160.103. It does not appear that any of the exceptions are applicable here.

In sum, the information in Relator's petition for a writ of certiorari appears to be

protected health information that Congress sought to ensure would remain confidential to protect

patient privacy. The serious infringement of these college students' privacy that would result if

the unredacted petition were to be made public strongly supports sealing it.

**B.    Alternatively, Compelling Reasons Exist to Seal the Petition.**

Even if the Court applies the more rigorous "compelling reasons" standard, it should

nonetheless order the Petition to be filed under seal. "The need to protect medical privacy

qualifies in general as a 'compelling reason.'" *Karpenski v. Am. Gen. Life Companies, LLC*, No.

2:12-CV-01569RSM, 2013 WL 5588312, at *1 (W.D. Wash. Oct. 9, 2013) (quoting *G. v.*

*Hawaii*, 2010 WL 2607483 (D. Haw. 2010)). As discussed above, the Petition contains what

appears to be HIPAA-protected health information, and disclosing it would provide no public

benefit and would violate this Court's Protective Order.

**1.    The Public Would Gain Nothing by Disclosure of the Health Information.**

There would be no public benefit from disclosing the health information of these third-

party college students. The particular details of the individuals' personal lives and medical care

are not germane in any way to the Petition or to Relator's obligation to comply with the

Protective Order. Thus, public disclosure of the information would not lead to even an

incremental improvement in the public's understanding of this Court's disposition of

Defendants' Motion. Rather, the information would serve only to "promote public scandal" and

reveal the "painful" details of third parties' personal lives and health. *Nixon v. Warner*

*Commnc'ns, Inc.,* 435 U.S. 589, 598, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) (internal quotation marks and citation omitted).

### 2. Public Disclosure of the Information by Relator Could Violate the Protective Order Entered in This Case.

Relator does not specifically explain the manner in which he obtained the records and information about these college students, but it seems likely—or at least possible—that he obtained them through his former position as a data warehouse administrator at Agate. (Pet. at 30 ("When he was granted access to the claims database in 2010/11, Brooks started looking for fraud, looking backward to 2000 in the record set and forward to the present day."); *see also id.* at 9 ("Brooks tried to provide this court with records showing harm done to foreign nationals. . . . Agate and Centene got those records from Oregon.").) If those records and the information therein were obtained by Relator from or in connection with his employment at Agate, the information is subject to the Protective Order and "shall be deemed Confidential" pursuant to that order. (Dkt. 57 ¶ 3.) Any disclosure of it to the general public by Relator would violate the Order. (*Id.* ¶ 8.) Yet even after being repeatedly reminded of the Protective Order, Relator appears to have intentionally ignored it by attempting to publicly file the Petition containing the students' information in both this Court and the Supreme Court. Relator's deliberate disregard for the privacy interests of third parties constitutes yet another factor weighing in favor of sealing.

### III. CONCLUSION

Regardless of which standard the Court applies, it should order the Petition to be filed under seal. The redacted Petition contains all of the original's contents except the confidential health information of third parties. Because there would be no public benefit but would be significant harm to these individuals' privacy if the health information at issue were to be made

Page 7   -   DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI ATTACHED TO RELATOR'S REPLY AND REBUTTAL

public by Relator, and because the disclosure likely violates the Court's Protective Order,

Defendants respectfully request that the Court seal Relator's unredacted Petition and substitute in

the public record the redacted version attached hereto.

DATED:  January 28, 2021.

STOEL RIVES LLP

/s/ Stephen H. Galloway
REILLEY D. KEATING, OSB No. 073762
reilley.keating@stoel.com
STEPHEN H. GALLOWAY, OSB No.
093602
stephen.galloway@stoel.com
Telephone:  (503) 224-3380

Attorneys for Defendants

EXHIBIT 8

**Mike Brooks**
Mike Brooks Schedule
September 18, 2013 at 9:34 AM



My schedule:

Per my PTO request to Patrice (approved) I am going to be in Seattle this coming Friday. My friends are leaving for Luxembourg on Saturday and I need to pick up some things for storage from them as well as seeing them off.

Monday, September 23, 2:00 p.m. Doctor's appointment with Dr. Brian Mehlhaff. He's a urologist, but was the doctor who found the growth in my right lung and, per my PCP's direction, has been doing an annual Cat-Scan, tests, and has prescribed drugs for that.

Thursday, 12:00, Doctor's appointment with Dr. Katherine Beckstrand to follow up on that and to run another series of tests and conduct a complete physical examination.

Daily, I work out at Oakway Fitness from 4:30 until 6:00. Every Tuesday and Thursday I meet with either a dietician or trainer. Today, however, at 4:30, I have a scheduled meeting with a trainer, too, for weight lifting. Because of the injuries to my feet, I cannot do Tae Kwon Do and Hopkaedo any longer and it is extremely important that I get into a regular routine of exercising per my PCP.

I am supposed to make a followup appointment with Dr. Edwards about my eye before the end of the month.


Mike Brooks

EXHIBIT 9

1

2

3        STATE OF OREGON
4   DEPARTMENT OF CONSUMER AND BUSINESS SERVICES
         DIVISION OF FINANCIAL REGULATION

5   In the Matter of                              Case No. INS 15-12-003

6   AGATE RESOURCES, INC.,                        ORDER TO CEASE AND DESIST,
                                                  ORDER ASSESSING CIVIL PENALTY,
7               Respondent.                       AND CONSENT TO ENTRY OF ORDER

8          WHEREAS the Director of the Oregon Department of Consumer and Business

9   Services ("Director"), by and through the Division of Financial Regulation, commenced

10  this administrative proceeding, pursuant to Oregon Revised Statutes ("ORS") 731.256, to

11  take enforcement action against Agate Resources, Inc. ("Agate"); and

12         WHEREAS Agate wishes to resolve and settle this matter with the Director,

13         NOW THEREFORE, as evidenced by the authorized signatures subscribed on

14  this order, Agate hereby CONSENTS to entry of this order upon the Director's Findings

15  of Fact and Conclusions of Law as stated hereinafter.

16

17                              FINDINGS OF FACT

18         The Director FINDS that:

19         1.     Trillium Community Health Plan, Inc. ("Trillium") is an Oregon corporation

20  formed on February 14, 2006.  Trillium's last known principal business address is 1800

21  Millrace Drive, Eugene, OR 97403.

22         2.     Lane Individual Practice Association Inc. ("LIPA") is an Oregon corporation

23  formed on January 29, 1996.  LIPA owns 60% of Trillium's issued and outstanding

24  shares of common stock.

25         3.     Agate is an Oregon corporation formed on December 12, 2003.  Agate's last

26  known principal business address is 1800 Millrace Drive, Eugene, OR 97403.  Agate

Division of Financial Regulation
Labor and Industries Building
350 Winter Street NE, Suite 410
Salem, OR 97301-3881
Telephone: (503) 378-4387

Page 1 of 4 – CONSENT ORDER – Agate Resources, Inc.          (INS 15-12-003)

1  provides administrative services and leases employees and buildings for Trillium and

2  LIPA.  Agate owns 40% of Trillium's issued and outstanding shares of common stock

3  and 100% of LIPA's issued and outstanding shares of common stock.

4     4.     Trillium received its certificate of authority as a health care service contractor

5  in Oregon on April 18, 2006.

6     5.     Agate has never been issued a certificate of authority evidencing the authority

7  to transact insurance in Oregon.

8     6.     Trillium had a verbal reinsurance and risk sharing arrangement with its parent,

9  Agate, under which Trillium paid a per-member, per-month fee to Agate in return for a

10  percentage of the risk between $100,000 and $300,000.  The risk sharing arrangement

11  started on August 1, 2012 and ended on December 31, 2014.

12

13                              CONCLUSIONS OF LAW

14        The Director CONCLUDES that:

15     7.     Agate transacted insurance as defined under ORS 731.102(1) and ORS

16  731.146(1)(c) by receiving a per member, per month fee from Trillium in return for a

17  percentage of the risk between $100,000 and $300,000.

18     8.     Agate did not hold a certificate of authority under ORS 731.072(1).  Agate

19  violated ORS 731.022 and ORS 731.354 because Agate transacted insurance without a

20  certificate of authority issued under ORS 731.072(1).

21     9.     In accordance with ORS 731.988(1), the Director may assess civil penalties in

22  an amount not to exceed $10,000 per violation against persons who violate any provision

23  of the Insurance Code.

24

25                                   ORDERS

26        Now, therefore, the Director issues the following ORDERS:

Division of Financial Regulation
Labor and Industries Building
350 Winter Street NE, Suite 410
Salem, OR 97301-3883
Telephone: (503) 378-4387

1    10.    Pursuant to ORS 731.252, the Director hereby ORDERS Agate to

2  immediately cease and desist from having a reinsurance and risk sharing arrangement

3  with Trillium in violation of ORS 731.022 and ORS 731.354.

4    11.    In accordance with ORS 731.988(1), the Director hereby ORDERS Agate to

5  pay a civil penalty of $10,000 (ten thousand dollars) for violating ORS 731.022 and ORS

6  731.354. The payment shall be made in the form of a check payable to the "Department

7  of Consumer and Business Services." The payment shall be delivered or mailed to the

8  Division of Financial Regulation at the Labor and Industries Building, 350 Winter Street

9  NE, Room 410, Salem, OR 97301-3881; or mailed to the Division of Financial

10  Regulation at PO Box 14480, Salem, OR 97309-0405. The payment is due and payable

11  within 30 days of the final execution of this order.

12    SO ORDERED this __10__ day of _February_____, 2016 in

13  Salem, Oregon.

14               PATRICK M. ALLEN, Director
                      Department of Consumer and Business Services

15

16

17               ___*/s/ Laura Cali*_____

18               Laura N. Cali, FCAS, MAAA
                      Insurance Commissioner
                      Administrator, Division of Financial Regulation

19        *[The remainder of this page intentionally left blank.]*

20

21

22

23

24

25

26

Division of Financial Regulation
Labor and Industries Building
350 Winter Street NE, Suite 410
Salem, OR 97301-3881
Telephone: (503) 378-4387

CONSENT TO ENTRY OF ORDER

1

2   I, ___Terry W. Coplin_____, state that I am an officer of Agate
Resources, Inc. and I am authorized to act on its behalf. I have read the foregoing order,

3   and I know and fully understand the contents hereof. I have been advised of the right to

4   a hearing and of the right to be represented by counsel in this matter. Agate Resources,

5   Inc. voluntarily and without any force or duress consents to the entry of this order
expressly waiving any right to a hearing in this matter. Agate Resources, Inc.

6   understands that the Director reserves the right to take further actions to enforce this

7   order or to take appropriate action upon discovery of other violations of the Insurance

8   Code. Agate Resources, Inc. will fully comply with the terms and conditions stated

9   herein.

10  Agate Resources, Inc. understands that this order is a public document.

11  /s/ Terry W. Coplin_____

12  Signature

13  Terry W. Coplin_____
Printed name

14
Secretary – Officer_____

15  Office held

16

17  ACKNOWLEDGMENT

18  There appeared before me this _2__ day of __February_____, 2016,

19  _____Terry W. Coplin_____, who was first duly sworn on oath, and stated that

20  she/he was and is an officer of Agate Resources, Inc. and that he is authorized and

empowered to sign this Consent to Entry of Order on behalf of Agate Resources, Inc.

21  and to bind Agate Resources, Inc. to the terms hereof.

22

23  __/s/ Sandra Lee Stepp_____
Signature of Notary Public

24

25

26

# EXHIBIT 10





# EXHIBIT 11

**STATE OF OREGON**
**DEPARTMENT OF CONSUMER AND BUSINESS SERVICES**
**INSURANCE DIVISION**

BEFORE THE DIRECTOR
OF THE DEPARTMENT OF CONSUMER AND BUSINESS SERVICES

| | | |
|---|---|---|
| In the Matter of the Proposed Plan of Acquisition of | ) | Findings of Fact, Conclusions of |
| Control of Trillium Community Health Plan, Inc., | ) | Law and Order |
| Eugene, Oregon, by Centene Corporation, St. Louis, | ) | |
| Missouri | ) | Case No. 15-04-022 |

INTRODUCTION

On February 6, 2015, Centene Corporation ("Centene") filed a Statement Regarding the

Acquisition of Control of or Merger with a Domestic Insurer to acquire control of Trillium Community

Health Plan, Inc. ("Trillium") as required by ORS 732.517 through 732.546 (the "Form A"). The filing

fee required under OAR 836-009-0007(12) was received by the Oregon Insurance Division on February

12, 2015. The acquisition described in the filing was approved by the Board of Directors of Centene on

January 23, 2015.

Supplemental information was periodically provided until the filing was complete on June 24,

2015.

FINDINGS OF FACT

(1)    Trillium was incorporated in Oregon on February 14, 2006, as a for-profit corporation that

received its Certificate of Authority as a health care service contractor on April 18, 2006. Trillium is a

subsidiary of Agate Resources, Inc. ("Agate") and Lane Individual Practice Association, Inc. ("LIPA"),

which own 40% and 60% of its issued and outstanding common stock, respectively.

(2)    Trillium was authorized to operate as a Coordinated Care Organization ("CCO") under a contract entered into with the Oregon Health Authority ("OHA") on August 12, 2012 (with renewal contracts and amendment, the "CCO Contract").

(3)    Agate is an Oregon corporation formed on December 12, 2003. Agate provides administrative services and leases employees and buildings for Trillium and LIPA. Agate owns 40% of Trillium's issued and outstanding shares of common stock and 100% of LIPA's. Agate is owned by more than two hundred individual shareholders.

(4)    LIPA is an Oregon corporation formed on January 29, 1996, that owns 60% of Trillium's issued and outstanding shares of common stock. It is a wholly owned subsidiary of Agate.

(5)    Centene is a publically traded diversified, multi-line healthcare enterprise that provides programs and services to government-sponsored healthcare programs, focusing on under-insured and uninsured individuals. Centene subsidiaries offer healthcare services in several states, including California, Washington, Florida, Illinois, Massachusetts, Ohio and Texas.

(6)    Prefontaine Merger Sub, Inc. is a Delaware corporation and wholly owned subsidiary of Centene ("Merger Sub") that was formed to facilitate the acquisition of Agate by Centene and is not expected to have any material business operations.

(7)    Trillium has 5,000 shares of common stock outstanding with LIPA owning 3,000 shares and Agate owning 2,000.

(8)    Centene proposes to acquire control of Trillium through its acquisition of Agate (the "Acquisition") through a merger of Merger Sub with and into Agate, with Agate as the surviving corporation in the merger (the "Merger"). As a result of the Merger, the shareholders of Agate will be entitled to cash consideration and Centene will become the sole shareholder of Agate and thereby gain control of Agate and Trillium.

Page 2

(9)    Centene has access to cash sufficient to pay the purchase price for the stock of Agate as provided for in the Merger Agreement.

(10)    The terms and conditions of the acquisition are set forth in the Agreement and Plan of Merger by and among Centene Corporation, Prefontaine Merger Sub, Inc., Agate Resources, Inc. and James Dalton, as the stockholder representative (the "Agreement"), dated as of January 25, 2015.

(11)    Trillium management forecasts that following the contemplated dividend described in paragraph (15) below and closing of the acquisition, the year end 2015 capital and surplus of Trillium will be approximately $47,000,000.

(12)    The Purchase Price is set forth in the Agreement.  It was established through negotiations between Centene and Agate. The purchase of Agate includes all of its subsidiary entities, including LIPA and Trillium."**Final Merger Consideration**" means, as finally determined pursuant to Section 2.12, the sum of:

      (i) $80,000,000;

      *plus* (ii) the Aggregate Option Exercise Price;

      *minus* (iii) the excess, if any, of the Working Capital Target over the Final Working Capital;

      *plus* (iv) the excess, if any, of the Final Working Capital over the Working Capital Target;

      *minus* (v) the excess, if any, of the Target RBC over the Final RBC;

      *plus* (vi) the excess, if any, of the Final RBC over the Target RBC;

      *minus* (vii) the Final Indebtedness;

      *minus* (viii) the Final Transaction Expenses;

      *minus* (ix) the Stockholder Representative Holdback Amount; and

      *minus* (x)  50% of the Community Investment Fund Amount.

      "**Deferred Purchase Price**" means $20,000,000.

On each of the first, second and third anniversaries of the Effective Time, Purchaser shall deliver to the Paying Agent, by wire transfer of immediately available funds to an account designated in writing by the Paying Agent an amount in cash equal to the product of (x) 1/3 of the Deferred Purchase Price *less* (A) any Reduction Amounts, (B) any Unresolved Claim Amounts, in each case, not previously deducted from payments made hereunder, and/or (C) any Additional Stockholder Representative Holdback Amount and (y) the Stockholder Percentage, for distribution to the Stockholders.

(13)    Following the acquisition of Trillium, Centene does not anticipate a change to the corporate name of Trillium.

(14)    There are no current plans, other than as stated herein, to declare an extraordinary dividend, to liquidate, or to sell or merge any assets of Trillium following the acquisition.

(15)    Under the Merger Agreement, prior to closing Trillium is expected to declare and pay a dividend to Agate and LIPA (with LIPA paying the amount it receives to Agate in the form of dividend) such that Trillium's Risk Based Capital would be reduced to approximately, and not less than, 200.00 percent of Trillium's Authorized Control Level. Action to declare the dividend may be taken following the approval of the acquisition, and payment of the dividend will be made prior to the closing of the acquisition. Centene and Agate understand that any such dividend will require prior notice to and the prior approval of the Division, or failure of the Division to disapprove the request for approval of the payment of such dividend during the period prescribed by ORS 732.576.

(16)    Centene provided an anticipated parental guarantee of Trillium that will go into effect following the approval of the transaction to ensure certain financial benchmarks of Trillium are within regulatory thresholds, as defined under the Insurance Code, Oregon Administrative Rules, and guidance and processes as defined by the National Association of Insurance Commissioners. The guarantee is solely

limited to the regulatory authority of the Insurance Division of the Oregon Department of Consumer and Business Services.

(17)    Subject to rights shareholders may have under the Agreement and under ORS 60.551 through 60.594, the legal positions, equities, rights and relationships of Agate's individual shareholders, as shareholders of Agate, will terminate upon consummation of the acquisition.  Immediately following the acquisition, Centene will directly own 100% of the issued and outstanding common stock of Agate.

(18)    The legal positions, equities, rights and relationships of Agate will continue upon consummation of the acquisition.

(19)    The legal positions, equities, rights and relationships of LIPA will continue upon consummation of the acquisition. Immediately following the acquisition, through its 100% ownership of Agate, Centene will indirectly own 100% of the issued and outstanding common stock of LIPA.

(20)    The legal positions, equities, rights and relationships of Trillium will continue upon consummation of the acquisition. Immediately following the acquisition, through the 100% ownership of Trillium by Agate and LIPA, Centene will indirectly own 100% of the issued and outstanding common stock of Trillium.

(21)    All current officers and directors of Trillium will remain in place immediately following the Closing. Terry Coplin, Secretary and Chief Executive Officer of Trillium, will enter into a separate employment agreement with Centene in connection with the Closing.

(22)    Upon completion of the proposed acquisition, Trillium will have management comprised of individuals with many years of experience in insurance.

(23)    OHA provided by letter dated June 12, 2015, that Trillium is in satisfactory standing under the terms of the CCO Contract and that the acquisition will neither alter Trillium's compliance with the certification standards for CCO nor fundamentally change the information based on which Trillium was certified as a CCO.

Page 5

(24)    On the basis of the Statement Regarding the Acquisition of Control of Trillium Community

Health Plans, Inc. by Centene Corporation and specifically on the basis of the findings of fact above, the

Director enters the following:

## CONCLUSIONS OF LAW

1.    The Statement Regarding the Acquisition of Control of Trillium Community Health Plan, Inc. by Centene Corporation that was submitted to the Director is properly supported by the required documents and meets the requirements of the Oregon Insurance Code for approval with respect to acquisitions and mergers pursuant to ORS 732.517 to 732.546.

2.    The Director finds that there is no evidence that:

(a)    The activity is contrary to law or would result in a prohibited combination of risks or classes of insurance.

The acquisition of control of Trillium by Centene is permitted by ORS 732.517 to 732.546.

(b)    The activity is inequitable or unfair to the policyholders or shareholders of any insurer involved in, or to any other person affected, by the proposed activity.

The activity is not inequitable or unfair to the policyholders or shareholders of any insurer involved or to any other person affected by the proposed activity. A subsidiary of Centene will merge with and into Agate and Agate's existing shares will be converted into the right to receive the negotiated price. Trillium projects that, following the contemplated dividend and acquisition, the capital and surplus of Trillium for the year ended 2015 will total approximately $47,000,000.

(c)    The activity would substantially reduce the security of and service to be rendered to policyholders of any domestic insurer involved in the proposed activity, or would otherwise prejudice the interests of such policyholders in this state or elsewhere.

The activity will not substantially reduce the security of and service to be rendered to policyholders of any domestic insurer involved or otherwise prejudice the interests of such policyholders in this state or elsewhere.

(d)    The activity provides for a foreign or alien insurer to be an acquiring party, and the insurer cannot satisfy the requirements of this state for transacting an insurance business involving the classes of insurance affected by the activity.

The activity does not provide for a foreign or alien insurer to be an acquiring party. As such, this provision is not relevant to the Director's consideration.

(e)    The activity or its consummation would substantially diminish competition in insurance in this state or tend to create a monopoly.

> This transaction will not substantially diminish competition of insurance in this state or another state or tend to create a monopoly.

(f)    After the change of control or ownership, the domestic insurer to which the activity applies would not be able to satisfy the requirements for the issuance of a certificate of authority to transact the line or lines of insurance for which the insurer is currently authorized.

> Trillium will be adequately capitalized to transact the lines of business for which it is authorized in Oregon. *See* ORS 750.045.

(g)    The financial condition of any acquiring party might jeopardize the financial stability of the insurer.

> The transaction with Centene will enhance – not jeopardize – the financial stability of Trillium.

(h)    The plans or proposals that the acquiring party has to liquidate the insurer, sell its assets or consolidate or merge it with any person, or to make any other material change in the insurer's business or corporate structure or management, are unfair and unreasonable to policyholders of the insurer and not in the public interest.

> Following the proposed transaction, Centene has no current plans to liquidate Trillium, sell its assets or consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management.

(i)    The competence, experience and integrity of those persons who would control the operation of the insurer are such that it would not be in the interest of policyholders of the insurer and of the public to permit the activity or its consummation.

> There is nothing to suggest that the competence, experience and integrity of those persons who will control the operation of Trillium will not be in the interest of Trillium policyholders and of the public to permit the activity or its consummation.

(j)    The activity or its consummation is likely to be hazardous or prejudicial to the insurance-buying public.

> The transaction will not be hazardous or prejudicial to the insurance-buying public.

(k)    The activity is subject to other material and reasonable objections.

Page 7

OHA provided written indication that the acquisition is not expected to alter Trillium's satisfactory standing under the terms of the CCO Contract. Centene intends that Trillium will continue performing its obligations under the CCO Contract. The Division considered over 50 public comments received, both in support and opposition to this transaction over a period of 36 days. After considering all comments, the division finds that there are no material or reasonable objections to this transaction.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered that the acquisition of control of Trillium Community Health Plan, Inc. by Centene Corporation is hereby approved and is found to be fair, just and equitable to the Trillium Community Health Plan, Inc. policyholders.

DATED this _25_ day of June, 2015.

LAURA N. CALI
Oregon Insurance Commissioner

## NOTICE

Pursuant to ORS 732.528 (6), any insurer or other party to the proposed activity, including the insurer proposed to be acquired, within 60 days after receipt of a notice of approval or disapproval, may appeal the final order of the director as provided in ORS 183.310 to 183.550. For purposes of the judicial review the specifications required to be set forth in the written notice from the director will be deemed the findings of fact and conclusions of law of the department.