**REDACTED**

March 29, 2021

## IN THE
## SUPREME COURT OF THE UNITED STATES

### MICHAEL T BROOKS

<u>Petitioner</u>

vs

### US COURT OF APPEALS FOR THE NINTH CIRCUIT CSE #19-35547
**Centene Corporation**
**dba Agate Resources**
**dba Agate Health Care (aka Agate Healthcare)**
**dba LIPA (aka/dba Lane Individual Practice Association**
**(aka.dba Lane Independent Physicians Association**
**dba Trillium Community Health Program**
### US DISTRICT COURT FOR THE DISTRICT OF OREGON: 6:15-cv-00983
Brooks v. Agate Resources, et al

<u>Respondents</u>

## ON PETITION FOR WRIT OF CERTIORARI

Michael T Brooks
32713 Vintage Way
Coburg, Oregon 97408
541-556-6130

## TABLE OF CONTENTS

COVER PAGE...........................................................................................i
TABLE OF CONTENTS..........................................................................ii
QUESTIONS PRESENTED.....................................................................iii
LIST OF PARTIES BY CASE..................................................................iv
RELATED CASES.....................................................................................v
INDEX TO APPENDIXES........................................................................v
TABLE OF AUTHORITIES CITED.......................................................xii
  CASES..........................................................................................viii
  STATUTES AND RULES........................................................xiii
  OTHER......................................................................................xiii

**REDACTED**

OPINIONS BELOW..................................................................................1
JURISDICTION and OUTLINE OF THE ISSUES...........................................7
CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ...............7
STATEMENT OF THE CASE......................................................................8
1.  ORGANIZATION OF THIS DOCUMENT...............................................17
BROOKS EXPERTISE.............................................................................37
REASONS FOR GRANTING THE PETITION................................................38
CONCLUSION......................................................................................39

**EXHIBIT 2**
**Page 2 of 53**

**REDACTED**

## QUESTIONS PRESENTED

**1. Can the federal courts ignore the Federal Rules?**

Brooks was granted informa pauperis status at the District Court when he first filed this case in 2015 by District Court Judge Thomas Coffin. The Appeals Court dismissed 19-71240 in violation of FRAP 24 ignoring the fact that Brooks already had informa pauperis status at the district court level. Brooks provided the appellate court with the original grant of informa pauperis and records showing his financial status had worsened since then.

District Judge Aiken of the Oregon District Court assigned Magistrate Judges in violation of FRCP 73. Two different Magistrate Judges with conflicts of interest were assigned by Judge Aiken ignored Roell et al. v. Withrow, No. 02-69 (2003). Judge Aiken retaliated against Brooks for opposing those appointments and dismissed his wrongful termination case.

**2. Are the federal courts subject to the Rehabilitation Act and the American's With Disabilities Act and the ADAAA extensions?**

Brooks wrote a request for a stay while he recovered from a seven hour long heart surgery on January 31, 2020. Instead of granting that, the Court issued multiple Orders and a team of three defense counselors filed motions; more than 700 pages of documents and 30+ motions, with the Courts all piling on with Orders.

    **\* The Court denied counsel to Brooks who is paralyzed on the left side and has had three major surgeries in the last 18 months - cancer, upper spine, and heart. Brooks cannot sit up for more than 10 minutes, walk, or even sleep (his swallow reflex is gone.**

    Brooks was terminated by his employer after the cancer diagnosis and the spinal injury result from an on the job accident. The employer cancelled Brooks medical insurance, refused to even offer Cobra, literally tore up requests for Workman's Compensation medical for on the job injuries (detached retina, broken foot, lower back herniated disks). Those are STILL without necessary care.

    Brooks's former employer controls "Authorization Approvals" in Oregon and denied Brooks an MRI and treatment for 14 months causing spinal compression nerve damage to reflexes and Brooks' heart. Brooks cannot sleep laying down without choking from an impaired swallow reflex, is paralyzed on the left side cannot move his neck because four disks and two vertebrae were destroyed.

    As a result of a torn spinal sheath (Mylin Sheath) is suffering from the onset of MS:

> *... in MS, the sheath covering nerve fibers in the brain and spinal cord becomes damaged, slowing or blocking electrical signals from reaching the eyes, muscles and other parts of the body. This sheath is called myelin...Although several treatments and medications alleviate the symptoms of MS, there is no cure. "There are no drugs available today that will re-myelinate the de-myelinated axons and nerve fibers, and ours does that," said senior author Tom Scanlan,*

**EXHIBIT 2**
**Page 3 of 53**

*Ph.D., professor of physiology and pharmacology in the OHSU School of Medicine.*

3. Are attorney's allowed to misrpresent fact (lie) to the court and Pro Se Plaintiffs? Can the Article 3 Courts ignore this?

## LIST OF PARTIES

All parties **do not** appear in the caption of the case on the cover page. A list of all possible parties to the proceeding in the court whose judgment is the subject of this petition is as follows.

## NINTH CIRCUIT 19-35547 (appeal of 6:15-cv-00983-TC/JR/MK/AA)

Sidney R. Thomas
William C. Canby. Jr.
Ronald M. Gould
Case #19-35547
US Court Ninth Circuit Court of Appeals
THE JAMES R. BROWNING COURTHOUSE
95 7TH STREET,
SAN FRANCISCO, CA 94103

### Oregon District Court 6:15-cv-00983-TC/JR/MK/A

Magistrate Judge Thomas Coffin
Magistrate Judge Jolie A. Russo
Magistrate Judge Mustafa T. Kasubhai
District Judge Ann L. Aiken
US District Court, District of Oregon
Eugene Division
405 East Eighth Avenue
Eugene, Oregon 97401

Carolyn D. Walker
Ryan Gibson
Reilley D. Keating
Stephan H. Galloway
Rachel C. Lee
Brianne L. Bridegum
Bradley F. Tellam
Stoel Rives, LLP
760 SW Ninth Avenue, Suite 3000

**REDACTED**

**Portland, Oregon 97205-2584**

## RELATED CASES

Lane v Franks; 13-483, April 28, 2014

Julia Davis v. Department of Homeland Security

Fabula v. American Medical Response, Inc

United States of America vs. Lindberg, Gray, Palermo, Hayes; 5:19-cr-22-FDW

Lincoln v. BNSF Ry. Co. (10th Cir. 2018); failure of agency to file EEOC complaint

Sewell v Freedom Health, et al; 8:2009cv01625 (2017)

Thompson v. North American Stainless, LP, 562 U.S. 170 (2011)

Leary v Centene Corporation; 14-CV-2547

M.D. et al v Centene Corporation et al; 1:18-cv-22372
Dual Diagnosis Treatment Center, Inc. et al v. Centene Corporation et al; 2:2020cv04112

https://www.contractormisconduct.org/contractors/67/health-net-inc
20 lawsuits against HealthNet (This is actually Centene dba Trillium Community Health Plan in Oregon and North California)

"Centene sued over lack of medical coverage" in 15 states; New York Times
https://www.nytimes.com/2018/01/11/health/centene-health-insurance-lawsuit.html

"5 Ways Insurance Companies Meddle in Your Health Care", US News and World Report, July 13, 2017

## INDEX TO APPENDICES

APPENDIX A... US COURT OF APPEALS FOR THE NINTH CIRCUIT CASE #19-35547
Michael T. Brooks v Centene Corporation;
appealing
APPENDIX B... US DISTRICT COURT FOR THE DISTRICT OF OREGON: 6:15-cv-00983
Brooks v Agate Resources, et al

March 29, 2021                    Page v of xiii                    Writ of Certiorari re:19-35547

**EXHIBIT 2**
**Page 5 of 53**

REDACTED

*NOTE: "AGATE HEALTH CARE" doesn't exist. This was a deliberately misleading name by Stoel Rives, and Agate Resources came up with in the Dean Harris whistleblower case. In Oregon Department of Consumer and Business Services, Division of Financial Regulations, case No. INS 15-12-003 Terry Coplin was fined $10,000 for passing Agate Resources off as an insurance company, when it (and Centene) do not even have licenses to conduct insurance business in Oregon.*

Trillium Community Health Plan is a fraudulent conveyance operated by Agate Resources and the Centene Corporation. It had a certificate to audit and pay claims for the Oregon Health Authority, which expired when Centene acquired it - ORS 441.025(3). Even with that, Trillium never was anything other than a limited Business Associate under Oregon's federal contract. Under 45 CFR 160.103, Trillium **does not** have a grant to own nor possess patient or claims records for any purpose but that limited by the Privacy Act:

- *A third party administrator that assists a health plan with claims processing.*
- *A consultant that performs utilization reviews for a hospital.*
- *A health care clearinghouse that translates a claim from a non-standard format into a standard transaction on behalf of a health care provider and forwards the processed transaction to a payer.*

Trillium has no employees, facility, administration, or assets. Employees were leased from Agate Resources and Agate Resources provided the administration and facilities. Centene kept that false paper structure and expanded it to all of its shells and subsidiaries to facilitate avoiding payouts in the many lawsuits it is subjected to. Neither Centene nor Agate nor their employees has a license to possess medical records and they cannot legally assign or lease employees for that purpose.

Oregon has no authority to exceed 45 CFR 160.103 and could not grant Agate Resources or the Centene Corporation nor any subsidiary the right to own or possess patient records or medical claims. This becomes very important when the Court understands that OHA **sold** and otherwise provided to Agate Resources HIV lab test results, psychiatrist and medication records for patients in the Oregon State (Psychiatric) Hospital and various county clinics throughout Oregon (and Washington and California). After Brooks pointed this out, Centene applied for a license on June 12, 2019, but Brooks cannot see where they have obtained that license. Brooks notes that Centene and Agate and all of their subsidiaries have operated illegally for years.

EXHIBIT 2
Page 6 of 53

REDACTED

The patient records sold by Agate include the name, address, family, social security number, employer, and other personal information. Agate Resources **sold** that information information brokers, credit agencies, insurers, doctors, employers, even private investigators. Brooks can prove this, too, and has examples of the actual spreadsheets sold. Brooks had more, but they were stolen by Stoel Rives and have disappeared.

Agate Resources had no authority to conduct business as the Employers Health Alliance, IPS, Apropo Benefits Management, Lane Home Medical, EHA Pharmacare nor any other mail order pharmacy Agate Resources operated in 33 states. Agate Resources sold hundreds of thousands of employee and family medical records under its EHA, Employers Health Alliance, and Alliance subsidiaries.

## TABLE OF AUTHORITIES CITED

### CASES

**Cochise Consultancy Inc. v. United States, ex rel. Hunt**
The Supreme Court likes to take cases where one district court disagrees with another district court. Here, however, you have a case where the District Court disagrees with the US Court of Appeals for the 11th Circuit and the US Supreme Court and refused to abide by your decision.

Roell et al. v. Withrow, No. 02-69 (2003)
          - Rule 73

Turner v. Rogers, No. 10-10 (2011)
Matthews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)
          - due process

Ingraham v. Wright;  Wisconsin v. Constantineau
          -Due Process

EEOC, Retaliation

Murchison 349 U.S. 133 (1955)
Marshall v. Jerrico, 446 U.S. 238, 242 (1980)
Schweiker v. McClure, 456 U.S. 188, 195 (1982)
*Rendell- Baker v. Kohn* (1982)

**EXHIBIT 2**
**Page 7 of 53**

Mathews v. Eldridge 424 U.S. 319 (1976)
Lawson v. FMR LLC 571 U.S. ___ (2014)
        - Public Corruption, State Actors

## STATUTES AND RULES

### FY 2012 EEOC/FEPA Model Work Sharing Agreement

\*\* as proven in "EEOC Appeal BOLI 12/16/2014", Brooks filed a written appeal within 15 days of the receipt of BOLI's decision. The exact words in the EEOC Charge sheet given to Brooks on January 23, 2014, were:

> **"As a party to the charge you may request that the EEOC review the final findings of the above named agency (which was blank) within 15 days of your receipt of the Agencies final decision".**

Brooks received both BOLI decision and another copy of EEOC form 131A on December 5, 2014, proving that BOLI knew about those charges and had not filed them as required by their Work sharing Agreement with the EEOC.

Brooks immediately BOLI's dismissal s to the Regional EEOC Office, EEOC OIG, etc. Nancy Sienko, Regional Director confirms her offices receipt of the appeal in her letter of April 22, 2015, where she refers to their conducting a weighted review under the terms of that appeal. Brooks does not know why it took them four months to do this, but that is not Brooks' problem.

The EEOC conducted a weighted review, found that Brooks filing of a suit against BOLI for deceiving him gave BOLI all the excuse they needed to terminate their case, but the EEOC a issued a letter of right to sue in federal court on April 23, 2015, as required by law.

Brooks filed 6:15-cv-00983-TC/JR/KM/AA on the case was posted on 06/04/2015, which is 42 days, well within the 90 days specified in the right to sue notice and form, issued by Sienko on April 23, 2015.

These dates are and processes followed are important because unlawfully assigned Magistrate Judge Mustafa T. Kasubhai bases his dismissal on Galloway's "secret" opinion to him that Brooks had not filed an appeal to preserve his EEOC complaints in a timely manner.

It gets worse when you look at the BOLI filing first sent to Brooks on December 1, 2014 (and received on December 5, 2014). That charge sheet contains two notary stamps when the notary only records one in her book on January 9, 2014. And, that was not even to BOLI. That was on a draft that Mosley and Donna Brown insisted Brooks sign. Using Adobe Acrobat to lift signatures and add them to documents is a crime and Oregon is doing this.

That the EEOC charge sheet doesn't arrive to BOLI until after January 23, 2014, two weeks after the what BOLI is trying to pass off as their official filing. The final blow, however, is delivered in that recording of March 3, 2014, read by BOLI attorney Jeremy Wolff. That bears no resemblance to what BOLI tries to represent they filed. Someone at BOLI was provably engaged in altered documents in violation of 18 USC 1001 and their failure to file Brooks' claims and derailing an administrative matter into the federal courts with Brooks facing three to five member teams fo Stoel Rives attorney's clearly violates *Section 1107 Sarbanes Oxley (18 USC 1513e)*.

**Civil Rights Act, both Title Vi and Title II**
No person shall discriminate on the basis of race, color, or national origin - sex; disability or age - in programs receiving federal assistance or funding. This would include the federal courts, also. Brooks is a disabled Native American dealing with a racist Oregon District Court and a completely clueless Appellate Court.

**Civil Rights Restoration Act of 1987 (P.L. 100-259)**C clarifies the intent of Congress as it relates to the scope of Title VI of the Civil Rights Act of 1964

**Section 504 of the Rehabilitation Act of 1973, as amended (29 USC § 794)**, prohibits discrimination against otherwise qualified individuals on the basis of disability in programs and activities receiving federal financial assistance. There is no provision to exclude the federal Article 3 courts from this requirement. Agate claimed to not even know that Brooks was disabled and had health problems. They destroyed evidence of Brooks' asking for accommodation on the advise of Stoel Rives (and there are witnesses to that phone call to Human Resources). That said, these people still left an accidental trail showing they had knowledge of the mass in the lung and foot injuries in the Personnel File:

> I'm heading out for lunch. I got here at 5:00 a.m. and my bu** is paralyzed and I am reduced to gnawing on my **crutches**...plus, oatmeal sounds "icky" ...[email to Cobb 12/14/2012, re: taking time off for lunch]

> re: ACA...again
> I'm sorry. I would pick them up, but the doctor wants me in the office today They suspect is that the **cancer has spread into my throat**, which is why I have been horse the past three weeks. [email to Cobb 11/19/2012 8:19 AM. Interestingly I was not in the office that day. I was at two different doctor appointments; an Otolaryngologist and a Urologist, both checking for cancer. The information about this was in a Status Report sent to Korjenek on November 9. There are records of lab tests, radiological imaging, and doctor appointments from 9:00 AM until 4:30 PM

> I **still had a lot of tests going on with my lung, another Cat-scan. Add to that a detached retina and a broken foot**. I spiraled into a major depression and my doctor, Dr. Katherine Beckstrand, decided to put my on a light dose of an antidepressant and a sleep medication. I believe that was called Paxil or something like that. I made 'really* depressed, with suicidal thoughts on top of that. It was awful. I was jumpy, nervous, couldn't sleep more than one or two hours a night, and had some of the most bizarre thoughts of my life. Dr. Beckstrand immediately pulled me off of that and I returned to being merely mildly depressed after a couple of weeks ....
> [purported statement by Brooks, but unsigned, in personnel file, dated 9/16/2013]

> Nanette - [Woods, Agate VP if Human Resources and Director of HR]

Per my PTO request to Patrice (approved) I am going to be in Seattle this coming Friday. My friends are leaving for Luxembourg on Saturday and I need to pick up some things for storage from them as well as seeing them off.

Monday, September 23, 2:00 p.m. **Doctor's appointment with Dr. Brian Mehlhaff. He's a urologist, but was the doctor who found the growth in my right lung** and, per my PCP's direction, has been doing an annual Cat-Scan, tests, and has prescribed drugs for that.

Thursday, 12:00, Doctor's appointment with Dr. Katherine Beckstrand to follow up on that and to run another series of tests and conduct a complete physical examination.

Daily, I work out at Oakway Fitness from 4:30 until 6:00. Every Tuesday and Thursday I meet with either a dietician or trainer. Today, however, at 4:30, I have a scheduled meeting with a trainer, too, for weight lifting. **Because of the injuries to my feet, I cannot do Tae Kwon Do and Hopkaedo any longer** and it is extremely important that I get into a regular routine of exercising per my PCP.

I am supposed to make a followup appointment with **Dr. Edwards about my eye** before the end of the month. [status report 09/18/2013]

Patrice Korjenek, COO of Trillium-Agate Resources, forgot a statement containing a reference from a letter from my primary doctor, Katherine Beckstrand, in my Personnel File:

...**He was <u>undergoing tests for spots on his lung</u>.** We agreed he had a lot to manage emotionally. He said he felt better than he had over the weekend and told me he was under a doctor's care. I shared this information with HR ...**HR has a doctor's note from that visit.**

[unsigned statement in Brooks' personnel file by Patrice Korjenek, written 09/18/2013]

That doctors letter concerned Brooks' adverse reaction to medication and a medical demand to give Brooks time off to recover. Korjenek not only did not give Brooks time off, she withheld that letter. Brooks found out about it after he looked at the Personnel Files in 2014. In fact, Agate's contrived email is on the date when Brooks was undergoing tests for those "spots on his lung" - it was a mass in the lower lob of the right lung, a growth on his back, and another growth on his voice box.

**Refusal by the federal courts to grant required accommodations. Refusals to grant** stays during and while convalescing from surgery all violate **29 UCS 794,** and especially with regards to Brooks opposing this discrimination for patients of Agate, Centene, OHA, and OHP <u>and by the Oregon District Court</u>. In fact, in 19-35547 the courts were issuing Orders and Stoel Rives filed more than 700 pages of motions while Brooks was confined to a bed after a seven hour long heart surgery where his heart stopped on the operating table!

**Section 1557 of the Patient Protection and Affordable Care Act** (42 USC § 18116 - PDF), which provides that an individual shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination on the grounds prohibited under Title VI of the

REDACTED

Civil Rights Act of 1964, 42 USC § 2000d et seq. - PDF (race, color, national origin), Title IX of the Education Amendments of 1972, 20 USC § 1681 et seq. - PDF (sex), the Age Discrimination Act of 1975, 42 USC § 6101 et seq. (age), or Section 504 of the Rehabilitation Act of 1973, 29 USC § 794 - PDF (disability), under any program or activity, any part of which is receiving Federal financial assistance, or under any program or activity...

**Section 242 of Title 18** makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority. Furthermore, those officials "shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section". The fines and imprisonment increase to ten years in cases involving bodily injury.

**Americans with Disabilities Act of 1990 (ADA) (42 USC § 12101 et seq., Title II at 28 CFR 35)** . Books notes that when the federal courts tried to narrow the scope of this, the Congress broadened this in 2008 with Pub. L. 110–325 effective Jan. 1, 2009. In Pub. L. 110–325, §2, Sept. 25, 2008, 122 Stat. 3553, explicitly broadened the scope of the ADA. Congresses intent was to apply that law to states and all federal agencies, including the federal courts. Brooks notes, even though the federal courts seem to forget this fact, that Congress created the federal courts under Article 3 of the Constitution Congress, if it so wished, terminate those Article 3 courts.

**Americans with Disabilities Act Amendment Act of 2008 (ADAAA) (P.L. 110-325, 42 USC § 12101 et seq. at 28 CFR 35)**

**45 CF 92.101 - Discrimination prohibited** - "...shall not, on the basis of race, color, national origin, sex, age, or disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity to which this part applies
**45 CFR 611.3** - "...may not directly or through contractual or other arrangements, on the ground of race, color, or national origin
**45 CFR 125 - Prohibition On Discrimination** - may not discriminate based on an individuals age, expected length of life, present or predicted disability, degree of medical dependency, quality of life, or other health conditions.
**45 CFR 200 - Health Plan Standards**

**Federal Rules of Appellate Procedure**
In accordance with 18, U.S.C., §3372, and Title 28, U.S.C., §§2072 and 2075, the Chief Justice of the US Supreme Court is authorized to transmit these to Congress for its consent or veto.
**FRAP 24** - Proceeding in Forma Pauperis

**EXHIBIT 2**
**Page 11 of 53**

(3) Prior Approval. <u>A party who was permitted to proceed in forma pauperis in the district-court action</u>, or who was determined to be financially unable to obtain an adequate defense in a criminal case, may proceed on appeal in forma pauperis without further authorization, unless:

> (A) the district court—before or after the notice of appeal is filed—**certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis and states in writing its reasons for the certification or finding**; or
>
> (B) <u>**a statute provides otherwise**</u>.

**28 USC §1915** - Proceedings in forma pauperis

Brooks was granted in forma pauperis status in 6:15-cv-00983-TC on June 8, 2015, by Judge Thomas Coffin (docket #5). The Ninth Circuit Court has tried to ignore that and even dismissed 19-71240 because Brooks had no money to pay a court filing fee. They ignore FRAP 24 in doing that.

## <u>Federal Rules Of Civil Procedure</u>

The Rules of Civil Procedure for the District Courts were adopted by order of the Supreme Court on Dec. 20, 1937, transmitted to Congress by the Attorney General on Jan. 3, 1938, and became effective on Sept. 16, 1938. United States Congress reserves for itself the right to veto any rule or change to the rules promulgated or they become part of the FRCP. Brooks notes that the Oregon District Court altered FRCP 73 without telling the US Supreme Court or Congress. Everything done by Magistrate Judges inflicted on litigants, denied a right to not consent, is unlawful and overturned.

**FRCP 73** - Magistrate Judges: Trial by Consent; Appeal

**28 USC §636c** - Jurisdiction, powers, and temporary assignment, <u>consent requirement</u>

## <u>Whistleblower Statutes:</u>

**45 CFR §160.316** - Refraining from intimidation or retaliation for **opposing HIPAA violations**

*29 USC Section 1558, PL 111-148 - Affordable Care Act*, *Protection for whistleblowers*
*29 USC §218C, Affordable Care Act*, *Protection for employees opposing discrimination in health care*

*12 USCA. 5567 - Dodd Frank, employee protection*

> *(4)* objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the Bureau.

*18 USC §1514A - Sarbanes Oxley*, *Civil action to protect against retaliation in fraud cases*

*<u>Criminal Statutes</u>*

### *Section 1107 Sarbanes Oxley (18 USC 1513e) -*

> *Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.*

### 18 USC §1001- Crimes and Criminal Procedure

> whoever, in any matter within the jurisdiction of the executive, legislative, or <u>judicial branch</u> of the Government of the United States, knowingly and willfully—
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

### *18 USC §1513e - Retaliating against a witness, victim, or an informant*

### *Privacy Act - 5 U.S. Code § 552a* - *Records maintained on individuals. Criminal and civil sanctions applicable to*

> *(1) Agate's sale of HIV, STD, counseling and other health records*
> *(2) the state of Oregon's sale of Oregon State (Mental) Hospital Records.*
> *(3) to the State of Oregon demanding federal I-9 forms from Brooks on behalf of Stoel Rives; banking records by Oregon Employment on behalf of Stoel Rives; Gates from the Audit Division demanding info for Stoel Rives and OR DOJ*

### <u>OTHER</u>

REDACTED

IN THE SUPREME COURT OF THE UNITED STATES
PETITION FOR WRIT OF CERTIORARI

Brooks respectfully prays that a writ of certiorari issue to review the judgment below.

## OPINIONS BELOW

For cases from federal courts:
I. The opinion of the US Court of Appeals appears at **Appendix A** and is unpublished
US COURT OF APPEALS FOR THE NINTH CIRCUIT CASE #19-35547
Michael T. Brooks v Centene Corporation dba Agate Resources dba Agate Health Care (aka
Agate Healthcare dba LIPA (aka dba Lane Individual Practice Association aka Lane Independent
Physicians Association dba Trillium Community Health Program

The opinion of the US court of appeals appears at **Appendix B** and is unpublished
US DISTRICT COURT FOR THE DISTRICT OF OREGON: 6:15-cv-00983
Brooks v. Agate Resources dba Trillium Community Health Plan, et al

## JURISDICTION

The Jurisdiction of this Court is invoked under 28 USC § 1254(1), an appeal from the US Court
of Appeals For the Ninth Circuit (9th Circuit).

**More importantly, however, is that that court never addresses and attempts to hide
key issues. The press has asked the Appeals Court to make the case public, but the court
refused:**

- Petitioner, Michael Brooks was injured on the job and was/has been denied treatment for those
  injuries. Agate has, in fact, abused its contract with Oregon to deny access to medical care.
  - The first injury was a torn retina in early 2012, followed by a detached retina. Those
    happened on the job and occurred after a three day weekend spent working in the dark, with
    a 13" monitor, Agate refused to allow the lights to be turned on to save money.
  - That was followed by doctors finding a mass in Brooks' right lung. Agate denied time off
    for surgery for that and later claimed to not even know about it. In a note in Brooks
    Personnel File there is a note from Agate Chief Operating Office (COO) Korjenek:
    *A couple of months later I lunched with Mike to see how he was doing. While many of his
    numerous personal problems continued, the spots on his lung were determined to be non-
    malignant, and he repeatedly told me that he was not in the same emotional state as when
    he spoke of suicide. Furthermore, he was resolved to have only professional contact with
    Amanda. [Korjenek (unsigned), 9/18/2013; Personnel File,* **Previously provided in
    electronic form because it is 201 pages long]**

REDACTED

- When Brooks was fired, Agate cancelled his insurance and seized his medical savings account. Brooks is insured through his wife's job as a school teacher. That insurance is through MODA Health (check the OEBB contract for Oregon). The problem is, Agate, operating under a number of different aliases, is the Benefits Manager for MODA and every other government insurance program in Lane County. They denied Brooks access to treatment.
- That was followed by a broken right foot in November 2012, after a lathe being knocked off an unstable bench that destroyed the cuboid, calcaneus (closed fracture) and 2nd metatarsal (open fracture) bones. Those, of course, did not heal and surgery was denied in spite of doctor requests for time off. COO Korjenek did promise time off for surgery in November 2013.
- Brooks spoke out against Agate's selling patient records and creating patient profiles and selling those to doctors. Those has resulted in 23,000 patients without primary care doctors which placed Oregon out of compliance with its contracts with Medicare, Medicaid, SCHIP, the ACA. That resulted in Brooks being demoted from his job in IT, being reassigned to Analytics, his job classification changed so that he was now salaried and exempt and his work changed so that he did two hours of custodial work from 6 to 8:30 AM most mornings before starting to work as a DBA. A heavy metal cart fell on the left foot on 8/19/2013, and crushed it. Do note that was all assigned while Brooks was in a cast, on crutches. Brooks had been in a wheelchair from May through early August. Brooks was well aware that Agate was trying to get him to quit.
- Instead, Agate hacked into Brooks' Microsoft email and cloud accounts and read correspondence Brooks had with federal investigators and attorneys about Agate's sale of patient records, and records obtained from Oregon: state hospital psychiatric records, drug and alcohol counseling records, HIV test results - Agate assembled positive test results in spread sheets with the patient name, address, social security number…those were sold to employers, credit agencies and information warehouses Brooks has an original spreadsheet from 2009 with 235 names on it. Stoel Rives is frantically filing motions with the Oregon District Court to have all of that evidence destroyed, etc.
- Foreign student counseling and medical records that apparently ended up being sold to foreign intelligence agencies. This would seem to be espionage, the records from Oregon going to Agate for money. Even then, what use do they have for ████████████████████████████████████████████

• This case involves the sale of patient profiles and records. Most of those were workers or impoverished or sick immigrants or US citizens. Thousands, however, were foreign college student. Student's insurance is sold by the Oregon Health Authority and those student records were illegally provided to Agate Resources, who sold them to other foreign agents and entities. This meets the definition of espionage. So…is Oregon allowed to engage in espionage? This violates international law, and clearly invokes the US Supreme Court in this matter.

EXHIBIT 2
Page 15 of 53

**REDACTED**

- This involves the Oregon OHA/OHP in breaking its state law. Oregon Department of Consumer and Business Services Division of Financial Regulations, [Cease and Desist Order case number Case No. INS 15-12-003, 02/02/2016], fined former Agate Resources owner Terry Coplin $10,000 for trying to collected money from a risk sharing scheme: "Trillium had a verbal reinsurance and risk sharing arrangement with its parent, Agate, under which Trillium paid a per-member, per-month fee to Agate in return for a percentage of the risk between $100,000 and $300,000". The fine was levied because

  > 8. Agate did not hold a certificate of authority under ORS 731.072(1). Agate violated ORS 731.022 and ORS 731.354 because Agate _transacted insurance without a certificate of authority issued under ORS 731.072(1)._

- ORS731.072 describes the non-profit public corporation, Oregon Health Exchange, under which OHP exists. However, ORS 441.025, "License Insurance", which describes the grant under which an insurer can exist reads:

  > (3) Each license shall be issued only for the premises and persons or governmental units named in the application and shall not be transferable or assignable.
  >
  > ...
  >
  > (12) A health care facility licensed by the authority or department may not:
  > (a) Offer or provide services beyond the scope of the license classification assigned by the authority or department; or
  > (b) Assume a descriptive title or represent itself under a descriptive title other than the classification assigned by the authority or department.

- Under the Byzantine [**Exhibit 1**] corporate structure Centene and Agate Resources operated, one of their shell companies had employees, assets, equipment, or management. They were owned by the parent corporation, Agate Resources until August 2015, when Centene became the parent company and owned Agate. The "prize" was Trillium Community Health Plan, which was assigned a license by the state to operate as Business Associate to process claims for Medicaid, Medicare, SCHIP, the ACA, and other government insurance programs. The problem is #3. Trillium, did not exist and, as of August 2015, when it was transferred to Centene, it lost any fictional license it might have held to even operate as a Business Associate under 45 CFR 160.103.

- This case involves the State of Oregon providing Agate Resources with patient records from the Oregon State Psychiatric Hospital and County psychiatric units. Agate Resources not only "traded" $5000 cash payments and gifts of stock shares worth hundreds of thousands of dollars for those records on a monthly basis. Agate Resources obtained patient HIV and STD laboratory test results, drug and alcohol counseling records, counsel records for the victims of sex crimes, marriage counseling records. All of those were sold by Agate Resources in violation of HIPAA. Oregon took part in much of this and profited from it....so is Oregon liable under HIPAA? How about Sarbanes Oxley for its public corporation created in 2011 under Senate Bill 99?

- The District Court has sealed those records and defense counsel, with Petitioner's appeal before this court, is demanding the court to order the destruction of that evidence. Petitioner needs an order from this Court to either take possession of those records or a Mandamus Ordering the District and Ninth Circuit to cease protecting Centene, Agate, MODA, and Oregon at the expense of hundreds of thousands of patient victims. That order should also require these courts to maintain and cease altering records and restore docket items they deleted.

- Are the Article 3 Courts subject to congressional acts, in particular: the ADA, ADAAA, and Rehabilitation Act. The District Court and the Circuit courts are not able to operate without federal funds and it was clearly Congresses intent to include them under its requirement to provide access and accommodations to the disabled. Those Courts provide those accommodations to judges and court employees. If litigants are not granted the same rights, this Court sets a contest where court employees, judges and attorneys enjoy rights denied to litigants: *"all animals are equal but some animals are more equal than other animals"*.
- Congress intended for the ADA, ADAAA, Rehabilitation Act to apply to attorneys. When Stoel Rives took advantage of Petitioner's disability they ran afoul of the ADAAA and are liable to sanctions under that law. Brooks filed motions and complaints about all of this with the judges and Courts in the District Court, the 9th Circuit, and the US DOL Administrative Courts and filed motions and complaints with the ADA and the US DOJ...which they chose to ignore.

- Are the Article 3 Courts free to disregard the Congressional and this Court's mandates for Due Process embodied in the Federal Rules of Civil Procedure and the Appellate Rules of Civil Procedure
    The Oregon District Court, with the concurrence of the 9th Circuit ignored this Courts's opinion in Roell et al. v. Withrow, No. 02-69 (2003). "The Federal Magistrate Act of 1979 (Act) empowers full-time magistrate judges to conduct ...any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case,' as long as they are "specially designated ... by the district court" and <u>acting with "the consent of the parties.</u> Petitioner objected to the appointment of two different Magistrate Judges because both were friends of Oregon Department of Justice Attorney Generals that took part in allowing Agate Resources to sell patient medical records.

- What are the limits imposed by judicial ethics on judges?
    Are judges allowed to assist favored attorney's with private communications where they inform counsel of the courts decision in a matter that has not even by replied to by opposing counsel?
    Can a senior judge intervene in a case , dismiss it, when Petitioner objects to her imposing crony Magistrate Judges over Petition objections where he wrote that those judges had conflicts of interest and ties to corrupt state officials that had accepted bribes from Agate?

REDACTED

- Are the Article 3 Courts permitted to assist defense attorneys, inform them of what the court will do before even getting a motion from opposing counsel?

     Brooks finally obtained a complete archive of emails from Dugan and Stoel Rives, with telephone records, that shows Stoel Rives entering into an agreement with Dugan to postpone discovery to "late October". The court was part of that agreement, too. Then, you see Dugan's office empty, with no phone, no mail, no internet and Stoel Rives sending RFP's, registered mail overnight letters **in June** (with the signature requirement carefully removed...but most were returned to them as undeliverable anyways). The court knew all about this, knew of the written agreement, and played this elaborate games just to deny Brooks discovery. Leiman, Johnson, London were co-counsels to Dugan and were not notified. Brooks was never called or emailed. Supposedly Reilly Keating, Stoel Rives and the federal Court spend 13 weeks "trying to contact Dugan at her vacant office", who they knew was out of state with the full cooperation of the court...18 USC 1001.

     Was this a clerk? Was it the Magistrate Judge? Was it the senior judge? Someone participated in a deliberate breach of judicial ethics. This is so egregious that the people Brooks has spoken to about it think it crosses the line into criminal conduct and it directly involved the district court. The court created a pretext to deny Brooks discovery and created a broken trial

- The 9th Circuit Court denied Due Process.
  - Brooks brought all of this to the attention of the 9th Circuit, along with the emails which the court refused to look at and returned to Brooks. Instead to looking at this, they pawned it off onto a **secretive "merit panel"**. Now, Brooks looked and cannot find any other Appellate Court with such a panel. There clearly is not such a thing in the Constitution, the FRCP, or ARCP. The 9th Circuit reserves those merit panels exclusively for Pro Se litigants where they dismiss subjects they don't want to look at. The 9th Circuit denied Brooks' request for the appointment of counsel, even they they were finally forced to grant him in forma pauperis status in 19-35547 for this very reason. Those judges knew Brooks could not write, could not get out to do research, did not have access to PACER and could not go to the federal courthouse to access their computer.
  - Did the United States turn into communist China when we weren't looking? Secret courts and panels! No control over what is presented to the panel? No right to even present a case to them or appeal? Couple that with District Court Judge Ann Aiken jumping in and dismissing the wrongful termination case in a tantrum over Petitioner's exercising his legal right to object to the imposition of Magistrate judge cronies? Brooks is still trying to figure out how Aiken can accept the inaccurate scribbling, actually written by defense counsel Stephen Galloway, when Kasubhai was not even legally assigned the case. The average person on the street has more legal say than this unlawfully imposed Magistrate Judge.
  - The federal courthouse in Eugene was locked down because of the wild fires from September through November and locked down over Covid as of February. No Pro Se litigant had any access to court documents or legal case history or legal research because

the courthouses are closed and documents and court proceedings are behind attorney pay walls like PACER.
- With the forest fires surround Coburg, the internet was down most of the time. Even if Brooks had not been crippled, could have driven to the courthouse, or if Brooks could have access to the internet, could somehow pay for access to those cases and legal research held behind subscription pay walls and only accessible to lawyers who can pay for access, Brooks was physically incapable of using that information.
- Brooks had cancer surgery in July.
- Brooks was recovering from that with the cardiac problems landing him in and out of the hospital from October on.
- Brooks was under the care of cardiologists as of October. He had a 7.5 hour long heart surgery on January 31, 2020.
- Brooks was not even recovered from that when Oregon Cardiology shut down surgeries over Covid. Brooks had no access to physical therapy, no access to water therapy.
- The US Court of Appeals for the Ninth Circuit, those judges, Stoel Rives mobs of Portland attorney's (safely away from the fire and apparently exempt from the lockdown that has shut the rest of the state) knew that, also.
- Add in the undeniable fact that Brooks did not receive over half of the mailings from the court, had no access to PACER, and his phone calls to the court clerk (assumably recorded) never met with an actual mailing or copy of motions, documents, orders.
- In Rome, when the empire was falling apart, the gladiator fights were the main form of entertainment. The "rabble" were given bowls of strong wine and sat and watched people die. One of the most popular events was for the elite to fight a slave or even a professional gladiator. First, however, officials broke an arm , a leg, or both; they usually stabbed or beat the sacrificial victim, rendering them unable to defend themselves. Then, they stuck them in the ring to be butchered by some rick and powerful social elite for sport. Oregon District Court, the US Court of Appeals for the Ninth Circuit, those judges are no different, no better than what took place in Rome.

• Both the District and Appellate Courts ignored the demands Congress imposes upon them when it enacted the ADA, ADAAA, and Rehabilitation Act. They are required to provide accommodations for a disabled Petitioner, something they refused to do. Instead, the seemingly took advantage of Petitioner's disabilities to file Orders, Motions, over a thousand pages of legal paperwork by teams of from three to six defense attorneys and an equal number of judges.
- The attorneys did not merely file supporting motions, they each filed their own. Petitioner, blind in the right eye, paralyzed on his left side, suffering from MS, having had cancer surgery in 2019 and a 7.5 hour long major heart surgery on January 31, 2020, was unable to even sit up and read those. Brooks dictated a letter to that effect to the Court.
- That merely resulted in the Court and defense lawyers to take advantage of a wounded Petitioner. The Appellate Court full well knew of the raging Holiday Farm forest fire and the fact that Brooks was surrounded by forest fires. Platoons of judges filed orders when an already sick petitioner was locked in and on the verge of being evacuated.

- Petitioner could not afford PACER and the Court fought allowing him to be in forma pauperis. Brooks threatened to appeal the that to the Supreme Court because he had been granted in forma pauperis status when he originally filed 6:15-cv-00983.

- If there are documents missing, required to be filed with this appeal, Brooks has no idea of what they would be because he never received them and has no access to PACER to even know what they might be. The judges at the 9th Circuit are, I assume, trying to dismiss this case on behalf of Aiken. What they have accomplished, however, is to pile court errors on top of court errors.

- Brooks has been in and out of hospital since December 1, 2018, with a brainstem infection, spinal surgery, a 7.5 hour heart surgery, and been in and out of the hospital for heart attacks, the latest of which was last month, October 18, 2020!

- Brooks now has MS due to the rouge actions of the Courts who have done things like order Brooks to print out and scan 5.2 GB (200,000 plus pages) of documents, write a log on them. This is a plaintiff that was injured on the job, is paralyzed on the entire left side, cannot swallow, cannot sleep laying down, with multiple sclerosis, who cannot even sit up for ten minutes and the court ordered him to stand for hours scanning or face sanctions? Of course Brooks ended up in the hospital four times over a two week period trying to comply.

- That stunt by the District Court ended with the Mylin Sheath being torn and resulted in the multiple sclerosis. The date was November 15, 2017. The court ignored pleas from Brooks and letters from doctors warning of the consequences of the court's actions. Look at the MRI **in Exhibit 2**

The Court can clearly see the torn mylin sheath, the brain stem infection, they compression on the spinal cord that cost Brooks his involuntary swallow [**Exhibit 3**], ankle, and knee reflexes [**Exhibit 4**] .

Over the last 18 months Brooks has had three major surgeries and spent most of that time recovering from those surgeries, unable to do anything. These filings are with the help of friends or, as in the present case, result from agonizing ten minute increments of work over weeks.

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED
The ADA, ADAAA, Rehabilitation Act and other laws cited in Jurisdiction

Fifth and Fourteenth Amendment, Due Process Clauses.
- This case involves procedural due process in a civil preceding
- This case involves substantiative due process - prohibitions against vague laws, the courts inventing law, especially with regards to discovery, in forma pauperis standards, and FRCP 73. The Courts have/are ignoring both statutory law and established case law
- The case involves due process in violation of Brooks's Bill of Rights in
  A. Ignoring basic human rights for a profoundly disabled litigant,
  B. Assaulting and intentionally inflicting bodily harm on Brooks
  C. Harming by hiding evidence for hundreds of thousands of patients harmed by cronies of Judges

D. The denial, by the Oregon District Courts, of Due Process for citizens in 32 other states who health records were sold, bartered, and exchanged, doing them physical and financial harm

## STATEMENT OF THE CASE

Ultimately, this case involves the Supreme Court because the Petitioner Michael Brooks was injured on the job and treatment for those injuries was not merely refused, the employer blocked access to medical care. Agate Resources is a wholly owned subsidiary of the Centene Corporation. Trillium Community Health Plan(s) is a subsidiary of theirs. Its convoluted and we will discuss it later. Petitioner will refer to the collection of these as Agate, because that paper corporation, with no employees, no assets, no facility or administration, existing as a pure fraud, describes the entire corporate structure of Centene. It is a gigantic shell designed to commit fraud.

For now, understand that Petitioner had Medicare and was covered as a dependent on his wife's state health plan as a school teacher under the Oregon Educator Benefits Board, operating under the Oregon Health Plan. Agate managed access to medical care, claims, and records under it.

The dependent coverage was required by Oregon for spouses. That made Medicare secondary. Brooks' former employer acted as the Benefits Manager and Pharmacy Benefits Manager for both policies. They could, and did, deny doctor referrals and authorizations for care. They even blocked prescription drugs like Xarelto and Metropolol, which Brooks takes for atrial fibrillation, atrial flutter, and bradycardia (all three) which resulted from spinal injuries sustained on the job, for which treatment was blocked and denied for eight years. That Kaiser supervisor of customer service gave Brooks her card if she is needed as a witness.

Abruptly cutting off Xarelto leads to some serious health issues:

- *Within 12–24 hours of stopping Xarelto: Side effects, such as headache, fatigue, dizziness, lightheadedness, easy bruising, back pain, nausea, heart palpitations, high blood pressure, leg weakness, and dry mouth, can occur. Risk of a blood clot or a stroke is high*
- *24–72 hours after stopping Xarelto: Emotional disturbances, such as depression, restlessness, anxiety, possible suicidal ideations, sleep difficulties, trouble concentrating, and problems thinking...*[Janssen Pharmaceuticals, Inc. 2020]

REDACTED

Agate was doing this as recently as January of this year at Kaiser Permanente. Their customer service discovered that "someone at Trillium" was switching Brooks prescriptions from Xarelto to Pradaxa There was no withdrawal period, either. A month before, "someone at Agate" completely dropped Metropolol, used to regulate heart rhythm , which resulted in Brooks pulse doing what you see in the exhibits - the rate switches suddenly from 40 BPM to 191 BPM and Petitioner passes out. "Someone at Agate" did this in October 2020, too.

Aside from the fact that Brooks had to borrow $537 for a 30 day supply of Xarelto to keep from dying, the trips to the emergency room are expensive and twice Brooks passed out while using his computer,  breaking it, loosing all of his work, and lay bleeding on the floor.

Brooks was not a "team player". Brooks was the lead database administrator (DBA) and programmer at Agate. His title was Data Warehouse Administrator. Brooks was demoted and removed from IT, made to directly report to Agate COO Patrice Korjenek and Analytics Department supervisor Amanda Cobb for speaking out at a staff meeting. The staff meeting, in 2012, was on HIPAA. Agate had been selling patient records since 2005 (after his termination, Brooks discovered that the DBA he had replaced, Dean Harris, had been fired for blowing the whistle on the same patient record sale, patient profiling, and denial of service schemes).

Brooks stood up and asked why Agate was creating and selling "Hot Spotter" reports for costly patients, selling those reports to doctors, and hiding the fact that those patients had lost primary care providers.

Brooks job category was changed from "hourly" to "Exempt" and, when Korjenek decided to make him quit, Brooks was assigned two job - as a custodian from 5 AM until 8:30 AM, as a DBA from 8:30 until when Korjenek decided (usually 7 PM or so) . It was worse when Brooks, because he broke his right foot (cuboid, calcaneus, and 2nd metatarsel -  surgery was required but Agate refused time off for that), could not drive. Korjenek had co-workers pick Brooks up from his home in Coburg and bring him to work. Korjenek would keep Brooks at work until everyone else had left and then, leave, leaving Brooks to find a ride home. Brooks either had to take a taxi or sleep on his cubical floor. Sleeping on the floor was so common, Brooks had a sleeping bag and pillow in his filing cabinet.

The right foot was Brooks on a fall for an escalator on November 23, 2012. That was made worse when doctors removed the cast in January and a small lathe was knocked off a self and crushed it. The left foot was crushed doing custodial work on August 19, 2013, when a

heavy metal cart, provided to transport garbage to an outside dumpster, fell on Brooks, injuring his back, crushing the left foot, and so injuring the right foot that it swelled inside the cast until blood circulation was cut off.

Brooks had an MRI on that left foot on September 28, 2013. The results were phoned to Brooks by Dr. Cassell on September 9, 2013, while Brooks was at work. Brooks reported that he needed surgery to Nanette Woods in Human Resources and she called in Korjenek, who told Brooks to leave and get the MRI and medical records before he would be allowed to return to work. Brooks got those and was able to return to work on September 12, 2013. Brooks also brought the Workman's Compensation form 801 paperwork to Korjenek, who tore it up and sent Brooks to his cubicle.

The following Monday morning, September 16, 2013, at 8 AM, Brooks was called into HR. Korjenek, Woods, and CEO Terry Coplin were present. The took Brooks' FOB. Badge, and Woods escorted him to his computer. He was told to log into the FaceBook account Cobb had created for Brooks and all of her employees. Brooks was wiped clean except for three scrabble games that Cobb had challenged Brooks to play. They placed Brooks on "administrative leave" but refused to tell Brooks why. It was a "secret complaint". Brooks kept his emails and Woods' replies where he pestered Agate for their reason for placing him on administrative leave, but they refused to provide it. On August 27, Woods called Brooks at home and told him he was being fired for "sexually harassing" Amanda Cobb.

Now, aside from the being his supervisor, Cobb was the author of those Hot Spotter reports that Brooks complained about in that staff meeting. She also ran Agate mail order pharmacy, where she literally took boxes of drugs from a cage in the warehouse to the Willamette Room and filled prescriptions, substituting drugs from a book. Cobb was a music major with no medical credentials whatsoever. What was she doing prescribing drug and filling prescriptions? The Court can hear Garrett Andres and I talking about this in a recording on the enclosed thumb drive. Brooks telephoned a complaint about it to US_HHS in 2011.

Beyond that, Cobb was disgusting. She referred to a young DBA working with Brooks, Vladimir, as "Vlad the Impaler" and tried to seduce him. She sent Brooks a Facebook message about an abrasion and followed up by telling Brooks it was from shaving. She made remarks about hot flashes and would regale us with stories of picking up men in bars and their sexual Olympics. Brooks was disgusted and filed a complaint with Human Resources. When Brooks

was fired, that was removed, but Brooks has dozens of emails between himself and Woods where those complaints are referred to.

While the termination was going on, Korjenek was hacking into Brooks' private Microsoft email and cloud account. You can look at the provided hacking records from Microsoft on the accompanying thumb drive [**Exhibit 6**]. Brooks is also providing Verizon telephone records. You can see the call record from Dr. Cassell at exactly 1:10 AM on 9/9/2013, the call to Brooks at home on 8/19/2013 at 9:33 AM by Nanette Woods after he crushed the left foot. The doctor call, calls to BOLI to try and lodge complaints about retaliation and harassment are all there. Brooks even kept emails. The one on August 20 is notable because ot is at WayPort 64, an AT&T owned hotspot in downtown Seattle, across the street from Stoel Rives Seattle offices. This was Agate's (and Oregon and MODA) law firm.

The photographs in **Exhibit 5** illustrate only some of the foot injuries. The skin splitting because of the swelling is not an artifact, it really happened. Brooks paid for surgery on his right foot after he was fired by Agate. That was done on March 21, 2014. Brooks had to wait until he received his own retirement savings (Brooks was 66 years old) because Agate held it back. That paid for the surgery.

Surgery for the left foot is $80,000. That needs being done at the Foot and Ankle clinic at the University of Washington and the $80,000 figure is their estimate for the surgery, post surgical therapy, and assisted living quarters for ten days. The result of not having that done has meant that foot swells from even standing on it for more than an hour and Brooks ends up in a wheelchair for several months. That "handicapped" parking permit in **Exhibit 5** is a **wheelchair permit**.

Not job related, was the discovery of a growth/mass in the lower lobe of Brooks right lung in 2012. Brooks was blocked from doctor appointments and was docked PTO or pay for time off when he was did keep those appointments. A growth developed on Brooks vocal cord in November 2012 and November 19 , 2012, was spent seeing a doctor for that; a recheck of the growth in the right lung (Brooks was taking drugs to shrink it); and to see his primary care doctor for a horrific drug interaction that caused extreme depression and anxiety.

That untreated right lung collapsed in 2019.

In 2012, Brooks' doctor had prescribed Paxil and Ambien because Agate was refusing the ability to telecommute and working him 80 hour weeks, deliberately preventing him from

REDACTED

attending church by scheduling mandatory work when church services were scheduled. Korjenek even forget she mentioned the doctor writing a note to Agate asking them to give Brooks time off in a note in Brooks' Personnel File. Agate refused to allow Brooks to take time off even though he had three months of vacation time owed him.

Brooks was also subjected to racial diatribes for being a "drunken Indian", a "squaw", "chief", "old timer", "old coot", and ridiculed for being disabled. This was to make work so uncomfortable that Brooks woud quit.


Petitioner Michael Brooks pleads for a review of his cases and for the intervention by this court in a matter where the state, state agencies, and the Courts have acted outside of US and international law.

Brooks' on the job injuries and subsequent blockage of treatment are clearly violations of Section 1513 of title 18 - retaliation against informants. They are also the ADA, ADAAA, Civil Rights Act, and state law. That was the finding of the EEOC, who was forced to turn Brooks complaint to them over to the state Bureau of Labor and Industries on January 23, 2014. Brooks describes that in detail in another Writ of Certiorari filed with this Court. Oregon and the Disrict Court tried to make any suit by Brooks as complicated as possible, so there are two for BOLI, one for a wrongful termination, and another for False Claims Act violations and fraud.

Brooks was one of several whistleblowers concerning claims and other financial fraud, the sale of patient records, homicide, patient profiling, espionage and violations of international laws and treaties to which the United States is signatory, and unlawful activities by Oregon, Agate, Centene, and their dozens of shells.

In the corporate merger filings with the state, Insurance Division filing 15-04-022, Centene, Agate, and Oregon claim that:

> Trillium is a subsidiary of Agate Resources, Inc. ("Agate") and Lane Individual Practice
> Association, Inc. ("LIP A"), which own 40% and 60% of its issued and outstanding
> common stock, respectively. Agate provides administrative services and leases employees
> and buildings for Trillium and LIPA . Trillium has 5,000 shares of common stock
> outstanding with LIPA owning 3,000 shares and Agate owning 2,000. Centene proposes
> to acquire control of Trillium through its acquisition of Agate (the "Acquisition") through
> a merger of Merger Sub with and into Agate. with Agate as the surviving corporation in
> the merger (the"Merger"). As a result of the Merger, the shareholders of Agate will be

*entitled to cash consideration and Centene will become the sole shareholder of Agate and thereby gain control of Agate and Trillium.*

Centene acquired all outstanding shares on August 31, 2015. There are no outstanding shares of Trillium, LIPA, Agate Resources stock. Agate Resources and LIPA have no employees or assets. They are fraudulent conveyances established by Centene to create a cutout and avoid paying money or fines in lawsuits. Centene employs all employees of Trillium. Trillium is purely a shell. Agate Resources and LIPA are legal cutouts - paper creations, dime store fiction, the classic fraudulent conveyances Brooks refers to in his letter to the Insurance Division on June 8, 2015…except, records Brooks had shows Centene and Agate operating together in 2011/12.

Brooks opposed fraud, insider trading of stock, government corruption, and the **sale** of medical records, prescription drug and laboratory records to employers, credit agencies, underwriters, and information warehouses by his employer **and** the State of Oregon. Unlawful acts also included drug dealing, manslaughter/murder, racketeering, and public corruption.

Brooks tried to provide this court with records showing harm done to foreign nationals. Thousands of foreign college students, the children of those countries leaders and elite, their best and brightest — children from Russia, China, Sweden, China, Saudi Arabia, South Korea, India — had their privacy invaded, their health and counseling records sold by Agate Resources and the state of Oregon. This involves a state acting against the interests and laws of the United States.

College students in Oregon and neighboring states buy their student health insurance from the state health program. Agate and Centene got those records from Oregon.

Why did Oregon sell or give those records to Agate Resources? What on earth use would Agate have knowing that ████████████████████████████████ ████████████████████████████████████ Agate **SOLD** those records to international "information warehouses" (read "intelligence agencies"). The sale of those records is an international crime. Collecting and selling those is espionage.

District Judge Ann Aiken and Stoel Rives knew this, had records of it, and cooked up an illegal "Protective Order" with Aiken giving Agate **OWNERSHIP** of those records…something Agate cannot possible have as they legally cannot even possess health records. (See paragraph 3 on page 3 of this document). Agate has never had any legal ability to own or possess patient

records. Neither has Centene, as least prior to June 14, 2019. Yet, we can see them selling insurance products, selling patient records, in at least 33 states since 2001.

This Court will need to decide if Oregon is subject to Sarbanes Oxley and HIPAA. 2011 Oregon Senate Bill 99 created the public non-profit corporation Oregon Insurance Exchange, which BOLI attorneys thought fell under Sarbanes Oxley and SEC jurisdiction. The ACA Pilot Program, Cover Oregon, where Oregon bilked the federal Government out of a billion dollars existed under that. So does the Oregon Health Plan (OHP), which subcontracts with between 14 and 16 private for profit companies as Business Associates for the sole purpose permitted under 45 CFR 160.103 for processing claims under HIPAA.

The State of Oregon operates public employee insurance programs under the Exchange, also. Brooks' wife, a school teacher, has her and Petitioner's health insurance in an Exchange corporation - private partnership, OEBB MODA. Private for profit insurers act as both the Benefit Managers and as the insurers. The state, through the Exchange, has a pseudo arms length relationship with this. It is routinely abused for fraud.

The public agency, the Oregon Health Authority (OHA) is the contractor for Medicaid, SCHIP, the Affordable Care Act, Medicare Special Needs and other government programs. It is the sole HIPAA <u>Covered Agency</u>. Everyone else is a <u>Business Associate</u> with the scope undefined and therefore limited to that defined by 45 CFR 160.

Brooks has accurate records showing that Oregon, as operators of the Exchange and as the public department OHA, the did violate Sarbanes Oxley and HIPAA. If they are merely subject to HIPAA, the fines levied would total $1005 billion ($1 trillion dollars). And, that explains why the District Court issued a gag order for those records, why Stoel Rives and the Court went to great lengths to steal those records and have secreted 90% of them, and why they are feverishly trying to order Brooks to give them the few records he still has. Oregon, the District Courts, Agate and Centene, MODA, and Stoel Rives engaged in criminal racketeering and the courts are more interested in covering up wrong doing than protecting victims.

The reason Brooks is Pro Se is because the governments of Russia, England, Canada, China, India, Jordan, Saudi Arabia, etc. are not involved in this suit, why it is not before the International Court of Justice, is because the Oregon District Court issued a gag order that Brooks has abided by in spite of that fact that he knows it is illegal and with the court approval of and the theft of at least 90% of Brooks' evidence. Those three banker boxes of evidence, the

REDACTED

dozens of memory sticks where transported to Stoel Rives Seattle office sometime on September 10 or 11, 2017, and have never been seen again. That was Brooks' property, not Agate's. Most of that never came from Agate.

Brooks had some records from shells, Lane Home Medical and mail order pharmacies, where Agate was the prescriber, the vendor, the provider, and the patients were fake recipients of drugs mailed to post office boxes. There would be as many a 100 fake patients using each post office box. Every month, Agate apparently vended to itself thousands of opiates with street values of millions of dollars. Brooks did that project with Dick Sabbath, Agate's Compliance Officer and a former California Police Officer who Brooks is fairly sure will tell the truth, at least to the FBI.....and, if he does not, those records stolen from Leiman and Johnson's office are available from a number of government sources making lying very dangerous. Likewise, the state psychiatric hospital records went to Del Texley at Agate in the form of a zipped and compressed file every month. Texley unzipped those and added those to a table that was accessed for Impact Intelligence reports. Laboratory reports from Legacy Lans and the state for all state residents came into James Kaizer, who unzipped and stored those records on another database. Brooks, again, has the names, proof, locations of all of those. Agate stored those in its facility on Millrace. Today those are in St Louis at Centene's offices.

It needs noting that neither Centene nor Agate have any legal right to possess those records, much less use them for profiling or selling them to doctors other insurers, employers, banks, or information warehouses. Those crossing state lines is a federal matter.

Oregon harmed other whistleblowers of these criminal acts. Dean Harris was fired in 2005 for reporting Agate's profiling patients and not paying claims. That ended up with the Seatttle EEOC office with a director that deliberately derailed and hushed that complaint. That administrator met with Stoel Rives attorney Carolyn Walker, who represented Oregon, as well as Agate, MODA, etc.! That OSHA executive is still at the Seattle office.

Whistleblowers that have come forward and had their rights trampled on by Oregon for simply trying to report these crimes.

The records for employees at Monaco Coach Corporation show that Monaco terminated 80% of the employees that exceeded their capitation ceiling of $40,000 for an entire family in a single year. This is currently going on with the largest employers in Washington, Oregon, and California. Those reports result in denied jobs, life insurance, home or automobile loans. Even if

**EXHIBIT 2**
**Page 28 of 53**

they do not result in an outright denial of a loan, they cost the family 2 to 5 points more on credit card, auto, and home loans.

Agate and Centene withheld medical care from patients to increase profits under a scam run by OHA that allowed them to keep unspent money given for patient care. Look at the cases in "Centene sued over lack of medical coverage" in 15 states; New York Times; https://www.nytimes.com/2018/01/11/health/centene-health-insurance-lawsuit.html or the hundreds against Centene subsidiaries like HealthNet, AmBetter, Trillium, Michigan Healthcare Solutions, Managed Care Solutions, State Healthcare Solutions, the Alliance, and dozens of other Centene shells.

A pediatrician was denied a referral for a four year old female patient with ulcerative colitis who died when her intestine ruptured due to lack of medical care. The little girl was denied treatment because of risk scores created by Agate and in use today. That little girl was a mixed race foster child. She was condemned to death by executives looting money from Medicaid and SCHIP to divert patient money for bonuses.

White Medicaid patients at Agate were granted medical referrals 65% of the time. White foster children, however, were only granted referrals for specialist treatment or testing 26% of the time. These children were denied x-rays for injuries, even vaccinations. Black foster children, received approval at half that rate - 13% of the time, Native American children had approval for 10% of requests, Hispanic children only had a 6% approval rate. Some of these kids died because of this.

Prenatal care for Native American woman is so lousy that 36% of the c-section deliveries take place in emergency room, 26.7% of those women in Lane County sent home within four hours of surgery to save money on hospital costs. Major surgery as an outpatient, with over half of them returning because of bleeding with distressed or dead babies...and District Court Judge Ann Aiken hid this with a gag order! And, note, among white women Brooks can show records of a mere 0.053% that were not granted a hospital room, 24 women over a five year period.

Agate spent $509.39 on the average prenatal contact for pregnant white women, but only $324.69 for black women, $354.16 on Hispanic women and $291.84 for Native American women.

Black, Hispanic or Native American senior citizens were forced to do without food or medical to pay for illegal medical bills in Oregon because of a racket run by OHA. Medicaid, Medicare, SCHIP fee schedules are set in the CMS Physicians Fee Schedule.

From an actual Medicare claim in November 2019 by Eugene Emergency Physicians:

| | | |
|---|---|---|
| *ER Charge: 99285 (Hospital ER Grey Book)* | | *$945.00* |
| *MODA Adjustment* | *-588.03* | *$356.97* |
| *Medicare Paid Amt* | *-135.33* | *$221.64* |
| *Medicare Adj, state & local rules* | *- 2.76* | *$218.88* |
| *Bill Patient* | | *$218.88* |

The CMS Physicians Fee Schedule sets the maximum charge for 99285, an emergency room visit - high complexity: $172.61. The maximum amount that can be billed to the patient is $34.52. The fraud was done by subtracting the Medicare Paid Amount from a "Grey Book" amount and overcharges the Medicare patient by $184.36. This happens thousands of times a day in Oregon and is facilitated by OHA, the Oregon Medical Bureau and the Insurance Division. That bill should have been:

| | | |
|---|---|---|
| ~~*EEP Charge: 99285 (Hospital Grey Book)*~~ | | ~~*$945.00*~~ |
| *Medicare Assignment Maximum Amt* | | *$172.61* |
| *Medicare Adj, state & local rules* | *- 2.76* | *$169.85* |
| *Medicare Paid* | *-135.33* | *$34.52* |
| *Bill Patient* | | *$34.52* |

The $184.36 doesn't seem like much until you are living on Social Security. Currently, Congress is talking about outlawing surprise medical bills. Well, here it is and it is already illegal. If anyone pays attention we can end 98% of surprise billing tomorrow.

OHA operates as predatory political/business hacks, not public servants administering health programs. Look at the Lynn Saxton and Family Care scandal as another example: https://www.bizjournals.com/portland/news/2017/08/09/embattled-saxton-exits-exits-oha-amid-turmoil.html

What you are not being told in these stories is that Home Care was a non-profit CCO and Centene donations fueled their being kicked to the curb by Oregon to make room for Centene's Health Net and Trillium entering the Portland and Washington state markets.

## 1.  ORGANIZATION OF THIS DOCUMENT

To save space, Brooks uses last names wherever possible. In the case of people with the same last name, Brooks is forced to use both first and last name; e.g. Julie Brown, Donna Brown, and Kate Brown. This is not meant as an insult.

Brooks is presenting this in two Writs of Certiorari because the Court Clerk told him he needed to separate out the BOLI-US DOL complaints from the District Court Claims. Because of time limitations, Brooks cannot address the district court False Claims Act case, but there simply is not enough time to cover that when Brooks is limited to brief period of time when he can work. Sitting up for more than10 or 15 minutes is extremely painful. Sitting up for 30 minutes sometimes results in passing out and a bradycardia episode due to spinal compression. It always results in pain that lasts for days.

Nonetheless, a brief synapsis of the 19-71240 writ is in order. Oregon OSHA is recorded as telling Brooks that he has to file with them because, as a State Plan, the US Department of Labor and OSHA have no jurisdiction in Oregon. And, with regards to BOLI taking Sarbanes Oxley, Affordable Care Act, and other complaints, the recording between Brooks and Oregon OSHA headquarters has them telling Brooks:

> "... *if you look at the statutes, and they want to you click on it it comes up as 29 USC 218C, which is the Affordable Care Act. It comes up with Sarbanes Oxley...18 USC 1514A and it used to come up with Privacy Act, which was going to be part of their profiling stuff (HIPAA violations) ...Dodd Frank, there it is 12 USCA. 5567"*

BOLI attorney Jeremy Wolff's recording on March 3, 2014, refers charges that BOLI had already cross filed for: "...*security fraud and violations of health insurance regulations... HIPAA*". Brooks signed a complaint for the additional charges referred to at BOLI headquarters in March 6, 2014. Mr. Wolff told Brooks that BOLI had cross filed those complaints with federal OSHA because the State Plan contract required it! [OSHA Whistleblower Investigations Manual ("Dual Filing", page 1-4)]. However, Seattle OSHA and OSHA headquarters claim to have never received those cross/dual filed complaints. Something is very fishy.

Wolff was very explicit in the meeting with Brooks at BOLI headquarters on March 6, 2014, where he had Brooks **sign** complaint papers. Brooks took notes and listed 18 USC §1514A and §1513e, 29 USC §218C and "Section 1558", "PL 111-148", 12 USCA. §5567, and CFR §160.316 , Privacy Act and OSH Act complaints. Those notes were witnessed by Oregonian newspaper reporter Nick Budnick immediately after that meeting, too.

What should outrage anyone reading this is that the Oregon District Court suppressed evidence Brooks gave to BOLI under a gag order. Look at the date of that "Protective Order", January 20, 2016. Look at the date of the published decision in 15-12-003. Agate Resources did not exist and the Court and Stoel Rives knew it. It had been sold to the Centene Corporation on August 31, 2015. Likewise, Trillium **lost its license** and contract with OHP on that date under ORS 441.025(3).

There is not one word about Centene in that protective order, either. Either Stoel Rives played the District Court for a fool, misled them (something they repeatedly do) or the District Court was involved.

Stoel Rives' motive was obvious. Agate Resources illegally operated a pseudo insurance business, peddled themselves off as a third party administrator under 45 CFR 160.103, when they had no license to be an insurer or business associate. Agate operated in 33 states, harmed hundreds of thousands of employees and families, and was liable for $1005 billion in HIPAA fines. The District Court Judge was protecting Oregon and the Appeals Court was protecting the District Court. No one was protecting the victims or the whistleblowers.

## 2. CASE BACKGROUND AND ORGANIZATION

If the system had worked the way it is supposed to, Brooks would have had the necessary medical care he needed and the government would have assigned honest investigators, looked at the data, and recovered money and fines for the taxpayers, dispensed justice for the patient victims, all handled administratively.

Instead, Brooks has seen a string of sketchy characters from Governor Kitzhaber forming a special board for "financial considerations" that overturned a court decision that found that Brooks had been unlawfully discharged. The "opinion" for that board was written by Stoel Rives lawyer Carolyn Walker using known falsified emails by Agate. Someone did not check Brooks calendar because Brooks was receiving cancer treatment from 8:30 AM on that day, Novembner 19, 2012. The falsified emails are stamped as being written 7:13 AM through 8:46 AM on November 19, 2012, and the doctors offices were 10 miles away from Agate's offices. The Supreme Court needs to take up the whole problem of employers falsifying documents and emails and records. Agate prohibited Brooks from seeing his "Personnel File" for months and then sent it to him just as they published it as evidence in defaming Brooks. Brooks is told that

Personnel Files are the property of the employer and they can put anything in them they want. Why, then, are they permitted to use a Personnel File as evidence in Court?

A Stoel Rives investigator, Donna Brown, passed herself off as a BOLI supervisor while Kitzhaber campaign chairman and his wife, Kristen Leonard, acted as lobbyists for Agate. Leonard was, by the way, the future Chief of Staff for Governor Brown until she, like Saxton, was forced to resign because of $214,000 in financial "conflicts of interest" (her husband was doing business with the state while she steered contracts to him). Lynn Saxton forced the last non-profit OHP contractor out of business to make room for Centene to get contracts for Trillium and Health Net in Portland. Saxton was caught and forced to resign.

Any ordinary person listening to the telephone recording of Wolff on March 3, 2014, reading from the charge sheet he has can easily see that it bears no resemblance to the one BOLI is passing off as being written on January 9, 2014. The forgery of that January 9, 2014, "complaint" becomes very apparent and involves Oregon criminally.

A cursory glance of the forged complaint shows two notary stamps with what seems to be the same signature: 10 items, a notary stamp, 3 more items and another notary stamp. The problem is the notary, Galina Selivanova, has only notary stamp recorded for January 9, 2014, and that is not the document she recorded it for. Oregon, acting as a federal contractor, forged an official document and somehow falsified a dozen federal civil rights, medical, and whistleblower complaints. Those are felonies. Then, ask yourself, how does BOLI have that as a complaint when they were not even give the handoff from the EEOC until January 23, 2014? Then, listen BOLI attorney Jeremy Wolff reading from this complaint on March 3, 2014, two months later, that bears no resemblance to the purported January 9 version.

The EEOC was forced to surrender it's case to Oregon, but that was on January 23, 2014, two weeks after Oregon claimed to have filed a case they did not even have! Look at Oregon's filing [**Exhibit 7**]. Then look at the EEOC handoff and form 131A [**Exhibit 8**]. Note the missing filings for Civil Rights violations, Americans With Disabilities Act, federal age and sex discrimination, age, disability, "retaliation" and "Other" (opposing patient profiling on the basis of race, national origin, sex, economic status, age, disability).

Add in US Attorney Jeffrey Wertkin, caught peddling Brooks' evidence that he had sent to the Portland IS Attorney's office. He is serving 30 months in prison for that, but the Portland US Attorney that gave Werkin those records merely was forced to resign. That same Portland US

Attorney went to the lawyer Brooks had found to take this case and he called her told her Brooks was lying. When Brooks found out about that, he wrote to the US DOJ and that US attorney was forced to resign. Brooks had a dated forensic CD Snapshot of Agate's claims database that cannot be altered that was sent to US DOJ OIG with his complaint.

The 9th Circuit dismissed this, recently. As far as Brooks can tell, this was November 30. It is hard to tell because the Ninth Circuit Court did not send Brooks all of the documents and Orders they filed. Brooks enclosed what he received when he requested thos final documents in the Appendix. Brooks was in forma pauperis at the district court level docket #5), but the Ninth Circuit denied that in violation of ARCP 24. Brooks could not afford it and the Court refused to give Brooks access to PACER. Then, they referenced PACER numbers in the few filings Brooks did get. Brooks would call the court clerk's office and the calls were not returned. This went on before covid. Brooks has had no idea of what the court was doing. Add in the fact that Brooks had major surgeries on January 17, 2019 (spinal), July 23, 2019 (cancer), and January 31, 2020 (7.5 hour heart), coupled with cardiac episodes on March 13, 2021, December 17, 2020, November 11, 2020, November 21, 2020, November 18, 2019 (a very bad one), October 21, 2019, October 23, 2019 (atrial BPM 416 with blockage resulting in damage to heart). The Ninth Circuit Court was appraised of all of this, look at the Briefs, the appeal of Aiken's ruling, etc. Brooks asked for the accommodations mandated of the article 3 courts by Congress in the Rehabilitation Act and the ADAAA and the Court ignored them. The Court and Stoel Rives were busy issuing hundreds of pages of filings and documents while Brooks was laying in a hospital bed!

The judges at the Ninth Circuit were cruel. Their worst treatment without any warning whatsoever, involved sending the following threat when Brooks filed his opening brief. The judges, on their own and in secret, decided hat Petitioner's appeal and complaint about Judge Aiken's actions constituted a Brief.

**The opening brief cannot be filed for the following reason(s):**

- **Opening brief already filed" Appellant has already filed an opening brief. Only one opening brief may be filed. See Fed. R. App. P. 28. Please submit a motion requesting permission to file a substitute or supplemental brief.**
**The following action has been taken with respect to the brief received by this office:**
- **The deficiency by appellants is judged to be serious. We cannot file your brief. The deficiency must be corrected within 14 days or the case is subject to dismissal**

REDACTED

pursuant to 9th Cir. R. 42-1. The receipt of a serious defective brief in this office does not toll the time time for filing the brief while defect is being corrected.

**9th Cir. R. 42-1 provides:**

> *When appellants fail to file a timely record, pay the docket fee, file a timely brief or otherwise comply with the rules requiring processing the appeal for hearing, an order may be entered dismissing the appeal. In all instances of failure to prosecute an appeal as required, the Court may take such other action as it deems appropriate, including imposition of disciplinary and monetary actions on those responsible for prosecution of appeal.*

**When you submit corrections to your brief or a corrected brief, please return a copy of this letter. If you don't submit your correction within 14 days of this notice, you must file a motion for leave to file a late brief. See 9th Cir. R. 31-2.3 re: Extensions of time for filing brief. [Exhibit 1, November 12, 2019]**

This was the Court's response to Brooks' submitting his Opening Brief on November 4, 2019. The Brief and a Motion To Exceed Page Limit both explain:

> *As near as Plaintiff can tell, the page limit for a Pro Se Brief is indeterminate. Plaintiff has two serious cardiac episode while trying to write this this on October 21 and 23, 2019. The attack on Oct. 21 seems to have resulted in blood pooling in the lower chamber of the heart. The attack on October 23, ended up with an atrial rate of 416 BPM (actual BPM rose to 435) and a Ventricular rate of 85 BPM. Plaintiff lost consciousness.*
>
> *Plaintiff has experienced Dailey attacks since then and wrote this in spite of that. He simply does not have the energy and lacks any help, to edit this down to his self imposed page length of 30. Plaintiff is saying what he honestly believes needs to be said.*
>
> *Plaintiff is scheduled for a CT scan of the heart blockage on Wednesday, November 6, 2019. This was supposed to be for surgery, but plaintiff's have blocked that. There is no telling what will happen on Wednesday. Plaintiff has arrived at several appointments only to discover that defendant did not "really" authorize the medical procedure.*
>
> *This document is 60 pages long, inclusive of the cover page. It comprises both his objections and Brief, however. These are roughly the same length, about 30 pages each, but they are somewhat duplicative. Please forgive that. In total, this document contains 23,691 words and is 60 pages long, using 12 point double spaced Times New Roman characters.*

The following day, Brooks filed an "objection to a declaration by Rachel C. Lee in support of Appellee Agate Resources' Motion for extension of time to file answering brief". This was an objection to the Court's refusal to grant in forma pauperis status.

The Ninth Circuit made it clear he was filing this matter with the US Supreme Court and they filed a flurry of documents, two of which are supposedly "mandates", but Brooks only received one of these. These are the same judges that filed documents to a Petitioner that was in the hospital, refused for over a year to grant in forma pauper status and then refused to appoint counsel when Brooks could show that he was bed ridden, had lost the use of his left hand, could not swallow and has having routine bradycardia attacks where he passed out whenever he even tried to sit for ten minutes writing on a computer.

If there was ever a reason for this Court to force the Article 3 courts to abide by Congress' imposition of the ADA, ADAAA, and Rehabilitation Act on these Courts, Brooks is about as close as you will ever get to the poster child for that test case. Those Article 3 Courts have taken federal money and not followed the law. Those Courts are supposed to uphold the law and the law is that they WILL provide accommodations to the disabled. They refused to provide those accommodations and conducted themselves with dishonor.

Ninth Circuit Court has mishandled Brooks' Appeal. It appeal is over the dismissal of 6:15-cv-00983-TC/JR/MK/AA by Oregon District Court for District Judge Ann Aiken because Brooks refused to accept her assignment of Magistrate Judge cronies that had conflicts of interest. [**Exhibit 11** is Brooks' Appeal]

This also involves unconstitutional and secretive "merit panels"by the Ninth Circuit that only applies to Pro Se litigants. By itself, that negates their case. That court's ignoring the District Court violating FRCP 73, engaging in unseemly and unlawful exparte communications with defense counsel, and a series of illegal actions that can and will be discussed in oral arguments.

Aiken dismissed 6:15-cv-00983 because Brooks refused to accept Aiken's assigning Magistrate Judges with conflicts of interest his case.and because Brooks called out Kasubhai for permitting Galloway to author a rogue recommendation that he had no business writing. Brooks did not have five attorneys. He had one, Another was appointed by the Court for three hours to write an Amended Complaint...which Aiken dismissed. Brooks had filed five RFP's and participated personally in two discovery conferences. Docket #24 is a report on one. Stoel Rives

and Kusubhai obviously never even read the court docket [**Exhibit 9**]. Look at this, Stoel Rives refused to comply with even one of the requests and the Court refused to even publish Brooks' objections, refused to entertain a Motion to Compel Discovery. In fact, with this, the Court changed from saying it would never grant discovery to saying it would grant discovery but only after hearing the never ending parade of motions filed by Stoel Rives teams of attorneys. That day, of course, never came.

Aiken dismissed Brooks' case when Brooks asked for a mistrial based on the Court refusal to abide by the law and Aiken attempted to make it impossible to appeal that dismissal. Aiken seemed furious because Brooks presented evidence concerning Stoel Rives attorneys and a Qui Tam lawyer stealing and destroying case documents and records stored in other attorney law offices. That theft involved an admission by Magistrate Judge Jolie Russo knowing about it in docket #88.

It is made worse by either Russo, or more likely, Aiken assisting Stoel Rives by telling Keating and Galloway the contents of a Court's Order on 8/22/2017, eight days before it was delivered on 8/31/2017. (docket #68) . Brooks tried to introduce emails proving this between Stoel Rives and another attorney they boasted to about this and the 9th Circuit evidently found that objectionable and refused to hear it. It provides grounds for declaring this a mistrial; never mind that it is a civil mistrial, this case involves criminal conduct by the defendant and the state and other players that the district court protected from being defendants.

When Russo was removed from this case, another Magistrate Judge, Mustafa T. Kasubhai, was assigned with conflicts of interest involving the Oregon DOJ. Brooks again wrote timely objections. Bearing in mind the Supreme Court decision in Roell et al. v. Withrow, No. 02-69 (2003), all ofBrooks' objections were in writing and done within ten days on the assignments.

Kasubhai had conflicts of interest involving Aiken, Oregon DOJ, and especially Brooks denials of SAIF/Workman's Comp help for his on the job injuries. Kasubhai went so far as to crib his "Findings And Objections" in docket #198 from Galloway.

Both Magistrate Judges Russo and Kasubhai were not merely assigned 6:15-cv-00983 over Brooks's objections, the district court shredded the privacy and "substantiative consequences" clauses of Rule 73 by unsealing Brooks' objections and sharing them with the Magistrate Judges . Russo prevented Brooks from filing a Rule 73c appeal and presently, Stoel

Rives is before the Ninth Circuit trying to get that, phone recordings of Oregon officials, and evidence stricken from the record. Galloway is demanding that all of the evidence Brooks has be destroyed under the terms of a gag order by Aiken and that dozens of motions be stricken from the record. **[Exhibit 10]**

The 9th Circuit is an APPEALS Court that is supposed to be based on the District Court record. What on earth is an Appeals Court doing excluding evidence, motions, declarations? And, then, remember Brooks has had three major surgeries, is paralyzed, impoverished, and incapable of even sitting, and the Court refuses to appoint competent counsel to opposed three Stoel Rives attorneys filing 800+ of pages of documents and more than 30 filings that remain unopened because Brooks cannot move? Due Process is meaningless with this court. Brooks has no idea what the court did because the court neglected to tell him. Did they strike motions, declarations, evidence filed by Brooks? Beyond being a gross miscarriage of justice, this is just plain sloppy.

Consider the Oregon employment ALJ case, the one where the court ruled Brooks had been terminated without cause. Korjenek and Woods perjured themselves in that case. They swore they had not hired or looked for a cheaper replacement, when had replaced Brooks with a cheap H1-B worker, a 28 year from Denmark - Claus Søgaard Andersen, a two weeks before the date of that trial. Prima Facia evidence of age discrimination and the courts ignore. He posted of the job on a social media page and Brooks has that record! Brooks used that to find Agate's advertisement for an "Impact Intelligence expert" in "Beyond.Com".

Then, Russo retaliated by unsealing Brooks's examples of his case strategy documents that had been given to Stoel Rives and publishing them on PACER that she was not entitled to hear/try. Stoel Rives, in turn, deceived Brooks in a declaration in docket #85 claiming that they did not get Brooks' evidence from Leiman and Johnson's office.

They lied. They had been given every document and recording by Dugan, all of that stolen from Leiman and Johnson's Law Office where it was stored for safe keeping. 90% of that has disappeared. It was picked up from Dugan and driven to Stoel Rives Portland offices. Whatever was left, Dugan apparently has stores somewhere or destroyed.

Brooks did not own a Windows computer and writes using Apple Pages. Brooks' Case Strategy document had been converted to Word and the header it contained was deleted:

*These are my notes preparing for the production request by Stoel Rives. If you are not Marianne Dugan, Drew Johnson, Jesse London, or Alan Leiman, do not read further and destroy this. This is privileged attorney-client information.*

Brooks' computer was a MacBook Pro. It is all he owned. Brooks used Apple Pages for all of his documents. Brooks' Case Strategy document had been converted to Word by Dugan or Stoel Rives and the header had been stripped out.

Brooks extracted meta data from the Pages and Word versions to see who and when the conversion had been done. This was from thumb drives the court ordered Stoel Rives to give Brooks on October 16, 2017. The Drop Box transmission of that document is shown to be at exactly 3:06 PM on 9/11/2017 in an email from Dugan to Reilly Keating [126]. This printed out in **Exhibit 12.** Next you see the Pages version <u>modified</u> by Stoel Rives at exactly 4:11 PM on 9/11/2017. That is followed by the conversions of the Pages version to the Word version at 4:12 PM.

In other words, it is beyond doubt that Stoel Rives opened that file, saw the header, read it, deleted the header and used Page's Export utility to convert it to Word.

There is no other DropBox transmission on that day. Stoel Rives is proven guilty of theft, of unethical conduct, of 18 U.S.C. § 1519 - felony "destruction, alteration, or falsification of records". A quick look at the file forensics will verify this. The file was clearly altered by Stoel Rives. Dugan did not have access to a Mac or Pages. Stoel Rives did. Add in the times and you have a criminal case of document alteration. You also have violations of ABA Rule 1.6(6)(6), ABA Rule 4.4(6), and the Rico v. Mitsubishi Motors Corporation case, but on steroids. Counsel was disqualified and their expert witnesses disqualified in the Rico case. This is a hundred times worse.

As for the forensic evidence and the inevitable protests by Stoel Rives, this kind of forensic evidence is impossible to fake. This is the kind of forensic evidence by which murder cases are won. It's rock solid and at the very least should have immediately resulted in the disqualification of Stoel Rives. Why the Ninth Circuit did not do so is of enormous import, too. Are they so blinded by their prejudice against Pro Se litigants that they will ignore actual felonies by attorneys before their court? Brooks summarizes a criminal case in **Exhibit 13** that needs to be brought to federal attorneys. This Court needs to look at it because it, along with the above, provides all of the reason this court needs to disbar Keating, Galloway, and Dugan.

**REDACTED**

There were also over 500 attorney client emails covering everything from Brooks injuries, doctor chart notes and records, correspondence with federal investigators from EBSA, the SEC, US DOL, EEOC, the FBI, even the notes from the SEC interview. The really curious thing about that was, those names ended up at Seattle OSHA and are in emails that OSHA one Seattle OSHA administrator was sending to EBSA and the SEC. That person had obviously gotten those names from Stoel Rives and was following up on those names to see where their investigations were going while trying to end them. Brooks has those letters, too.

Everything of Brooks' at Leiman and Johnson's office - and none of it was backed up, it was there for copying and safe keeping - was stolen and sent to Stoel Rives. None of that was ever seen again. It "disappeared". Brooks was unable to afford an attorney and could not find one to take or help with his case because, as one attorney put it, you had no idea of what Stoel Rives had. That planned theft made finding legal help impossible.

Brooks was told one Stoel Rives attorney quit over this.

Brooks has been contacted by the press, evidently CBS News, who has copies of some of what was taken. Brooks wrote the 9th Circuit about that contact immediately which elicited this from Keating:

> As you know, the district court [Judge Ann Aiken] in your FCA case (Dist. Or. Case No. 6:14-cv-01424-MC) entered a protective order that specifically restricts the use of those documents..."[a]ll documents and information in Relator's (including his attorney's or agent's) possession, custody or control that were obtained in connection with Relator's employment with and/or originating from Trillium, Agate or any of Trillium's or Agate's employees, officers, directors, corporate parents, subsidiaries, divisions, successors, predecessors or affiliates shall be deemed Confidential unless a different designation is mutually agreed to by the Parties." Paragraph 5(c) provides that the parties are "EXPRESSLY PROHIBITED from using or disclosing PHI subject to this Order for any purpose other than prosecuting or defending this action." Likewise, paragraphs 7 and 8 prohibit the use of all confidential documents for any purpose other than preparation for the lawsuit. And paragraphs 8 and 9 prohibit disclosing the confidential documents and materials to anyone other than certain specified persons and entities. Paragraph 19 states that the Protective Order remains in force after the conclusion of the FCA case. Email from Keating to Brooks, 6/20/2020]

This is interesting only because Brooks had nothing to do with the press. Brooks spoke with Mr. Budnick back in 2014 because he thought it might help his case. Budnick wanted documents that Brooks morally felt he could not provide (HIPAA and records of Kitzhaber staff soliciting

**EXHIBIT 2**
**Page 40 of 53**

"payments"). The reporter that contacted Brooks, and Brooks has no idea of who he is, suggested those documents came from Stoel Rives. Brooks deliberately refused a name or identification. Brooks did not want to know, Brooks only desires that all of this becomes public.

Brooks filed a False Claims Act case, 6:14-cv-01424-AA/MC on September 3, 2014, at the request of CMS investor Bob Ohlbeck (Brooks is not certain of spelling). Mr. Ohlbeck's superiors were not interested in this case because Brooks was Pro Se and 90% of the evidence Brooks gave them were Civil Rights and HIPAA complaints. Those complaints were where Brooks' passion was. As Oregon Bureau of Labor and Industries (BOLI) Attorney Jeremy Wolff noted in his telephone call on March 3, 2014, concerning Brooks' complaint filings:

> "... there's five statutory claims that we have to cover on in the complaint...And also **kind of** a whistleblowing retaliation claim... security fraud or violations of health insurance regulations... HIPAA is also relevant on this as well."

Lawyers do not think selling patient records are real whistleblower complaints. Profiling patients on race, national origin, sex, age, disability, and "socio-economic" status (foster children), knowingly condemning patient to die by withholding medical care to save money for bonuses, stock dividends, etc. are not profitable enough to warrant the attention of lawyers.

Aiken (and the Ninth Circuit) would not allow Brooks to pursue the Qui Tam case Pro Se. Instead she appointed a Pro Bono lawyer, Jesse London, who forced Brooks to lead him through his fraudulent claims record set. London was shocked to find that Brooks had millions of dollars in obvious False Claims Act recoverable claims. London then shopped this case around to big name Oregon law firms, with the prevision that he could quit as Pro Bono counsel and join them as a partner. Brooks would not have cared if he had known about shopping this around, but London forged Brooks' signature on two "declarations, #55 and #59. Worse, the Courts knew those signatures were forged, because Brooks filed a motion and declaration, and the court still used them!

London decided on partnering with Leiman and Johnson. Brooks first heard of Marianne Dugan in December 2016. She was part of the Qui Tam team of lawyers. It bears noting, here, that Brooks met with this team three times, at most.

Dugan was substituted into 6:15-cv-00983 on March 17, 2017. On April 24, 2017, Dugan first conferred with Agate attorney Reilley Keating, about this case. Dugan had contact with Keating as a member of the Qui Tam team and in the US DOL case for about a month.

**REDACTED**

This is the email, summarizing what she had spoken with Keating about on April 24, 2017. This email was to her fellow Qui Tam team members.

> *Just had a conferral call with Reilley Keating from Stoel about the wrongful discharge case.*
> *1) We concurred no discovery has been done.*
> *2) We concur the complaint needs to be amended because only the pro se complaint (and reply to complaint) are on file and they don't meet pleading standards.*
> *3) They agree to a two-month extension of discovery (bringing it to some time in October) because of the above two issues and the fact that I am just coming on board.*
> *4) They will argue the whistleblower claim is not ripe until the DOL appeal process is done. I was wondering how the whistleblower claim could be proceeding in both forums (fora?) They are right on that point. If the DOL appeal is unsuccessful I think then we can pursue the whistleblower claim in the federal case but the same statute of limitations arguments will be presented and will likely be successful, I think.*
> *5) They will be arguing that discovery should be stayed in the wrongful discharge case until the motion to dismiss and potential followup second amended complaint in the Qui Tam case is resolved...*

Dugan told Keating that she was fine with the postponement because she was shutting down her office in Eugene and leaving for Minnesota for three months to vacation, and plan her daughters wedding. Instead, Dugan was in Standing Rock, North Dakota, acting as lead counsel for some outfit calling itself the Civil Liberties Defense Center.

That, using computer forensics is not hard to discover, too. Dugan in early May and told Keating to contact her fellow Qui Tam team members is anything came up. Dugan had no secretary, forwarded telephone calls, email. Keating knew this. In fact, there was exactly one contact to an apparently empty Dugan office on May 23 (the entire cache of emails is available). Brooks only received these in July 2018:

> From:Keating, Reilley
> *Sent:Tuesday, May 23, 2017 9:40AM*
> *To: Marianne Dugan*
> *I wanted to follow up on our call from a number of weeks ago. I believe that you were going to assess whether you intend to file an amended complaint, as Brooks' prior counsel had represented he would do, and whether you were going to seek an extension of the deadlines in the case. Please advise as to status.* [75 in the Dugan SR email cache]

No answer....and next, you hearing from Keating on June 23, 2017:

> To: Marianne Dugan

**EXHIBIT 2**
**Page 42 of 53**

*From: Keating, Reilley*
*Sent: Fri 6/23/2017 7:39:48AM*
*I wanted to follow up on my email from below and on the voice mail that I left for you*
*shortly after I sent this email. Are you planning on filing an amended complaint? As you*
*know, the discovery deadline is fast approaching so we need t o get moving on this or*
*seek an extension of the deadlines. Please let me know if you would like to setup a call to*
*discuss.* [77, in the Dugan SR email cache]

At the bottom of that email is a copy of the May 23 one. What stands out though is the time:
**Sent:Tuesday,May 23, 2017 10:40AM**

That email was never received by Dugan. It was a test message. Stoel Rives was verifying that

Dugan was not in her office. They found that she was in the Mountain Time Zone With that,

knowledge and being far too aggressive, Keating and Stoel Rives filed an RFP. They know that

Dugan is gone, that her office closed for three months and they dig themselves even deeper into a

hole by claiming to have left messages on a phone that did not take message, that had a recording

telling users that she was out of state until August 8, 2017 and to contact.....

If Keating and Stoel Rives were actually concerned about no contact from Dugan, as the

claim in the email on June 30, they would have contated her co-counsel, Brooks, or even the

court. Instead you get June 29, 2017

*To: Marianne Dugan; Keating, Reilley, Galloway, Stephen...*
*Cc: Brown, Julie*
*From: Holland,Darise*
*Sent: Thur 6/29/2017 3:24:58 PM*
*Subject: Brooks v. Agate, USDC CaseNo.6:15-cv-00983-JR [S-R0061542.00016]*
*Attachment: 2017.06.29 Brooks v.Agate - Ltr MarianneDugan.pdf*
*Attachment: 2017.06.29 Brooks v.Agate - Defendant's First Request for Production.pdf*
*Attachment: Brooks v.Agate-Medical Release (Form) for Michael T. Brooks.pdf*
*Attachment: Brooks v.Agate-Psychotherapy Medical Release (form) for Michael T.*
*Brooks.pdf Attachment: Brooks Agate-Defendant_s First RFP.DOCX*
*Attached please find a letter to Marianne Dugan from Reilley Keating dated today, June*
*29,2 017, enclosing the following:*
*1. Defendant's First Request for Production of Documents;*
*2. Medical Release forms (medical and psychotherapy); and*
*3. Word version of Defendant's First Request for Production of Documents. [78]*

**The next day,** Keating writes Dugan's empty office regarding a letter sent first class on

6/29. Kabuki Theater! Dugan's phone was disconnected, there was no email, and even though

Stoel Rives sent their letters with the no signature box checked, most were returned as

undeliverable. Keating is playing games, hoping that you will not wonder why she never contacted the three other Qui Tam lawyers or Brooks and is filing a "concern" before her overnight letter could have possibly reached Dugan:

> *To: Mariane Dugan*
> *From: Keating,Reilley*
> *Sent: Fri 6/30/2017 9:48:23 AM*
> *Attachment: FRCP 26 Agreement.pdf [a blank form example form in [85]]*
> *Marianne:*
> *I have attempted to reach you **multiple times by phone** and email over the past several weeks to discuss the status of Mr.Brooks' employment case. As you know, we served document requests yesterday. I cannot locate any record concerning whether Agate's former counsel (Ryan Gibson) and Mr.Brooks' former counsel (Mike Vergannini) discussed whether they would agree to waive initial disclosures required under FRCP 26(a)(1),and no FRCP 26(a)Agreement appears to have been filed with the court. However, we are willing to forego initial disclosures at this point. Please let me know if you agree as well, and I get the Rule26(a) agreement filed (see form attached).*
> *I also would like to schedule Mr. Brooks' deposition to take place sometime in mid- to late-August, after he has produced all of the documents in response to our document requests but before the August 31 discovery cut off date. Since I anticipate we will he competing with summer vacation schedules, etc. like to work on scheduling that now. Please let me know some dates during that time frame that work for you and your client. If you would like to discuss any of this by phone,I'm happy to schedule a call...*

This, of course, is all nonsense. Brooks had a court ordered Rule 26 Discovery Conferences with Stoel Rives attorney Brian Gibson on 8/12/2015, something he had told Keating about in an earlier email. She also knew about the RFP's and the Motions to Compel Discovery. Docket #34 is Brooks' report to the Court about discovery.

Those RFP's were sent to the Court, too. How does Kasubhai, then, claim Brooks never availed himself to discovery when he had three RPF's and two discovery conferences that Brooks did as a Pro Se litigant? Because that was written by Galloway, who also wrote that Brooks had not won any of the suits in this matter when Brooks plainly had. An Oregon Court even stated in its finding that Brooks was unlawfully terminated.

After Brooks wrote the report on the discovery conference to Court in docket #34 and issued yet anther RFP, the court appointed Pro Boni counsel, something the court had denied earlier when Brooks requested it in docket #31. Pro Bono counsel begged off. Then, the court appointed Michael Vergamini as counsel. As far as Brooks can tell, Vergamini did absolutely

nothing except not disagree agree to "Motions for Extension of Discovery & PTO Deadlines" by Stoel Rives five times in a row until he was replaced with Dugan by the Qui Tam lawyers.

Returning to the emails between Dugan and Stoel Rives to see what happens next. Dugan returns from Minnesota on 8/8/2017. Dugan telephone Galloway and he sent a demand letter for production of documents by 8/28. Unless Dugan agree to this, Galloway would file a Motion to Compel on 8/14 . #98 in a cache of emails Brooks has, is one of Galloway boasting about his inside knowledge of how the court will decide his Motion to Compel. This is 8/23/2017, and Dugan has not even filed her answer, yet.

Then, on 8/25 you see Dugan go off the rails. She tells Gibson that she has a memory stick of "evidence" and sends it to him. That memory stick was Brooks' motion and evidence (x-rays, doctor notes, MRI pictures, 100% medical records and a statement of poverty and money owed) to the court asking for accommodations under the ADA, ADAAA, and Rehabilitation Act. The Court would not accept that motion "because Brooks was represented by counsel". Dugan somehow got that and that was the evidence she sent Stoel Rives. Brooks found this out in July 2018.

8/25: Dugan reminds Galloway of the earlier agreement to postpone discovery until October 31 and asks for a stipulation. Galloway pretends like he has never heard of this: "I'm afraid it's too late for a stipulation, as we've already been forced to incur the cost of tiling a motion to compel." Dugan pleads with them and Keating answers

> *"The motion asks the court to order Plaintiff to produce the responsive documents and allow for his deposition to be taken after the cutoff. There is no other pending discovery to be completed." (8/25)*

Keating sends Dugan a series of screen shots of court deadlines. Dugan tries to remind Galloway of her agreement with Keating:

> *I unfortunately had docketed the discovery deadline as October after speaking with Reilley Keating 4/24/17 —*
> *1) We concurred no discovery has been done.*
> *2) Reilley agreed to a two-month extension of discovery (bringing it to late October) because of the fact that I was just coming on board.*
> *3) Reilley actually told me defendant would be arguing that discovery should be stayed in the this case until the motion to dismiss and potential followup second amended complaint in the Qui Tam case were resolved.*
> *It sounds like perhaps this information is new to you?*

On August 31, 2017, Russo sanctioned Dugan and terminates Plaintiff's right to discovery by holding to the August 31 deadline even though Russo knew of the agreement and Brooks not being informed of anything by Dugan or Stoel Rives. Dugan is fined $1486 and writes

> *To: Keating, Reilley. From:Marianne Dugan. Sent:Thus 8/31/2017 9:31:45 AM*
> *Subject:Brooks*
> *Before running up more "fees on fees," please let me know how much fees you are*
> *intending to seek and perhaps we can agree to a resolution.*

In **[114]** Dugan signs away Brooks right to an ADR without a conferral and arranged a deposition without informing Brooks. In **[122]** Dugan gets Stoel Rives fees bill of $1486.00.

At 7:33 PM on 8/9, Alan Leiman emails Brooks about the documents he has and is answered  and Brooks mails him right back:

> **From: Mike Brooks** *mibrooks@me.com Subject: Re: Documents at L&J*
> *Date: September 9, 2017 at 8:27 PM* **To: Leiman Law** *alan@leimanlaw.com*
> *Cc: Marianne Dugan mdugan@mdugan.com, Jesse L. London, Attorney at Law*
> *jesse@jesselondonlaw.com*
> *I tried to telephone you at your office and emailed you, but you evidently did not get that.*
> **My intent is to come by your office on Monday, likely around 1:00, and pick those**
> **up**...*both feet are badly swollen. If the get too swollen, it's akin to over inflating a tire. It*
> *does soft tissue damage that can take weeks or months to heal and THAT lands me in a*
> *wheelchair for weeks or months. I will be wearing booth foot braces and and can safely*
> *carry one load, too.*
> *So, I will call you and try to park as close to the front door as possible, perhaps double*
> *park. If you and Drew could help, we could put everything in the back of the RAV and I'd*
> *be on the road home. I need to be home at 2:40, when my grandchildren's bus arrives at*
> *the end of our cul-de-sac.*

Dugan, then, sneaks into Leiman and Johnson's office on Sunday September 10 and takes everything in that locked safe room. According to Leiman, no one was there. Just to be certain, however, Brooks had fired Dugan on September 7 and was impressing upon Leiman, who was trying for a reconciliation, that he was not interested:

> *From:  Mike Brooks*
> *Date: September 7, 2017 12:35 PM*
> *To: Jesse London, Drew Johnson* **Allan Leiman**
> *...She isn't talking with me. I have no idea of what she is doing. The last thing I sent her*
> *was that "Smoking Gun?" finding and the reply I got was* **"I don't know when I'll be**
> **back in office. Likely not til Saturday. Jesse, Drew, do you have docs scanned that**
> **would be responsive?"** *on 8/31/17 and she wanted to drop the case and the qui tam case*
> *so she would not have to pay Stoel Rives.*

**EXHIBIT 2**
**Page 46 of 53**

REDACTED

Brooks asked the Qui Tam attorney to fire Dugan, too, because he was done dealing with her.
Brooks tried to file a motion on September 7, 2017, to fire her and the Court refused to take it
"because you are represented by counsel". Brooks was trying to get London, Leiman and
Johnson to remove their attorney; Brooks did not hire her, they did. What we do know is that
Dugan scurried down to Leiman and Johnson's office on Sunday, 9/10, and STOLE everything in
their evidence room associated with this case. Then, in **[123]** (9/10) you see Dugan bargaining
away that evidence:

> *To: Galloway, Stephen  Cc: Keating, Reilley.  From: Marianne Dugan*
> *Sent:Sun 9/10/2017 12:42 PM      Subject:RE:Brooks[S-R.F1D4085643]*
> *Can you share your timesheets with me for quick review?*
> *Also.I just learned there is approximately a bankers box of documents that were not*
> *scanned. I worry that scanning them will eat up too much time - can you send someone*
> *down to review?* **[123]**

What? Dugan is texting from her cell phone, having just seen the evidence room at Leiman and
Johnson full of unscanned documents. And…at this point, Galloway threatens her:

> *To Marianne Dugan.   From: Galloway, Stephen   Cc: Keating,Reilley*
> *Sent: Sun 9/10/2017 1:44 PM   Subject: RE:Brooks [S-RFID4085643)*
> *Regarding the additional documents, you need to find a way to get them to us in time to*
> *review for the deposition. The court treated this portion of our motion as moot based on*
> *your representation (12 days ago) that all documents had been produced. Otherwise, it*
> *would have undoubtedly ordered you to produce them before now and bear responsibility*
> *for all costs necessary to do so.A vendor will not have any trouble scanning a box of*
> *documents and sending us the files electronically in a day. If we do not get the documents*
> *by close of business tomorrow, we will be forced to take the matter up with the court.*
> *Please advise as soon as possible when we can expect to receive the documents and*
> *payment of the fee award.* **[124]**

Dugan spoke with Galloway on the phone about those documents. Dugan, saw those as a
bargaining chip to avoid paying sanctions. Brooks was told by the reporter that Dugan did not
pay Stoel Rives and sent an automobile down to Eugene to pick up several boxes of documents.
Brooks was told they "forgave" the sanction debt. Brooks has no idea of how the journalists got
that information, but it is apparently true.

Finally, after Stoel Rives got all of the stolen documents and the court thought it had all
of the incriminating evidence aginst Oregon, it permitted Brooks filing an Ex Parte ADA
communication with the Court on September 12 (docket 70). Brooks expresses his mistrust of

Dugan and states he will file a motion to proceed pro se the following morning. Russo sent a copy of that Ex Parte document to Dugan, who sent it to Stoel Rives **[142]**

> From: Marianne Dugan, cc: Galloway, Stephen.  Sent: Tue 9/12/2017 3:55 PM
> Subject: RE: Brooks v. Agate
> Ok. *[Referring to what???]*
> By the way, I just saw Mr Brooks apparently just filed something about the ADA on his own.

**[143]** and **[144]** are about stipulation and fees, but, in **[145]** Keating writes to Dugan
> Sent: Wed 9/13/2017 8:50AM    Subject: RE:**Brooks Attachment Production.docx**
> ***First, is this the "filing" you were referencing?*** *It was contained in the documents you produced yesterday afternoon. Did he also file this with the court?* ***If this is not the document, please send me whatever he filed.***
>
> NB: That "filing" was Brooks' 98 page case strategy document. There were three copies of that file sent to Stoel Rives. Brooks got them and extracted the forensic evidence. The earliest conversion to Word was at 4:12 PM on 9/11/17. The header was deleted and a copy of that file saved one minute later. Brooks found a DropBox record where that file was sent to Stoel Rives at exactly 6:49 PM on 9/11. So, it would appear that Dugan altered that file and sent it to Stoel Rives.

Then, finally as promised above, we have Russo admitting that she knew about the agreement to postpone Production between Keating and Dugan. This is docket #88, filed on October 16, 2017 (and the District Court has altered some documents and deleted others - Brooks downloaded those files and had the originals from the dates they were filed on PACER)

> *On March 17, 2017, plaintiff substituted Marianne Dugan as counsel.* ***On April 24, 2017, the parties' conferred regarding this lawsuit; defense counsel agreed to join plaintiff's forthcoming request to extend the then-current discovery deadline by two months, from August 31, 2017, until October 31, 2017.*** *Additionally, the parties discussed potentially staying this lawsuit to allow for the resolution of a related matter and to permit plaintiff the opportunity to amend his complaint.*
> ***During May and June 2017, defendant's attorneys contacted Ms. Dugan numerous times to ask whether she intended to file an amended complaint or seek an extension of pretrial deadlines.*** *Because Ms. Dugan did not respond, defendant served its Requests for Production on June 29, 2017. Ms. Dugan thereafter did not furnish any responsive documents, so that on August 15, 2017, defendant moved for sanctions and to compel production.*

Thus, Russo knew at least by October 16, 2017, that Dugan and Stoel Rives had an agreement to postpone discovery. She also knew that Dugan had communicated the date she was

leaving and returning to Stoel Rives and her fellow qui tam layers. Russo also knew that Dugan was appointed by Leiman and Johnson as part of their Qui Tam team.

By August 23, 2017, the Judge knew that Dugan had been out of state and Dugan had told Stoel Rives that she was leaving in May. In fact, has already showed that Stoel Rives attempts to contact Dugan were show! She also refers to a voicemail...left on a disconnect phone with a message telling callers she is out of the office and returning in August. Judge Russo should have sanctioned Stoel Rives right then. So, why did she sanction Dugan and go on to deny Brooks his right to discovery when she knew Dugan ran off "on vacation" without telling him.

Worst case, Dugan had somehow screwed up filing that Discovery extension. Russo also knew that Dugan was out of contact from May until August with an agreement to postpone discovery. Why didn't Keating, then, call the other three lawyers working with Dugan? More to the point, why was Russo denying Brooks right to discovery? Brooks was the innocent party. Brooks case bears a striking resemblance to Bailey v. Brookdale Univ. Hosp. Med. Ctr,, No C 16-2195, but on steroids. In that case, the court sanctioned the attorneys for keeping the plaintiff in the dark, for not communicating with Bailey. Here, Russo seems to be part of the Stoel Rives team.

Russo knew by August 31 that Keating set Dugan up and allowed her misrepresentations and obvious creation of an elaborate document trail (which Brooks only got by accident and, then, a year later). Russo used that as an excuse to illegally deny Brooks discovery. Those were, at the very least, Judicial and ABA ethics violations. Aiken and Mosman all knew that Russo had wrongly denied Brooks his discovery rights, too. **At best**, Russo, Aiken, and Mosman allowed the Court to be manipulated by Keating and Galloway. You had, no matter what, a broken trial that demanded a retrial.

Rather than declare the trial broken, Russo was abruptly pulled from this case and moved to Portland, between September 19 and September 21, 2018; then, Aiken assigned Kasubhai.

In her parting statement, Russo repeats the same, by now discredited and unhinged, claim that Brooks never sought discovery. In an Order ( docket #174) on September 17, 2018, we see Russo arguing:

> In September 2017, plaintiff moved to proceed pro se and for an extension of the discovery deadline, as <u>neither he nor his former counsel had sought any discovery during</u>

the course of this lawsuit. The Court granted plaintiff's requests and allowed plaintiff 30 days to locate substitute counsel.

Worse, on December 7, 2017, Keating and Galloway oppose a motion by Brooks that his discovery rights were unlawfully denied by the Court.

> *Agate objects to Plaintiff's service of a Request for Documents*
> *on Agate, and to each and every individual Request, on the grounds that the Requests are*
> *untimely because the deadline to complete discovery was August 31, 2017.*

This was removed from PACER!

And in this latter regard, consider Brooks' email to Galloway on October 30, 2017. And note, Brooks is requesting this because Dugan claimed to Brooks, the Oregon State Bar, and the Court that her computer had crashed and she lost all of her documents and emails:

> *One thing you can help me with is communications you had with Dugan...I have no idea*
> *of what she discussed...why she waved preliminary discovery with a disabled client filing*
> *ADA and FMLA complaints..."*
> *[email Brooks to Galloway and Keating, 10/30/2017 4:21 p.m.]*

To which Galloway replies:

> Mr. Brooks, We also received very little communication from Ms. Dugan, which is why
> we filed a motion to compel. I have attached our motion and supporting declaration,
> which to my knowledge, contain or describe all of our correspondence prior to August 8
> that was related to discovery. [email Galloway to Brooks, 10/30/2017 4:33 p.m.]

Then, on July 5, 2018, Brooks finds 175 emails between them and Dugan that Galloway and Keating had kept from Brooks and another 102 emails and telephone records. Anyone looking those can determine laws and ethical violations took place that required sanctions against Stoel Rives.

Russo broke this case by her conflict of interest with Keating and Stoel Rives partners in her OWLS group. Russo, Galloway and Keating, are members of this OWLS lawyer social group, so there is a conflict of interest and ethics violations. Stoel Rives should be disqualified and a new trial and a new venue ordered, if a fair trial is even possible.

## BROOKS' EXPERTISE

Brooks is not your normal DBA. Brooks is actually an engineer, a Tektronix Fellow and lead or sole inventor on US Patent 6,618,162 and 6,618,162B1; updates for computers, cell phones, printers, over the internet. The international version of that, granted on July 27, 2000, is

WO 00/43863 (WO2000043863A1). Brooks was awarded a Tektronix Fellow for inventing the OTDR algorithms and pattern recognition . You would not have DSL internet, fiber optic based networks, or even internet or broadband based updates or software loading on your smart phone, computer, printer, or smart refrigerator if it were not for those inventions.

Brooks knew nothing of medical coding when he was hired. As a result of Agate's sale of patient records, which Brooks found out about in 2006, Brooks dedicated himself into becoming an expert on Medical Coding. Brooks took the AAPC Accreditation course. When he was granted access to the claims database in 2010/11, Brooks started looking for fraud, looking backward to 2000 in the record set and forward to the present day.

Brooks became so proficient with Medical Coding that he was correcting Ingenix/Optum errors and writing groupers and special code for them. mArlan Lillie, the IT manager in the 2011 Performance Review wrote:

> *This past year, Mikes work consisted of about 75% Ingenix reporting tool for medical management, and the remaining portion of his time was spent creating reports for almost every other department. The Ingenix reporting and predictive modeling system is very complex, and has a number of problems. New releases from Ingenix often contain errors, and it takes Mike weeks to find all of the bugs in each new release. He works closely with Dr. Satt and Dr. Stern to create reports that are used to direct medical management department policy*

*In 2012, Ingenix sent their programmers to Agate to meet with Brooks about errors in their code and program structure:*

> **"Recently, Ingenix had a problem with their programming, that involved all of their users, nationwide. Mike was able to work with them and help them fix their code and get the project back on track. " [Performance Evaluation 2/17/2012]**

Brooks wrote the medical code grouping algorithms in use today. He is one of the country's leading experts on medical coding. This become important when you look at the Oregon District Court's dismissal of 6:14-cv-01424-AA/MC.

## REASONS FOR GRANTING THE PETITION

Brooks' life been destroyed for trying to do the right thing. His health has been wrecked, and he has been impoverished deliberately by the courts and defendants in retaliation. The key points will determine and set policy for the:

• Application of the Rehabilitation Act, the ADA and ADAAA; the FRCP and ARCP, and other statutes and rules established by Congress to the federal Article 3 Courts as Congress intended and to states and lawyers

- Due Process for Pro Se litigants who are treated differently and with prejudice and disrespect by the federal courts
- Revisit Sarbanes Oxley and its applicability to the new Byzantine corporate structure that been created to circumvent it
- The application of Sarbanes Oxley, HIPAA, an other laws pertaining to healthcare to state governments in light of the ACA and Congress's "outsourcing" healthcare and the money and opportunity to create organized crime in state governments
- Revisit setting professional, ethical, and legal guidelines for judges and attorney's before the federal courts

Brooks is asking that Stoel Rives, Oregon, and district Court judges be criminally indicted for felony tampering with documents, perjury, and derailing a case in an act of political revenge.

Brooks asks for a summary judgement, based on his Revised Complaint. That is highly unusual, but Brooks is not likely to be alive is this goes through another 8 years of legal circus paid for by a corrupt Centene Corporation with deep pockets and political contacts that include being the largest bundler for President Biden and a board stuffed with governors, senators, astonauts, and enough military officers to staff a third world Pentagon.

If not that, Brooks has more than demonstrated that Stoel Rives and their experts should to be disqualified. The Rico v Mitsubishi Motors 42 Cal. 4th 807, 171 P.3d case makes this an easy decision. Simply based on the evidence given to the 9th Circuit Judges Stoel Rives was disqualified. They participated in theft of Brooks' case documents and hid that fact by lying to the Court.

Brooks asks for the return of all of his evidence and documents, everything that was taken by Dugan.

Brooks asks this court to remove the "Protective Order" issued by Aiken and asks for permission to give that evidence to Congress, the US Department of Justice, private attorneys representing Agate and Centene's victims, to the International Court of Justice and countries of foreign student victims, and to the press (with suitable HIPAA identity protections).

Along with disqualification, Brooks asks for sanctions against Stoel Rives and Leiman and Johnson to pay for expert counsel.

**REDACTED**

The new trial should be anywhere but Oregon. Brooks is doubtful however, that a fair trial is possible anywhere.

Brooks asks that the defendants and Ninth Circuit and District Court judges that received medical records, received doctor letters about the precarious state of Brooks health and callously disregarded that, further harming him, be subjected individual and corporately to the full financial penalties accompanying HIPAA and the ADA, ADAAA, and Rehabilitation Act:

Kasubhai and Aiken, $55,000 each for HIPAA violations in unsealing or denying the seal of medical records

Stoel Rives attorneys Reilly Keating and Stephen Galloway, $55,000 each for receipt of medical records from Seattle OSHA, Davis Nessler Cass at MODA and $55,000 for each violation of HIPAA by use of that information before the Court. Brooks estimates this at $550,000, to be shared between Keating and Galloway and Stoel Rives.

$55,000 for each Ninth Circuit Court Judge.

$5,5000,000 against Centene for abusing their position as a state contractor and denying Brooks critical medical care, leading to life ending injuries and suffering.

All of these fines to be paid immediately and prior to any new trial.

Respectfully Submitted, March 29, 2021,

Michael T. Brooks
Pro Se
32713 Vintage Way
Coburg, Oregon 97408