**REDACTED**

April 27, 2021

## IN THE
## SUPREME COURT OF THE UNITED STATES

**MICHAEL T BROOKS**
<u>**Petitioner**</u>

vs

**Centene Corporation**
**dba Respondent Resources**
**dba LIPA (aka/dba Lane Individual Practice Association**
**aka.dba Lane Independent Physicians Association)**
**dba Trillium Community Health Program**
<u>**Respondent**</u>

**Petitioner's Response to "DEFENDANTS' MOTION TO SEAL PETITION FOR WRIT OF CERTIORARI ATTACHED TO RELATOR'S REPLY AND REBUTTAL of April 19, 2021**

Michael T Brooks
32713 Vintage Way
Coburg, Oregon 97408

**EXHIBIT 3**
**Page 1 of 30**

Respondents seek to mislead the Court in keeping from public knowledge Respondent's multiple breaches of public trust. Petitioner will take the time to show their counsel misleading courts and attempting to mislead this Court, and provide legal support for unsealing and releasing the records in this case. The public is not served when one of the Country's largest insurers has been engaged in selling their medical records and causing them to lose jobs, pay higher interest rates or be denied loans for home, auto, and personal credit.

The present issue seems to seal a record of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. What Respondent's counsel does not tell you if that Respondent's **sold** that record to an information warehouse. The information warehouse was foreign. Petitioner checked and that was a f**oreign intelligence agency** . Petitioner cannot imagine anyone else being interested in a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

What Respondent's counsel does not tell this Court is that Respondent's **sold** the medical and counseling record for at least 5,197 ▮▮▮▮ students and tens of thousands of students from Taiwan, Singapore, South Korea, Saudi Arabia, UAE/Dubai, Canada, the UK, Sweden, Denmark, Norway, Australia, Spain, Japan…. More than 90 countries.

Those **records included** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, counseling records where children from foreign countries discuss their families and innermost secrets, records of students who caught AID and the laboratory records of HIV tests. Professional chart notes, billing records, records that Respondent's were not even legally allowed to see, much less possess, were sold.

Those sales contravene the Fourth Geneva Accord, Section 3, against "outrages upon personal dignity, in particular humiliating and degrading treatment" of civilians in times of peace. [see ICRC "Convention (IV) relative to the Protection of Civilian Persons in Time of War. Geneva, 12 August 1949"]

These sales  contravene the Geneva Conventions, are Crimes Against Humanity, and this Court is looking at tens of thousands of foreign student victims,  every one a separate violation. The act of a rogue state government and its contractor could make the United States an international pariah.

These are violations of UN treaties to which the US is signatory to and ratified: "International Covenant on Civil and Political Rights", "Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment", the "Convention on the Prevention and

**EXHIBIT 3**
**Page 2 of 30**

Punishment of Crimes Against Internationally Protected Persons", the Conventions on the Rights of Children, all of which the United States has ratified. These also contain specific protections for whistleblowers. The US, because of the sale of these records is in violation of the UN Convention Against Corruption. No international Court is going to see Oregon or the Oregon federal court as anything other than the United States in violation of international law and treaties.

Respondent's counsel seems to think that the US Supreme Court is the end of this. This case, however crosses national boundaries, just as it crosses state boundaries. Centene has operations in Spain and the UK ("Trowbridge surgery in Hackney Wick. It is one of 11 GP surgeries in NE London and 49 across London that have just been sold to Operose, a subsidiary of Centene without public input") Spain, South America, and Centene is attempting to enter Germany. Brooks fully intends to file complaints with the UN High Commissioner and the UN Courts, as well as the International Court of Justice with the backing and sponsorship of Russia, China, Iran and other foreign countries whose children were harmed by the sale of their records, if need be.

This is the last requirement  before Brooks can sue in the Geneva and UN Courts ("All local and national remedies must be exhausted before filing with the UN"). Brooks fully intends to sue Centene and Agate and Oregon-United States. Russia will can sue in the International Court of Justice or sponsor Brooks.

 Brooks is going to be made whole, his name cleared,  receive apologies for the wrong done to him, and permitted to live his life out in peace,  or he will fight to the very end and that is going to entail going public with everything. A copy of this is being sent to foreign sponsors and potential foreign sponsors.

The State of Oregon, Respondent's and the Oregon District Court, acted as predators upon those children and they harmed a disabled Petitioner by illegally imposing Magistrate Judges over Brooks' written objections. District Judge Ann Aiken dismissed his case out of spite for Brooks' objections and for Brooks' finding and showing illegal/unseemly communications and assistance by the those Magistrate Judges to Respondent's attorneys.

REDACTED

Those foreign student records are only part of the records Agate sold. Agate sold records for hundreds of thousands of workers from 33 states that were enrolled in pseudo self funded insurance plans - Agate's Employers Health Alliance, Alliance, EHA, and other private plans. Agate sold health records for patients in California and Washington, SAIF patients, **public employees** - State, county, and city public employees, and public school teachers, aides, and support workers.

Those people's health, prescription drug, raw laboratory test results, medical imaging, psychiatric and counseling records, were sold to their employers, credit agencies, and to information warehouses.

Agate should not have possessed the records for those foreign students, the HIV records, the counseling records. Agate Resources did not even have a license to transact insurance business in Oregon when they were selling those insurance products in 33 states and pawing through and selling the medical records for hundreds of thousands of patient/workers and their families. Agate was fined for illegally operating an insurance business in 2016 Oregon Cease and Desist Order #INS 15-12-003; *"Agate has never been issued a certificate of authority evidencing the authority to transact insurance in Oregon."*

The Director of the Analytics Department and Chief Operating Officer Patrice Korjenek, assembled tables used to profile and discriminate against patients. Respondent's chose the helpless and the poor. Most were racial minorities, but Petitioner will not call Respondent's racist bigots and will leave that up to others to determine.

For example, white Medicaid patients were granted medical referrals or authorizations 65% of the time. Referrals and authorizations were for specialist care or devices, X-rays or MRI's for injuries for a broken bone, prenatal care for expectant mother, referrals for ulcerated colons, bleeding, psychologists in cases of sexual molestation or, in the case of foster children, being taken from their home and housed with strangers, wheelchairs, transportation to school for disabled children.

White foster children were only granted referrals or authorizations for specialist treatment or testing 26% of the time. Again, these children were denied x-rays for injuries or broken limbs. Black foster children, received approval at half that rate - 13% of the time, Native American children had approval for 10% of requests, Hispanic children only had a 6% approval rate.

**EXHIBIT 3**
**Page 4 of 30**

REDACTED

Prenatal care for minority women was so lousy that the majority of Hispanic and Native American women ended up in the emergency room (ER). For Native American women, 36% of the c-section deliveries took place in the ER and 26.7% of those women were sent home within four hours of surgery (to save money on hospital costs). Major surgery as an outpatient, with over half of them returning because of bleeding with distressed newborn babies? And, District Court Judge Ann Aiken hid this with a Protective Order! Who was she protecting? And, note, among white women Brooks can show records of a mere 0.053% having c-section deliveries that were not granted a hospital room for at least one night, 24 women over a five year period.

Respondent spent $509.39 on the average prenatal contact for pregnant white women, but only $324.69 for black women, $354.16 on Hispanic women and $291.84 for Native American women.

Brooks was in charge of a special web based report, Gweezel.com, containing the raw data for this that was accessible only to Agate Resources CEO Terry Coplin, COO Patrice Korjenek, CFO David Cole, Shannon Conley, and Agate Attorney Cassandra McLeod Skinner. Brooks wrote the code for this. The code behind the web pages makes it more than apparent that executives were looking for foster children, ESL patients with poor English skills, racial minorities, seniors, and disabled to deny care to to save money. This was so apparent that a local doctor went to the press about this in September 2016:

> "You might expect (this kind of behavior) from the business people — Papé and Torrey— but not from doctors who gave an oath to first do no harm," said a local neuropsychiatrist, who asked not to be named. If you're going to screw over a population and not have any consequences, (Oregon Health Plan patients are) a perfect population…The only way (Trillium) makes money is to deny patients of the very care we're supposed to give."
> [http://projects.registerguard.com/rg/business/34579621-63/trillium-complaints-surge-with-profits.html.csp]

Jim Torrey, former mayor of Eugene, and Randall Pape, of the multinational construction firm, were board members of Agate. Torrey reportedly received $2.5 million from Agate in 2015, but records show that was actually $3.3 million. Pape received $1.4 million and did not inflate the number.

Agate, Trillium, Centene, HealthNet are, bluntly, gigantic fraud operations currently in violation of 42 CFR 455.104 because of their Byzantine corporate structure. Agate's subsidiaries, Trillium Community Health Plan and Trillium COO, might have had the ability to operate as a

**EXHIBIT 3**
**Page 5 of 30**

"Business Associate: under the terms of the Privacy Act and HIPAA, but that appears to have been forfeited when Trillium was acquired by Centene and all of Agate Resources employees leased to Trillium suddenly became Centene employees:

> 8. *Agate did not hold a certificate of authority under ORS 731.072(1). Agate violated ORS 731.022 and ORS 731.354 because Agate <u>transacted insurance without a certificate of authority</u> issued under ORS 731.072(1). [#INS 15-12-003]*

This was altered on May 16, 2020, by the state in response to Brooks' objections, but it did not fix the underlying problem of Trillium lacking authority to conduct insurance in Oregon (or Washington). A new license application was required and was apparently issued on January 1, 2019, by OHP as Contract # 143115-11, but that was with Health Share, supposedly a different contractor entirely.

Let's try and unravel the actual corporate structure of Centene, Agate Resources, LIPA, and Centene. A quick check of the "Statement regarding the acquisition of Control of or merger with a domestic insurer - Trillium Community Health Plan, Inc. by Centene Corporation", filed with the Department of Consumer and Business Services of the State of Oregon on February 06, 2015 both shows that <u>Centene is the sole shareholder of Agate</u> and "gained control of Agate and Trillium in 2015" . There is no "indirect subsidiary", whatever these attorneys mean by that.

> *(3) Each license shall be issued only for the premises and persons or governmental units named in the application and shall not be transferable or assignable [ORS 441.025]*

All of this, with a bit more to come, shows that Agate Resources and all of its subsidiaries were illegally in possession of protected health information. Agate Resources did not have a license to conduct insurance business. Trillium employees were Agate employees. Agate accessed, sold, and used (by its subsidiaries) PHI. Agate was co-mingling Medicaid, CHIP, Medicare records with EHA records and selling them. And, remember, Agate owned the servers, the facility, and exercised hiring and firing control over the employees of Trillium, the mail order pharmacies, SAIF, private insurances companies (which, note, it operated for more than 10 years without a license), DME prescribers, home health organizations, women's clinics, etc.

The Protective Order by the District Court conveys ownership of those records Agate, a company that cannot legally even see those records. Agate, the business and executives, harmed those patients. The District Court has no legal authority to have done that and this Court will need to address that error.

Neither Trillium, Agate, Centene, and certainly not Stoel Rives, has any right to counseling records, HIV and STD laboratory reports, genetic test results, foreign student medical and counseling records, Oregon State (psychiatric) Hospital prescription drug and psychiatric records, the records of thousands of public employees and public workers in Washington, Oregon and California (and that is just the ones Brooks found…they are undoubtably more).

The majority of these people were not even patients or customers of Respondent and likely did not even know of the existence of the Respondent. Respondent **never** had any right to possess those records or even see them. Judge Aiken, however, has made all of that property of this outfit and ordered it kept secret from the Courts, Congress, the governments of the students involved, and in violation of US law.

What were Aiken and McShane thinking? They put the United States government in the middle of a nightmare situation. The office of consulate affairs of every one of those students is required to be informed of the breach of their nationals records. And federal law, statutory law reads

> *45 CFR §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured protected health information. Similar breach notification provisions implemented and enforced by the <u>Federal Trade Commission (FTC)</u>, apply to vendors of personal health records and their third party service providers, pursuant to section 13407 of the HITECH Act.*

Aiken and McShayne make the Oregon District Court in violation of that law by blocking fulfilling the statutory requirements.

> *Judicial and Administrative Proceedings. Covered entities may disclose protected health information in a judicial or administrative proceeding if the request for the information is through an order from a court or administrative tribunal. Such information may also be disclosed in response to a subpoena or other lawful process if certain assurances regarding notice to the individual or a protective order are provided. [45 C.F.R. § 164.512(e).]*

There is nothing in the law permitting a district court to <u>prevent</u> public knowledge of that breach so long as individual PHI is not disclosed. The Oregon District Court was protecting Respondent and Oregon and harming the victims, denying justice to the victims of Respondent's criminal acts.

In the February 13, 2019, attachment of a "Letter of Intent to Apply Form" [RFA
OHA-4690-19 – CCO 2.0], Chris Ellerson, Trillium's Plan President and CCO of Trillium,
HealthNet, swears in an affidavit that:

> *Centene is led by a 9 member Board of Directors and no single individual has a*
> *controlling percentage over the organization.*
> Centene Corporation
> 100%
> Agate Resources, Inc.
> 100%
> Trillium Community Health Plan, Inc.

Note the Health Plan Services Contract ID, #143121-14. On January 1, 2019, that was the
Health Plan Contract issued to FamilyShare transferred to Health Share of Oregon and
transferred to Centene in February 2019. ORS 441.025 is unambiguous. OHA was operating
outside of state statues and, more importantly, it was operating outside of federal statutes like 42
CFR 455.104. OHA is in violation of the CMS "Fiscal Agents: Disclosure of Ownership and
Control Snapshot". Read the requirements. Oregon should not be permitted to operate it
healthcare exchange.

In a convoluted, but interesting, story about organized crime in Oregon, Lynn Saxton, the
head of the Oregon Health Authority was forced to resign when newspapers discovered Oregon
Health Authority had defamed FamilyShare, the last non-profit Medical Services Contractor in
Oregon, and gave that contract to Health Share in 2017.

> *OHA had proposed feeding ideas for negative stories about FamilyCare to several*
> *Oregon journalists [they actually did] as part of a strategy to sway public opinion*
> *against the health care provider. Members of the Oregon Senate's Interim Committee on*
> *General Government and Accountability sought to have the three testify at its Monday*
> *meeting. Saxton's attorney responded to the testimony request with a letter explaining*
> *that Saxton "respectfully declines." Attorney Steven Blackhurst said he has advised*
> *Saxton "not to make public statements about her service at the Oregon Health Authority*
> *so long as there is pending litigation between FamilyCare and the Oregon Health*
> *Authority." The new director of the OHA, Patrick Allen, did appear before the legislative*
> *panel.*

Patrick Allen, his assistant Laura Robison (Cali) and staff, are mentioned in Secretary of State
Dennis Richardson's Audit Report [November 2017, "Oregon Health Authority Should Improve
Efforts to Detect and Prevent Improper Medicaid Payments"]. This concerned fraud by OHA and
executive impeding outside auditors attempts to follow federal law and used records Brooks

**REDACTED**

provided to the Secretary and the Outside auditor at Acuity Forensics. Note that the report was altered by OHA subsequent to its being completed in March 2018 and recorded conversations between Brooks and Secretary Richardson. The fluff about Patrick Allen was NOT in the Secretary's Report.

It is not difficult to see the alternations, either. Look, for example, at recommendations and letter by Audit Division head, Kip Memmott, purportedly written on November 28, 2017. Mr. Memmott refers to future events. Books met with the Secretary and Mr. Memmott on October 18, 2017, about records Brooks provided the Secretary of hundreds of thousands of questionable payments, not the 31,300 referred to in the report or the 10% in another report. Brooks records showed an astonishing 30% of money fraudulently misspent. Mr. Richardson recorded his interviews with Mr. Brooks and with Mr. Memmott and **Brooks has those recordings** and tried to introduce those as evidence to this Court.

> *Government Auditing Standards require that we report circumstances that interfere with the completion of our audits. In particular, we are required to report potential scope limitations.*
>
> *Some employees informed us that their manager had directed them to not respond directly to auditor follow-up questions and to send responses through managers identified as points of contact for this audit. Preventing direct follow-up slowed our work, potentially limited our access, and created a bottleneck for both us and OHA. We had questions that staff could answer in minutes, but were instead required to ask managers, who sometimes provided incorrect information because they lacked the same level of familiarity as staff.*
>
> *In addition,* ***OHA management monitored our contacts with agency staff. In one example, an employee was flanked by two managers and OHA's Chief Auditor [Laura Cali] for an audit interview. In another example, a total of six agency staff, including OHA's prior Chief Financial Officer/Chief Operations Officer at the time, accompanied one auditor** around during a tour of OHA's eligibility processing center.*
>
> *OHA delayed answering requests and at times provided incomplete or erroneous information. For example, in February, the audit team inquired about a list of carve outs to perform the testing mentioned on page 16. Five months later, OHA provided an answer that ended up being incomplete.*
>
> *We also used multiple independent verifiers of our analysis and vetted results with OHA. We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained and reported provides a reasonable basis to achieve our audit objective.*

**EXHIBIT 3**
**Page 9 of 30**

> *In mid-September, the agency informed us for the first time about dozens of other carve outs. Another example was when the agency took more than a month to provide a copy of an existing draft contract.*

** The Auditor referred to was Tiffany Couch, Acuity Forensics, who met with Brooks at the State Audit Offices in the Public Service Building, 255 Capital Street, in Salem, from 10 AM until after 12:30 PM on November 29, 2017. She was still writing the actual Audit Report with the Secretary and we had arranged for Brooks to give her documents. Secretary Richardson telephoned Brooks at home on March 28, 2018, about that Audit Report and told Brooks that he had secured a promise from Oregon AG Rosenblum to criminally prosecute Centene executives for fraud, failure to pay capital gains and state income taxes, and other criminal acts.

Furthermore, Centene did not apply for a license to operate as an insurer in Oregon until June 12, 2019. They were forced to because Brooks pointed out the convoluted corporate structure that has Centene employees freely passing between supposedly competitive businesses in violation of SEC laws and Sarbanes Oxley. Centene was fined $163,000 for 163 violations of 744.074(1)(a), "providing incorrect, misleading, incomplete or materially untrue information in the license application". This was over fraud by HealthNet in INS 16-0162.

All of this is applicable because Centene and Oregon are operating as subcontractors implementing Medicare, Medicaid, the ACA, CHIP, all federal insurance programs funded by the US government and subject to federal statutes and contracts with the federal government that Oregon has not abided by. [See the ownership and control requirements by CMS. Oregon knowing accepted and passed off 42 CFR 455.104, and failed to require disclosures by Centne, Agate , and Trillium under 455.105 and 455.106. All of that was required within 35 days of any ownership change or change in organizational structure.

Trillium has no employees. It had no employees when it was operated by Agate and it has no employees being operated by Centene. All Trillium employee were leased to Trillium by Agate and the state was not privy to this until 2015. This applied to all of Agate's subsidiaries, its mail order pharmacy businesses, its DME businesses, the various pseudo self funded and private insurance programs it operated. It was, it is, all a lawless scam being perpetuated by Respondents and their counsel.

Centene adopted the same corporate structure with that sale. **Today**, Agate Resources has no shareholders, executives, employees, facilities nor assets. It is a pseudo legal cutout used to avoid lawsuits and SEC and CMS regulations, especially reporting requirements. [see Findings Of Fact, Conclusion of Law, Case 15-04-022; 6/25/2015]. "Trillium" is Centene, its employees

are paid by Centene. Most of those employees are **represented** by Centene as working for other companies (eviCore, CareCore, HealthNet, Ambetter, various mai order pharmacies and DME vendors) on a legal whim. They **are** Centene employees the entire time. Their paychecks, retirement plan, taxes, and benefits, reflect that, too. What Respondent's counsel is arguing for us to accept is a fiction that no one with common sense would accept. There is no Trillium and there is no Agate Resources They have no more existence than a character in a novel. There is only the Centene Corporation and it has failed to fulfilled SEC, CMS, Oregon, and other statutory legal requirements.

Respondent's counsel deliberately misrepresents the true structure of Trillium, Agate Resources, Agate Healthcare, and Centene. Stoel Rives is paid by Centene. They reported to Centene's Senior Director, Elizabeth McCray, who was the Sr. Vice President, Operations at Trillium Community Health Plan & Health Net of Oregon through March 2020.

Agate Healthcare aka Agate Health Care, Oregon business registry number 695284-96, did not exist until June 16, 2010. The registered agent was Terry Coplin. That paper company had no employees. It existed solely to "make" campaign contributions and pay gifts to politicians and state agents. It never had a license to engage in ay kind of healthcare during its entire existence.  Coplin failed to renew and Agate Healthcare **ceased to exist on June 17, 2016, and was never renewed**. It was moribund after paying off Oregon politicians in 2015 to pass HB3300 because of the 23,000 plus patients they were caught with not having primary care providers:

> Prohibits Public Employees' Benefit Board and Oregon Educators Benefit Board from contracting with health care providers, directly or through third party administrator, for payment or reimbursement of claims for health care provided to public employees residing in Lane County unless health care provider accepts patients who receive medical assistance. [2015 Session, HB3300]

This failed to pass, of course. With no doctor willing to take those patients, Agate "persuaded" Lane County to misappropriate federal low income housing and health funds to build two "clinics" that they staffed with four contract nurse practitioners and doctors who took roughly 8,000 patients each. The Agate executive who drove this, a former legislator, is married to Lane County Commissioner Patrick Farr. Brooks, personally, spoke with Commissioner Heath Buch about this and she promised to do something but never did. Essentially what you is elected officials taking money from the poor, homeless, and sick, and bailing out corrupt executives that

committed fraud and giot themselves into that mess. What is my county government doing preserving executive's multi-million dollar bonuses , bonuses they did not even pay taxes on, at the expense of the poor?

Something known to Agate employees, and available through public records, reveals that connections between Agate Resources, HealthNet, and Centene go all the way back to 1999. Check, for example, Cheryl Lund, the Compliance Officer Agate Resources and HealthNet from 1999 through 2010 or the Agate VP, HealthNet VP, and Centene VP Eric Hause 2006 through May 2020. The executive staff of these outfit, and Oregon Providence Health System, are in a revolving door.

Dean Harris, Brooks' predecessor as Data Warehouse Administrator at Agate Resources, was misled into thinking he worked at Agate Healthcare, which did not exist at that time. He filed a whistleblower retaliation complaint with federal OSHA listing Agate Healthcare as his employer. Dean Harris was fired in 2005 for reporting Agate using Apropo Benefits Management as a front to deny necessary medical equipment and services to OHP patients.

Agate Resources owner Terry Coplin installed Amanda Cobb as Apropo's Director. Harris was fired for "inappropriate behavior toward a female colleague". This was Amanda Cobb, who Harris was reporting to.  Brooks has heard of five different whistleblowers who were pre-textually fired by Agate Resources using the exact same excuse and Ms. Cobb. Brooks personally knows four. This bears some brief attention.

The corollary to Agate using Cobb as an excuse for sexual harassment is the history of grievances filed by male employees reporting to her. A very young, new DBA named Vladimir, was called "Vlad the impaler", accompanied by suggestive body language. Grievances from Dean Harris, Jim Kaiser, grievances by Brooks  and others sexual suggestive remarks such as of an "abrasion from shaving" and picking up men in bars referred to in a Court case in Oregon that Brooks **won** in 2014 are part of the record. Also, Brooks emailed Agate Human Resources with those complaints and filed grievance that he refers to in emails. Agate destroyed those grievances and other records.

Brooks **never** had contact with Cobb outside of work. Outside of her initiating FaceBook messages that she insisted on, Brooks had no social interactions with her at all. Brooks went to

great lengths to avoid her. Brooks was afraid of her. She had the power to fire him or ruin him professionally. Agate LOST in court (thus, another perjury by respondent's counsel, who knows that) with that claim of an inappropriate relationship and here are witnesses about Cobb making sexually suggestive remarks, letters and emails to Mr. Brooks and other male workers.

Women, like the head of Pharmacy Management, Patricia Lane and Kathleen Howard were also destroyed by Cobb. Lane was approached about a mail order pharmacy scam. Cobb, with zero background in medicine, was dispensing drugs from a box. She used a book to guess at appropriate substitutes. Garrett Anders and Brooks walked in on her doing this in the Willamette room at Agate and conversations of that were recorded and given to this Court as evidence.

Lane refused and Korjenek offered her the choice of resigning or being fired for "insubordination". She resigned. There is along list of doctors, nurses and other professionals that were fired by Agate or face being professionally destroyed because Agate owned the firm used by Oregon to vet professional credentials and licenses (IPS, Independent Professional Services, co-owned with Stoel Rives at the time). Doctors filed complaints against Korjenek and Cole for intervening in medical decisions. Coplin and Korjenek threatened doctors with termination and professional destruction if they got involved in their patient profiling and denial of services.

This interference with medical decisions by non-medical executives is a routine practice at Centene. It has been going on at Centene shell companies like Ambetter and HealthNet since at least 2007 with (former) Agate employees at the bottom of the crimes [see https://www.contractormisconduct.org/contractors/67/health-net-inc. This is a partial list of 33 examples lawsuits won for misconduct for just HealthNet].

Centene has been sued directly multiple times for misrepresenting health coverage and providers to patients. Trillium-Centene represented that they will assign a particular doctor to a new patient if they sign on with them. Most of the time they cannot and they run the patient in circles. Costly patients are left without primary care doctors to prevent them from getting costly prescription drugs, specialist care, or even requesting authorizations. The $650 a month the get from Oregon for that patient is pure profit. It goes into the Reserve Fund and is available for bonuses or stock buybacks.

In Oregon, over 60,000 Trillium patients discovered that hospitals and clinics were refusing to see Trillium insured patients unless it was a life threatening emergency. It took a

Court Order to force Trillium and HealthNet to tell prospective patients that they could not get elective surgeries or other care if they signed on with them.

Brooks was injured on the job several times between 2011 and 2013. Agate refused to accept Workman's Compensation claims (in Oregon you have to file a form 801 before seeing a doctor). HR's Woods, Coplin and Korjenek all threatened to fire Brooks if he tried to go around them and file.

Brooks was confined to a wheelchair because of on the job injuries that began in 2011 and 2012 . In 2011/2012 Brooks developed a detached retina from working in an unlit office at nights. Korjenek prohibited turning overhead lights on because of the electrical costs and Brooks' computer workstation had a single 13" monitor. Brooks complained about eye strain and was ignored. (Agate installed dual 20' monitors in early 2013 after Brooks' second eye surgery.)

This resulted not merely in the detached retina, but three tears to the retina of the right eye. Brooks had two surgeries and required another, which Agate refused time off for, with the result that Brooks lost most of the sight in that eye; e.g. Brooks cannot read an ordinary paperback book. Brooks subsequently broke the cuboid, calcaneus and metatarsal to the right foot as a result of a fall and subsequent small lathe falling on it. He was in a cast, on crutches or in a wheelchair fro November 2012 through July 2014. That foot still swells if Brooks stands on it and that has resulted in Brooks' returning to a wheelchair for months.

In 2013, Brooks suffered a crushed left foot, a consequence of a heavy steal cart loaded with garbage tipping and falling on it. That heavy steel cart also injured Brooks' lower back. That was due to harassment by Agate. Agate wanted Brooks to quit because Brooks spoke out at a staff HIPAA training meeting conducted by Korjenek. Brooks opposed Korjenek and Cobb's "Hot Spotter" Reports and  Agate's profiling patients - especially foster children and racial minorities, denying doctor authorizations and referrals just to funnel money in their Reserve Account.

Brooks was told by doctors to ask for time off for surgery.Brooks' wife and a famiy friend, Shannon Urhausen, were at a June 4, 2013, doctors appointment with Dr. Donald Jones. Brooks was confined to a wheelchair and doctors had just done a series of fluoroscopic guided injections into the joint of the right foot to try and get the swelling down. It dod not work and Dr. Jones was concerned about permanent damage and suggested immediate surgery.

Brooks told Dr. Jones that he had requested time off for surgery at the request of his orthopedist, Dr. Dennis Routhier and Korjenek and Agate refused, in spite of the fact that Brooks had three months vacation that would not permit him to take. Dr. Jones suggested citing the Family and Medical Leave Act and explained that to the three of us. We all wrote declarations to the Court about that.

Brooks asked both HR and Korjenek for leave time under FMLA and was refused because they needed Brooks to complete setting up a new server for Impact Intelligence claims analysis. Korjenek made an explicit promise for time off in November 2013. She fired Brooks before then.

Brooks provided photographs and medical records of those injuries, along with doctor letters, work status reports. Those photographs show the actual current state of Brooks' feet. That hole in the top of the left foot is where a broken bone pierced the foot. The swelling to double normal size, the bleeding from the skin splitting, the purple color, are because of those injuries. And understand that Agate denied Brooks time off for surgery, denied telecommuting, denied vacation time, and Korjenek and Nanette Woods did not even acknowledge the letter from Brooks' primary care doctor telling them that they were permanently damaging Brooks foot by delaying surgery.

All of this is in writing, including a reference to the doctor's letter by Korjenek, yet Respondent's counsel is still claiming that Trillium had no idea Brooks was injured and needed medical care. Instead of providing care, Agate FIRED Brooks.

On August 21, 2013, Korjenek telephoned Brooks at home at 8:10 PM. She told Brooks that the executive staff had approved his request for time off under the FMLA, but asked that he write a detailed report, explain the code, dates due, and spend hours and night automating procedures so that co-workers could fill in while Brooks was recuperating from surgery. This is referred to in several emails, one in this response.

Brooks finished that work on September 3, 2013, and sent it to Amanda Cobb as requested. Then, Agate reneged on their agreement. Korjenek claimed not to have made that call in spite of the fact that Brooks told her he had records and witnesses of it. In addition, Brooks had the complete writeup of code, schedules, stored procedures, and guides for co-workers that he had written and sent to Cobb.

Agate, however, destroyed Brooks servers in spite of a spoliation letter. Again, note that documents is referred to in emails that Brooks still has.

This is when Agate really stepped up the harassment. Agate altered Brooks job classification from hourly to exempt Brooks was made a custodian from 5 or 6 AM until 8:30 AM. Then he worked as a DBA, programmer, and report writer until 8 PM or so, whenever Korjenek felt like leaving. Brooks had the choice of taking a taxi hone or sleeping on his cubical floor. This was routine enough that Brooks had a shaving kit, a sleeping bag and pillow in his filing cabinet.

Korjenek refused to allow Brooks to use a wheelchair and forced him to use a wheeled secretary's chair and a crutch as a pole to get around. On September 6, Cobb, or Korjenek, sent Brooks a "love letter" on the Facebook account Cobb set up for Brooks. Brooks brought that up to Woods and Cobb, along with the paperwork applying for Workman's Compensation on Thursday, September 12, 2013. They deleted it, but Brooks showed his wife and several friends who warned Brooks to be careful because they thought Cobb was dangerous.

Brooks called the US DOJ, ADA headquarters with a complaint about the harassment and refusal to granFMLA and Korjenek tearing up Workman's Compensation paperwork. That was on September 13, 2013. The following Monday morning, September 16, Brooks was called into HR and placed on administrative leave for what he was told was a secret complaint.

Brooks has emails were Brooks demands to know why Agate placed him on Administrative Leave:

> *Nanette,    I am both surprised and outraged at your letter to me last night. I had informed you, on at least two different occasions, of remarks by Ms. Cobb that I regarded as sexual and too personal. 1 was embarrassed and did not know what to make of them. On one occasion, she was fanning herself and claiming to have "hot flashes". On another occasion, she told me, in some detail about her sexual encountered with men she picked up at nightclubs. And, there was a Facebook comment on another occasion. Likewise, I have been, as recently as three weeks ago, someone Amanda confided in about her mothers cancer and the fact that it was due to a genetic disorder that she might have, herself, but that Agate's insurance wouldn't cover such testing.*
>
> *I want you to know, in each an every cases, and in several others, I reported those exchanges to others; mainly in an attempt to figure out what Amanda was "up to".*
>
> *Your characterization of Amanda's "rubbing up against me", shows a complete disregard for my comments. I checked them and, what I said was, Amanda sit next to me, smiled, and occasionally [and unwanted] touched me in an affectionate manner". That's a far cry from your report. I just hope you didn't report your mischaracterization,*

EXHIBIT 3
Page 16 of 30

*slanderous, remark to anyone else. I suspect I wont find that out, however, until I have you and them witnesses on the stand.*

*Likewise, characterizing Amanda's sitting across from me, "making big eyes", is a far cry from what I stated. What I said was, she made eye contact. Period. And did so often in what I regarded as a flirtatious manner that made me uncomfortable. If you are going to try and characterize what I say, please make some attempt at being accurate. I am keeping very careful notes, about everything being said by Agate in this and will go to any lengths to prove my innocence.*

*If Agate has contacted persons far beyond any in house interview, broken any laws, continues to slander me, be assured that I will find out and I will sue you. You have already defamed me, done damaged to my reputation, attributed remarks to me that don't even resemble anything I have said, and appear to have engaged in what a reasonable person might regard as a contrived and staged person attack to rid yourselves of an employee facing high healthcare costs, someone older. You created a hostile work environment, **have not addressed my own formal grievances**, nor even acknowledged them, contrary to Agate published policies, and you have shared whatever I say with others, have led some witnesses and intimidated others. This "investigation" is a sham, one resting on sand. It is neither accurate nor fair nor professional.*

*As for giving you more information, I will not. I simply don't trust you and I certainly don't trust your process. Everything about this appears to be contrived, right down to having me **write up a detailed report as to the code, location of the code, details on it, days to be run, etc. for all of my normal work effort, two full weeks before this still secret "complaint" was filed**. Coupled with repeated intrusions into my personal life and medical conditions, all of this give a very clear indiction of age and sex discrimination, and of a healthcare company that is **seeking to terminate a long term employee over healthcare concerns**.*

*I am in contact with my attorney's. Barring apologies and assurances that this will never happen to me or any other Agate employee in the future, it is my intention to bring this matter before Agate's Board, the EEOC, and, ultimately, to litigate this.*
*Mike Brooks*
*cc Terry Coplin*

Brooks had an MRI done on the crushed left foot on August 28, 2013. The results were phoned into Agate on September 9 by Dr. Cassell. Brooks brought that to the attention of Woods and Korjenek. They kicked him out of the office. Brooks was escorted to the backdoor and told not to return until he brought in the MRI and doctor chart notes.

Brooks was unable to obtain those until September 12. Brooks brought those to HR and Korjenek and demanded that Respondent pay for the necessary surgeries and medical treatment. Instead, the following Monday, September 16, 2013, Brooks was placed on administrative leave for a secret complaint that Agate refused to tell him about:

> *I was under the impression, from our meeting on Monday, that FaceBook was the crux of the matter. Now, evidently it isn't the case. I am extremely concerned that I don't even know the nature of the complaint, then, much less any particulars about it. Facing an accusation that you are being kept in the dark about is disconcerting and highly irregular.*

In spite of a later claim to the contrary, Nanette Woods demanded that Brooks log onto FaceBook on September 16, 2013, and show her everything on that. Brooks immediately noted that Cobb, who had set up that FaceBook account Brooks and all of her other employees, was missing. Brooks had an old email of Cobb accepting and extending a "Friendship" request. Brooks could not find that, but had a copy at home and sent it and the complete history of everything he had every written or posted on that account at 12:21 PM on September 16, 2013. (e.g. as soon as he arrived home, Brooks requested the entire FaceBook history and sent it to Woods. That history was accompanied by the following email message:

> *I found out how to forward this to you. I am, also, sending you the entire contents of my Facebook private activity log and the "hidden posts" log. The search for Amanda Cobb on Sept 12 was when she suddenly disappeared from my "friends" list. I couldn't figure out why and took a look to see if she had blocked me for some reason or other. She hadn't.*
>
> *Likewise, the Scabble games on September 6, were in response to games it appeared she had started with me. I was not, am not, familiar with the interface with Scrabble, and that could have been a misunderstanding. I deleted those games. That has been the sum total of my contact with Amanda outside of work in at least 6 months.*

And, finally, showing perjury and defamation by Respondent's counsel, Brooks would refer the Court to a hearing and decision before an Oregon Administrative Court on December 16, 2013. Brooks has both the recording and the transcripts for this, but Korjenek and Woods both testified and perjured themselves and were caught.

The judge issued her decision and Order on January 8, 2014. Judge Katlyn Monroe's Conclusion of Law is one sentence long: "**The claimant was discharged but not for misconduct**".

Respondent's paid a $40,000 bribe to governor Kitzhaber, the governor that was forced to resign for accepting bribes. Kitzhaber formed an illegal two member board to overturn that court decision. Brooks in not sure if it was Stoel Rives or Agate, but someone fabricated emails and that board's decision was written by Agate's own attorney, Carolyn  Walker!

One board member was a former state senator who's wife worked for Agate and who was friends with Agate executives. He was reportedly paid by Respondent.

The other board member was a Kitzhaber campaign staff member and aide to the governor.

That board, operated under a special charter that it "*need not conform to common law or statutory rules of evidence and other technical rules of procedure*". Either Agate or Stoel Rives falsifed emails dated between November 14 and November 19, 2012.

November 19 was the day Brooks saw two doctors for cancer treatment and a drug reaction that made it impossible for Brooks to work.

One thing to note is the date and subject line in the "chain" of emails Respondent assembled. The subject is always "ACA…again", referring to an ACA report that Cobb wanted Brooks to fix. The problem was a simply syntax error of substitution a retired TSQL inner join, $X *= Y$, for the new explicit requirement: X left inner join Y. Brooks has the actual email and code. This syntax is missing from the email Cobb supposedly sent to Brooks on November 14. The code attached to that email compiles and runs just fine. In other words, someone faked that email.

The code was fixed by Brooks on 11/15 at 2:27 and sent to Cobb. That was the working code and that was the end of the email used to overturn the Court decision. Aside from the fact that this was a year old, the code included works. It is NOT the problems code claimed in the email. As far as forensic evidence goes, this proves fraudulent created evidence.

Everything else was contrived. Brooks has looked at their email chain, which covers 11/14 through 11/19. It does not make any sense because even their fake email on 11/15 shows Brooks having fixed Cobb's coding problem. No one sane would keep the same subject line from Wednesday of one week through the following Monday. Brooks can understand the fake, but why would be have it predated in 2012, a year earlier? If Brooks had actually written that, why didn't they fire him? Brooks had just been assigned to work under Cobb in the Analytics Group and the conversation doesn't make sense.

And, finally, Woods and Korjenek lied when asked if they were advertising for a cheaper, younger,  H1-B visa worker to replace 66 year old Brooks. The said, under oath, they were not

and had not. Korjenek and Woods had placed an ad in beyond.com for an H1-B worker who was an expert with Impact Intelligence, C, C#, C++, etc. They literally used the job description Brooks was requested to write by Korjenek in a telephone call to his home on August 21, 2013. Korjenek had hired 26 year old Danish guest worker, Claus Søgaard Andersen, who was working at Trillium at the time of the court hearing!

In fact, Korjenek advertised for an H1-B replacement in October 2012 on melikesh1b.com after Brooks spoke out in a HIPAA staff training session. Brooks was upset that Respondent violated HIPAA by giving doctors and other medical providers "Hot Spotter" profiling and denying care to patients with costly medical conditions. They had killed a 4 year old girl with inflammatory bowel disease. Her pediatrician had referred her to Seattle Children's Hospital and Agate had approved that referral. Korjenek, practicing medicine without a license, found that Dr. Anna Stern had approved that referral. Korjenek ordered Dr. Sattenspiel rescind that approval. Dr. Sattenspiel told an entire group of fly tying students that.

That little girl was, then, denied care entirely by Korjenek and Respondent's until the disease ruptured her appendix and killed her. Brooks regarded, still regards this as homicide. Most people will and you can count on the Russian, Chinese, Arab press stressing that as a homicide.

Those Hot Spotter reports resulted in more than 23,000 patients without primary doctors. With no primary care doctor to write prescriptions for pain medication, hypertension drugs, or ask for referral, Agate kept the entire $650 per patient per month OHP payment rather than paying part of it to a primary care doctor. Respondent's were out of compliance with their Medicaid contract. When another DBA, Garrett Andres reported the same thing, he, too, was fired by Agate, and Stoel Rives threatened to destroy him, too.

Respondent's counsel misled this Court. They knowingly committed perjury and defamed Brooks in their submissions, counting on Brooks being so disabled that he would not be able to respond to their libel. Brooks is responding and Brooks wants Stoel Rives censured.

Brooks writes about this in his Writ of Certiorari, but it bears being stressed here because Brooks needs appointed counsel and accommodations and those have been denied by the federal courts.

Agate ruined Brooks' health. They denied him medical care and, worse, abused their position with the government to **prevent** Brooks from obtaining medical care. Least Respondent's counsel deny that,  Brooks has recordings by co-workers referring to that, phone records from a call from Nanette Woods at 9:33 AM after Brooks returned home, unaware of how severe the damage was, and an email from his supervisor, Amanda Cobb, inquiring why he was not at work with Brooks' reply to that explaining the injury and his going home on the orders of a nurse. Brooks has witnesses statements and medical records. **Respondent is an employer that deliberately harmed an employee and refused and prevented that employee for getting medical care.**

Brooks had to pay for surgery on the right foot, which was done on March 21, 2014, just to be able to walk with crutches. The left foot has never been attended to and Centene blocked Brooks from seeing a specialist for care (Dr. Simona Braun) after she advised that surgery was necessary.

The lower back injuries are severe -. "L4-L5, L5-S1; Anterior extension of disk material is seen which extends into the retroperitoneum at the level of the aorta and cava as seen on imagine #19". The spinal injuries are actually in two placed, which is why Brooks provided those MRI reports in the medical exhibits. The MRI of the lower back showed the disk had been damaged at Agate.

The spinal injury to the upper spine resulted from mistreatment and failure to provide accommodations. That resulted in damage to the Vegas nerve, atrial fibrillation, atrial flutter, bradycardia, loss of the swallow reflex, and several heart attacks. The damage to the mylin sheath resulted in multiple sclerosis. That would not have happened, however, without the feet and lower back injuries that happened at Agate Resources and were never treated.

Brooks was unable to stand for more than 60 minutes or so because of the foot and lower back injuries from 2013 on. Trying to accommodate for led to damage to the upper spine that was severe. That ended up destroying four disks and a vertebra in October, November 2017 while working on this case. The Court assigned Brooks printing out and sorting, then sorting the thousands of documents into single files and scanning them into individual PDF's. Thereafter Brooks had to write a detailed description of each document. These were all of the documents

stored in a locked office at Leiman and Johnson's Law Offices for copying and "safe keeping" on January 18, 2017:

> *...we believe it is time to collect your evidence and get it cataloged and ready for the next stages of litigation in your cases... We thought I could come out in my truck with some empty boxes and pick up what you've got and bring it to our office so we can start to get our hands around it. Sound good? [email from Drew Johnson, qui tam attorney, 1/18/2017]*

They were stolen from that office on September 10, 2017, by an attorney assigned to this case by the Court and Leiman and Johnson. That attorney, Marianne Dugan, gave all of those documents to Stoel Rives, who lied about having them to Brooks. Brooks has assuming that the Court did not know they had those documents, but there are reasons to doubt that now.

In any event, the Judge, ignoring pleads from Brooks and letters from Brooks doctor and the head of physical therapy at Sacred Heart Hospital, ordered Brooks to print, sort, scan, identify and categorize those 5.2 GB of PDF's (roughly 600,000 pages and 8,000 documents). Individual ODF's contained 10 to 30 files and oft times files resided on two or more PDF's.

Brooks was informa pauperis, something that Judge Jolie Russo simply ignored. A black toner cartridge for Brooks HP LaserJet 200 276nw printer costed $76 from amazon and printed 1500 to 2000 pages. Paper was $27 for 8 reams at Costco. Brooks racked up over $2000 in credit charges just to comply with an order by a Magistrate Judge, Jolie Russo, who presumably was furious because Brooks had opposed her assignment of this case because she was friends of Oregon Department of Justice Assistant Attorney Generals that had interfered with the investigation of Kitzhaber. Judge Aiken unsealed Brooks' objections in violation of the FRCP 73 privacy rules.

Brooks was facing sanctions and daily harassment from Stoel Rives, demanding reports on his progress. Brooks ended up in the emergency room on October 30, 2017, for lower back pain, on November 7 for severe back pain and a possible heart attack, to urgent care on November 3 and 13, for progressive paralysis of the left side and much pain. Brooks was sent toDr. Jose L.R. Sioco III, on November 3, 2017; at Wendy Lange, FNP, on November 7; Dr. Katherine Beckstrand on November 10; and Peter Lunger, PT, on November 16.

The problem is that no one believed how badly Brooks was injured. Centene was denying MRI's and X-rays and denying visits with specialists. This is why Brooks is adding one Spinal MRI imagine to this document.

Below is an MRI imagine taken on August 17, 2018, of Brooks upper spine and brain stem. Note the bulging disks that have cut off feeling and notice the torn mylin sheath. The sheath protecting the spinal cord is supposed to be intact and filled with fluid. Brooks' has been pierced, the fluid having leaked out and providing a route for the infection in the brain stem you see.

> *... MS, the sheath covering nerve fibers in the brain and spinal cord are damaged, slowing or blocking electrical signals from reaching the eyes, muscles and other parts of the body. This sheath is called myelin...Although several treatments and medications alleviate the symptoms of MS, there is no cure.*



Throughout all of this, Brooks and Dr. Arnsdorf have records. Centene, acting as the Benefits Administrator, blocked Brooks for treatment, they cut off physical therapy, and they denied Brooks' getting an MRI. Centene did this to Brooks.

Centene was appointed by Oregon as the Benefit Administrator for all public employees. Brooks wife is a school teacher and is insured under OEBB. Brooks had no choice. He was covered under he plan running from October 1 to October. Originally with MODA Health (and Stoel Rives are attorney's for MODA and MODA provably gave Reilley Keating Brooks appeals. Keating ran Brooks in circles by ignoring appeals, refusing to comply with HIPAA requests for information, and by hiding her involvement from Brooks and the court and "misrepresenting" it in declarations and filings.

In the ever changing excuses sent to Dr. Arnsdorf, Centene said they would only allow an MRI in certain conditions. On June 6, 2018, they wrote:

> Requested servicies: CPT72141 - Magnetic Resonance Imaging (MRI)...
> Service Provider:     WILLAMETTE VALLEY IMAGING
> Date(s) of Service:   6/21/2018
> Claim amount:         n/a
> After a careful review of the documentation provide by DR. ROBERT ARNSDORF, we regret to tell you that this kind of service is not covered for the following reason: Based on eviCore Spine Imagining Guidelines Section SP 1.1 General Considerations, we cannot approve this request. Your records show you have neck pain. They also show a request for a magnetic resonance imaging (MRI) scan of your spine...A MRI is supported for your type of pain if one of the following applies to you. One...Three, you had a recent tissue sample taken for lab testing (biopsy) result that was not normal. Four, you had a recent infection, Five, you have had a cancer in the recent past. Your records do not show that one or more of these apply to you.

Neck pain? Dr. Arnsdorf's Chart Notes, diagnostic codes, and authorization request refer explicitly to paralysis and loss of automatic reflexes. This is, by the way, the tenth denial. We requested formal appeals and, as we found later, Reilley Keating was also MODA's attorney and was ignoring those appeals in spite state and federal legal requirements for an independent medical review to be made when an appeal is requested.

Who would have ever thought a diagnosis for cancer would be a blessing. On May 4, 2018, Dr. Beckstrand noticed a strange growth on Brooks' head. She took a shave biopsy and it turned out to be invasive squamous cell carcinoma. Dr. Beckstrand referred Brooks to Sacred

Heart Dermotology for surgery and Centene kept blocking that. When Dr. Arnsdorf did a careful reading of the June 6 rejection he discovered "**had a recent tissue sample taken for lab testing (biopsy) result that was not normal**" and "**you have had a cancer in the recent past**". Dr. Arnsdorf demanded the MRI. MODA "approved" it, verbally, but Centene still would not authorize it. Dr. Arnsdorf tried to arrange for Oregon Imaging to do it and Centene simply refused to  authorize it. Dr. Arnsdorf found a small new independent business,  Willamette Valley Imaging, who received an authorization on August 16, followed by a denial, then another Authorization on August 17 and rushed Brooks in for an MRI before Centene could deny it again.

The results were four damaged disks, two with < 5 mm egresses that were causing the paralysis. Those records bear looking at because Brooks is requesting accommodations under the Rehabilitation Act, the ADA, the ADAAA and the UN International Covenant on Civil and Political Rights, ratified by the United States on June 8, 1992.

> *3. Each State Party to the present Covenant undertakes:*
> *(a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;*
> *(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;*
> *(c) To ensure that the competent authorities shall enforce such remedies when granted.*

The MRI of the neck showed four damaged disks with an egress < 5 mm. That went on for a full year, which led to a brain infection. The spinal sheath was ripped and Vegas nerve was impacted. The torn mylin sheath led to Brooks' developing multiple sclerosis:

> *... in MS, the sheath covering nerve fibers in the brain and spinal cord becomes damaged, slowing or blocking electrical signals from reaching the eyes, muscles and other parts of the body. This sheath is called myelin...Although several treatments and medications alleviate the symptoms of MS, there is no cure.*

Brooks was permanently disabled by a legal system that failed him. Brooks has, at best, been crippled for the remainder of his life. Brooks cannot sit up for more than ten minutes or so without spinal compression causing atrial flutter alternating with atrial fibrillation alternating

with bradycardia. Essentially, as the records submitted with his Writ of Certiorari show, Brooks' a.flutter with Ventricular Rate will be 85 BPM when the Atrial rate will be 416 BPM, then switch to a. Fibrillation with 89/250, and them switch to a 36 BPM where Brooks passes out. The last time Brooks passed out was April 13, 2021. Brooks often passes out when he works on these legal papers because he pushes himself beyond 15 minutes of sitting, which is all it takes.

Brooks has to take Xarelto to prevent strokes, but that causes bleeding problems. The falls always result in damage to the head and face. Doctors fear that one day a fall will result in internally bleeding out.

Among the ongoing assaults by Respondents on Brooks, another recent one needs to be talked about. Centene as has been previously mentioned was the Benefits Manager for MODA. Brooks' wife switched insurers to Kaiser to avoid them. Well, "Trillium" was the Benefits Manager for Kaiser until very recently when they were fired.

For example, as recently as January of this year, "Kaiser" suddenly terminated Brooks prescriptions for Xarelto and Metoprolol. They did this without communicating with Brooks' doctors. The cardiologists had to get an emergency script for Xarelto because Brooks has both "atrial flutter with varying block" and "atrial fibrillation with premature ventricular or aberrantly conducted complexes" . That already resulted in two heart attacks and Centene full well knew that suddenly stopping Xarelto:

> *High Risk of a blood clot or a stroke, headache, fatigue, dizziness, lightheadedness, easy bruising, back pain, nausea, heart palpitations, high blood pressure, muscle weakness, and dry mouth*

Brooks was told by both the pharmacy manager and by the head of Customer Services at Kaiser that this was done by "Trillium", who is actually Centene. She did not know the names of the people that did this but she had first hand information that "Trillium" had switched Brooks prescription from Xarelto to Pradaxa because Brooks cardiologists had called her and told her that this switch had a high likelihood of killing Brooks and she had to find out why the change had been made in the first place. She was angry when it was done twice by Trillium, in December 2020 and, again, six weeks later in January 2021.

It's beyond imaginable, but Kaiser literally had to place a flag on my account because Centene was still trying to alter the assigned provider, and drugs as recently as  They terminated working with Trillium over this January (and found someone from there messing with Brooks' prescription records in March of this year!) . It is impossible for Brooks to imagine that Stoel Rives would not know about this, too. When they found out about Brooks spinal injuries in November 2017, they abrogated an agreement to include Brooks information in a joint status report due the next morning.

Stephen Galloway did that at 4:41 PM on November 14, 2017:

*Our section of the status report represents our point of view regarding the status of the dispute, and your section represents yours. We stand by everything we have written, but if you disagree with any of our statements or feel we have omitted anything important, please note that in your section.*

Brooks replied at 5:09

*Oh, I see what you did. Excuse me. By telling you that I was serious ill, you waited until 2:30 on the day before the Joint Status Report was due, before filing it. Nice. Well, I will be up all night working on this and will email it to you when I am done. That will not likely be until sometime tomorrow afternoon. I will take it to the court, with my letter, our entire email chain, and a response to your motion objecting to the interlocutory appeal. I have learned to never trust you, again.*

That cost Brooks the use of his left hand and his involuntary swallow reflex. Brooks lost those around 3 AM in the morning of November 15, 2017. Brooks worked through this and finished his part of the Status Report and took it to the federal Court House.

That swallow reflex has meant that Brooks has not slept in a bed since 2017. Brooks can drown on his own saliva when he lays down. Brooks "sleeps" in a recliner or propped up in a semi-sitting position with pillows. Harassment by Stoel Rives caused this.

(1) Brooks requests that this Court order the Federal Bureau of Investigations to investigate this entire situation. It should be that hard to interview Brooks and find he is telling the unvarnished truth. From there, they could interview the witnesses Brooks has provided; especially former Stoel Rives attorney Brianna Bridegum, Ryan Gibson, and Carolyn Walker about the Dugan burglary.

From there the FBI could investigate and arrange for the criminal prosecution of Centene, Agate Resource's executives and insiders, the state of Oregon. This matter is serious and no one should be permitted to lie or harm anyone else. This needs to stop here.

(2) Brooks asks that the "Protective Order" be declared unlawful and void and that Brooks be permitted to do his duty by notifying the governments of foreign nationals who were victims of Agate-Centene's criminal Acts. Brooks also intends to contact the US Congress with this.

(3) Brooks asks this Court set aside any statute of limitations or time bars where the District Court's Protective Order caused victims to miss filing deadlines.

(4) Brooks asks that this Court to set aside any decisions entered by the District Court in closing both the wrongful termination or False Claims Act cases.

In the former case, Judge Aiken acted out of spite for Brooks filing complaints against her Magistrate Judge cronies Russo and Kasubhai. Brooks provides ample evidence of wrongdoing by "someone" in the District Court unlawfully communicating and assisting "defense counsel" and unlawfully denying Brooks discovery, accommodations under US and international law and ordinary decency.

The District Court operated outside the law in the qui tam case by ignoring citations of Cochise Consultancy Inc. v. United States, ex rel. Hunt and demanding ever more current evidence. The District Court permitted misrepresentation by "defense counsel" where they lied about Brooks' expertise and about the actual meaning of CPT codes. The Court ignored the criminal intervention of Jeffrey Wertkin, Neil Evans, Kevin Burke, and possibly District Judge Ann Aiken in that case, also. Brooks was prohibited from filing an appeal based on fraud by the district court, just as he was blocked from filing appeals by the District Court.

(5) Brooks filed a spoliation letter and with the District Court and Stoel Rives when he was required to give them the evidence he had. Brooks wants all of that, **plus** everything Marianne Dugan gave them, returned to him and Brooks asks that they be made to account for any persons or agencies that they shared that information with.

(6) Brook, then, wants permission to speak with lawyers about filing class action suits and forcing CMS to fine Centene and Agate for HIPAA violations. Brooks estimates the

minimum amount of fines at $1005 billion, sufficient to put these corrupt companies out of business and impoverish the corporate officers, board members and shareholder insiders.

(7) Brooks asks that Stoel Rives be disqualified and that Stoel Rives be prohibited from practice before the federal courts for at least 12 months.

A. Brooks asks for the immediate payment of any and all medical and living expenses.

B. Brooks wants all medical bills stemming from his injuries at Centene-Agate-Trillium be paid in full. This will include prescription drugs, wheelchairs, crutches and other DME as prescribed by Brooks' doctors.

C. To that end, Brooks asks for a permanent Protective Order against Centene and any of their staff, experts, or other hires to cease attempting to harm Brooks or interfering with his medical care

D. It is too late for Brooks to be able to walk and use his left foot, and he is too frail to undergo surgery for the damaged lower back, and so Brooks wants lifetime access to swimming pools wherever he resides, so he can do water walking and retain some semblance of mobility

E. Brooks wants access to retinal surgeons to see if the sight in his right eye can be restored and the special eyeglasses necessary to restore vision sufficient for reading a book be made available

F. Brooks requests that Respondent's be required to immediately purchase Brooks a New Toyota Tundra pickup truck handicapped equipped with a towing package and the handicap 25 foot Airstream International trailer so that he might have a place to stay. Brooks has nothing and 8 years of being denied medical care and money has taken its toll. It is obvious that Brooks was injured on the job, that Respondent both denied and prevented medical care, and serious harmed Brooks. The least this Court can do is to order medical care and a safe place for Brooks to live.

G. Brooks asks for the assistance of this Court in arranging with the US Department of Justice to pursue the False Claims Act, Sarbanes Oxley criminal, and HIPAA actions against Agate Resources, Trillium, Centene, HealthNet, Providence, and their present and former executives. Brooks wants nothing from that, but would like to see any reward entered into

and managed as a legal fund for victims of medical profiling. Brooks law firm tasked with managing that be chosen by the Chief Justice of this Court.

H.   Brooks asks that Stoel Rives and all of their witnesses be disqualified from this case and from the False Claims Act case.

I.    Brooks asks that all current and past attorneys for Respondent in Brooks' False Claims Act and Wrongful Termination cases be subject to public censure and be prohibited from practicing before the federal courts for a period on not less than 12 months.

J.   Brooks wants a new trial in a new venue, outside of the 9th Circuit, for his wrongful termination suit. Brooks suggests the 10th Circuit because he has family in Utah that can assist him. Brooks asks for expert counsel to be paid for by Stoel Rives (based on the evidence of wrong doing he introduced in the Writ of Certiorari). If Brooks passes due to his injuries, Brooks asks that this case proceed and that any winnings be distributed equally between his spouse and children.


Thank You, Respectfully,



Michael T Brooks
Plaintiff in Pro Se
32713 Vintage Way
Coburg, Oregon 97408